## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

### Case No. 20-cv-60719-WPD

| |
|---|
| ITAMAR MEDICAL LTD., |
| Plaintiff, |
| v. |
| ECTOSENSE NV, and VIRTUOX, INC., |
| Defendants. |

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Itamar Medical Ltd. ("Itamar") brings this second amended complaint against Ectosense *nv* ("Ectosense") and VirtuOx, Inc. ("VirtuOx," and together with Ectosense, "Defendants") for trademark infringement, unfair competition/false designation of origin, and false advertising in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq*., and unfair competition, deceptive trade practices, and trademark infringement under Florida law. Itamar alleges, with knowledge concerning its own acts and on information and belief as to all other matters (unless otherwise specifically stated), as follows:

### INTRODUCTION

1.      Itamar is a medical device company that develops, manufactures, and sells, among other products and services, home sleep apnea tests ("HSATs") that use Itamar's proprietary PAT® technology. Itamar's PAT® technology allows for the non-invasive measuring, recording, and analysis of the peripheral arterial tonometry ("PAT") signal to diagnose, among other things, sleep apnea. Itamar coined the term "peripheral arterial tonometry" in or around 1997 and introduced this measurement to the medical field. Itamar then

used the related acronym (PAT®) to identify itself as the source of all products that incorporated its proprietary PAT® technology and could measure the "PAT" signal detected by its devices. Not surprisingly, consumers and those in the medical industry have come to exclusively associate the PAT® mark, PAT® based technologies, and "PAT" signal measurements with Itamar, the originator of this term, technology, and related devices.

2.      Itamar's product line includes the WatchPAT® 200, WatchPAT® 200U, WatchPAT® 300, WatchPAT® ONE, and Endo PAT® devices, as well as its CloudPAT® digital health platform.  Itamar's devices use PAT® technology not only with HSATs, but also to measure various bodily functions and assist with the diagnosis of a wide range of medical conditions.  For example, Itamar's devices can evaluate a patient's endothelial functioning, measure the cardiovascular effects of pharmacological agents, measure blood pressure and blood flow, and serve as a diagnostic marker in exercise stress tests.

3.      Ectosense has promoted a home sleep apnea test, known as "NightOwl," through false and misleading advertising and promotional materials that have harmed and continue to harm consumers and Itamar's sales of HSATs.

4.      One of Ectosense's distributors, VirtuOx, has also engaged in harmful false and misleading advertising in promoting both the NightOwl device and another device, the "EZ Slep," that it claims uses PAT® technology.

5.      Defendants' unfair competition and false and misleading claims have also infringed Itamar's federally protected intellectual property rights and harmed Itamar's goodwill and legitimate business enterprises.

6.      By this action, Itamar seeks to put a stop to Defendants' unlawful conduct and obtain compensation for Defendants' violations of federal and state law.

## THE PARTIES

7.      Itamar is a limited corporation, with its principal place of business in Caesarea, Israel.

8.      Ectosense is a Belgium-based company (Naamloze Vennootschap).

9.      VirtuOx is a Florida corporation with its principal place of business in Coral Springs, Florida.

## JURISDICTION AND VENUE

10.     This is a civil action alleging trademark infringement, unfair competition and false designation of origin, and false advertising under the Lanham Act, 15 U.S.C. §§ 1114(a), 1125(a); and unfair competition, deceptive trade practices, and trademark infringement under Florida common law.  Pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1338(a), this Court has subject matter jurisdiction over Itamar's claims for relief for violation of the federal trademark and unfair competition statutes.  Pursuant to 28 U.S.C. § 1338(b), this Court has supplemental jurisdiction over Itamar's state law claims because those claims are joined with substantial and related claims under the Lanham Act.  This Court also has supplemental jurisdiction over Itamar's state law claims pursuant to 28 U.S.C. § 1367(a) because all of Itamar's claims arise out of a common nucleus of operative facts.

11.     This Court has personal jurisdiction over Defendants because Ectosense distributes its products in the United States through various distributors, including VirtuOx. VirtuOx resides and maintains offices in this District and conducts business in this State, including within this District.  Ectosense has also conducted business in the State of Florida, and both Ectosense and VirtuOx have attempted to derive financial benefits from residents of the State of Florida, including by marketing the NightOwl product to residents of the State of Florida, including within this District.  Ectosense conducted and completed a U.S. validation

study, titled "A Validation Study of the NightOwl PAT-based Home Sleep Apnea Test," involving over 100 participants, in this District.  Moreover, Ectosense has promoted and continues to promote its NightOwl product through at least three websites accessible in Florida: *www.ectosense.com*, *www.elitedental.com.sg/wp-content/uploads/2019/09/Ectosense-NightOwl.pdf*, and *www.elitedental.com.sg/snoring-obstructive-sleep-apnea*.  Additionally, after receiving U.S. Food & Drug Administration ("FDA") clearance, Ectosense engaged in additional distribution of printed and electronic marketing materials through its U.S. distributors, including VirtuOx, and contacted a variety of doctors, dentists, and others that may use HSATs to serve their patients, including medical providers within the State of Florida and this District.

12.     Venue in this Court exists under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Itamar's claims occurred in this District.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### Itamar's Trademarks and Products

13.     Itamar was founded in 1997 under the laws of the State of Israel, and it is a publicly traded company, including on the Nasdaq Capital Market.  Itamar is a medical device company that develops, manufactures, and sells various products that use Itamar's proprietary PAT® technology.  The company (and through its subsidiaries) markets, distributes, and services its products worldwide, including throughout the United States and within this District.

14.     In or around 1997, Itamar coined the term "Peripheral Arterial Tonometry or Tone" to describe a signal that its new technology could measure and report to aid in the detection and diagnosis of a wide range of medical conditions.  Itamar then also coined the related acronym (PAT®) to identify itself as the source of products incorporating this ground-breaking technology.  As the progenitor of this term, acronym, and technology, Itamar and its

4

products have been and continue to be exclusively associated with all uses of the PAT® mark,

"PAT" term, and Peripheral Arterial Tonometry or Tone terms for the last two decades.

15.     Indeed, Itamar has defined and established the meaning of the term "PAT" based

on the special measurement conditions required, as well as the physiological rationale of those

requirements, to properly measure "PAT" signals.  Top-tier, peer-reviewed medical journals

have recognized and published the description of "PAT" as defined by Itamar.  For example, in

2000, the highly regarded journal Nature Medicine provided the following description of the

"PAT" measurement and how it differs from other pulse measurement methods:

> Using a new plethysmographic technique to measure peripheral
> arterial tone (PAT), we report here that REM sleep in humans is
> associated with considerable peripheral vasoconstriction.  The
> apparatus is essentially a plethysmograph that, unlike models now
> available, is able to envelop the finger up to and beyond its tip with
> a uniform pressure field.  The applied pressure field is sufficient to
> substantially unload arterial wall tension, thereby improving the
> dynamic range of the system, while preventing the potential
> occurrence of venous engorgement that promotes vasoconstriction.

16.     These special requirements mean that the "PAT" measurement, as defined by

Itamar, is a unique method, and it is distinct from other pulse measuring methods that do not

apply the basic requirements for accurate "PAT" measurement as established by Itamar.  In other

words, Itamar's PAT® devices are fundamentally different from other devices that do not

envelop the finger (or relevant body part) up to and beyond its tip, in a uniform pressure field,

thereby preventing venous pooling in the measured tissues.  The presence of this pressure field

(and the corresponding absence of venous pooling) is a critical feature of all PAT® based devices

and technologies.  These differences are critical to distinguishing between PAT® based devices

and the technologies underlying other devices.

17.     Patenting authorities have likewise found Itamar's "PAT" measuring methods to

be innovative and inventive, and assigned patent rights (including patents with "Peripheral

Arterial Tone" in the title) to Itamar for measuring "PAT." For example, in November 2001, the United States Patent and Trademark Office granted the following patents based on the methods and apparatus for measuring "PAT":

**United States Patent 6,319,205**: Method and apparatus for the non-invasive detection of medical conditions by monitoring peripheral arterial tone.

**United States Patent 6,322,515**: Method and apparatus for the non-invasive detection of medical conditions by monitoring peripheral arterial tone.

18.    Consistent with this widespread association of the PAT® mark, "PAT" measurement, and PAT® technologies with Itamar, the company has obtained extensive trademark rights in a family of PAT® derivative marks, including the following:

| Trademark | Class:  Goods/Services & First Use Date | Reg. No. and Date |
|---|---|---|
| PAT® | Class 10:  Medical apparatus, namely, non-invasive, diagnostic units used to assess and measure body functions and states and physiological conditions which affect the vasculature<br>First Use: 1997 | 3,870,786<br>November 2, 2010 |
| Endo PAT® | Class 10:  Medical apparatus, namely, non-invasive, diagnostic units used to measure vascular function and diseases and states and physiological conditions involving the vasculature<br>First Use: 1997 | 4,026,328<br>September 13, 2011 |
| WatchPAT® | Class 10:  Medical apparatus, namely, non-invasive, diagnostic units used to assess and measure body functions and states and physiological conditions which affect the vasculature<br>First Use: Jan. 9, 2003 | 4,660,354<br>December 23, 2014 |
| CloudPAT® | Class 42:  Providing temporary use of web-based cloud computing software for managing the diagnosis and treatment of sleep apnea<br>First Use: Aug. 2011 | 4,958,825<br>May 17, 2016 |

19.    The above marks are collectively referred to as the PAT® Marks. The above registrations are collectively referred to as the PAT® Registrations.

20.     Itamar's registrations for the PAT® and Endo PAT® marks are incontestable pursuant to 15 U.S.C. § 1065, which constitutes conclusive evidence of the registrations' validity, as well as Itamar's entitlement to the exclusive use of the marks in commerce throughout the United States on the goods listed in the registrations.  Further, the PAT® Registrations constitute prima facie evidence that the marks are valid, and that Itamar is entitled to the exclusive use of the marks in commerce throughout the United States on the goods and services listed in the registrations.

21.     Itamar also uses additional variations of its PAT® Marks, including the following marks used as product names:  the WatchPAT® 200, WatchPAT® 200U, WatchPAT® 300, WatchPAT® ONE, Endo PAT®, and CloudPAT® (a digital health platform that supports the use of some of these devices).  All of these products (other than the CloudPAT® digital health platform) use Itamar's proprietary PAT® technology to enable simple, accurate, and reliable sleep apnea testing without the discomfort of traditional in-lab sleep apnea diagnostic testing.

22.     The terms "peripheral arterial tone or tonometry" were used twice in 1990 and sporadically in 1993, without becoming a common term.   Extensive use in relation to Itamar's PAT® based devices started in 2000, as demonstrated by hundreds of usages in more than 500 publications, including in peer-reviewed medical studies published in medical magazines, all of which refer to Itamar's PAT® based technology and products.  These publications did not use these terms in a generic manner or in a manner indicating that these terms or technology are commonplace in the market or originated from manufacturers other than Itamar.  Only in October 2018 did one study (promoted by Ectosense) refer to Itamar's PAT® technology in relation to Ectosense's NightOwl device, clearly attempting to trade off Itamar's achievement of

the American Academy of Sleep Medicine ("AASM") guidelines adopting Itamar's PAT®

technology in 2017.

23.     Through careful cultivation of the various products offered under the PAT® Marks

and variations of these marks, the PAT® Marks have developed an outstanding reputation in the

medical community, become well-known, and are recognized as identifying Itamar as the source

of all PAT® technology based products.  Thus, Itamar has extensive common law rights in its

family of PAT® Marks.

**Defendants' Deceptive and Infringing Activities**

24.     Ectosense is a digital health and medical device company focused primarily on

sleep disorders.  Ectosense sells, promotes, and markets its product in the United States through

various distributors, including VirtuOx.  The actions and statements of Ectosense's U.S.

distributors were and are all authorized, approved, and/or ratified by Ectosense, and so

statements made by any such distributor will be attributed to Ectosense below.

25.     VirtuOx is a medical technology services company that provides diagnostic tools

and services, including Ectosense products.  In addition to the NightOwl product, VirtuOx

markets and sells at least one other product, the EZ Slep, that it represents as using "PAT

Technology" and markets as comparable to Itamar's WatchPAT ONE® device.

26.     Defendants have marketed and are actively marketing the NightOwl product in

the United States, Europe, and Singapore as a home sleep apnea test.  In an effort to usurp the

goodwill associated with the PAT® Marks and trade off Itamar's reputation, as well as mislead

and confuse consumers, Defendants have made blatant, unauthorized use of the PAT® Marks and

misleadingly described the NightOwl and EZ Slep products as "PAT device[s]" that feature

"PAT Technology" and  "PAT-based technology," even though they are not such devices and do

not feature such technology.

27.     Rather than moderate their unlawful conduct after the filing of the original Complaint in this suit, Defendants have instead launched a "shock and awe" marketing campaign to target Itamar's customers, confuse potential customers, and flagrantly violate Itamar's longstanding rights in the PAT® Marks.  This is not hyperbole:  Defendants have publicly stated that they are engaging in a "shock and awe" marketing campaign geared towards the U.S. market.  Accordingly, Itamar updated its first Amended Complaint to allege some of the unlawful activities involved in this "shock and awe" campaign, but there is expected to be much more malfeasance—and harm—that remains unknown to Itamar at this time and will be uncovered through discovery.

28.     As just one example of Defendants' misconduct, Defendants describe the NightOwl and the EZ Slep as "PAT device[s]" that "use[] the same tech as Itamar."  (From all appearances, the EZ Slep product is the same as the NightOwl product, just with a different name.)  That is false and misleading.  The devices use photoplethysmography ("PPG") technology, which is designed for oximetry to measure a patient's relevant vitals.  Specifically, the NightOwl uses "a 50Hz optical reflective sensor [that] shines light onto the finger and from the intensity of reflections determines, among other parameters, the oxygen saturation level of the blood."  The devices, shown below, are secured to the fingertip of the patient via a small elastic band.  This is ordinary PPG technology, which is a low-cost alternative to Itamar's PAT® technology.




29.     Itamar's PAT® technology, on the other hand, represents a unique method of acquiring plethysmography.  The common feature in PAT®-based plethysmography is the use of a clearly-defined, multi-featured pressure field applied around and enclosing the measured organ (e.g., a patient's finger), which is specifically designed to physiologically condition and optimize the signals.  The plethysmographic technologies that preceded Itamar's PAT® technology could not attain the same objectives as this PAT® technology because previous designs could not apply a near diastolic pressure that covered the measured tissues without causing the patient's finger to be pushed out of the probe by the pressure being applied to it at its distal end.  Itamar's PAT® technology allowed the desired level of pressure to be applied to the entire fingertip of the patient, without the pressure ejecting the patient's fingertip from the device.  For reference, Itamar's WatchPAT® 300 device appears as follows:



30.     Unlike Itamar's devices featuring PAT® technology, the Defendants' devices do not apply any sort of pressure field to the distal end of the finger, meaning there is no possibility of preventing venous pooling, as Itamar's PAT® technology requires.  In fact, the design of the Defendants' products promotes venous pooling.  Tellingly, Defendants know that the NightOwl

device does not provide a "PAT" measurement, as reflected in the analytic report produced by

the product, which includes no mention of the patient's "PAT" measurement.  As the NightOwl

device does not apply PAT® technology nor provide any of the functional characteristics

necessary for a "PAT" measurement, it cannot therefore provide an accurate "PAT"

measurement, as defined in Itamar's patents and published papers.  Accordingly, NightOwl does

not measure "PAT" and it is not "PAT-based."

      31.    More problematically, Defendants' marketing campaigns have misled and

deceived consumers about the limited capabilities of the NightOwl product as compared to

Itamar's products to their benefit and Itamar's detriment.  For example, Defendants have

highlighted the lightweight and small size of the product compared to Itamar's products, which

they are able to achieve by using PPG technology, not PAT® technology.  Ectosense stated that it

is "immensely proud of the fact that our device is finger-tip sized, completely self-contained,

[and] requires no external wristworn device common to our competitors."  This is a clear

reference to Itamar's products, which have a "wristworn device" (as shown above) so that they

can, *inter alia*, obtain secure and uniform pressure around the patient's finger, which is critical to

an accurate "PAT" measurement.  But, of course, the NightOwl product does not provide such

uniform pressure because it does not take a "PAT" measurement or use PAT® technology.

Rather, it uses PPG technology as described above.  This allows it to be a much smaller product.

      32.    Defendants highlight that the NightOwl product is a "PAT device" that "uses the

same tech as Itamar" when attempting to steal away Itamar's customers, but then focus the

attention of other consumers on the small and lightweight nature of the NightOwl product, which

they explain was achieved by using PPG technology.  But, Defendants cannot have it both ways:

The NightOwl product cannot be a "PAT device" using Itamar's technology when it suits

Defendants, and then be a PPG device using PPG technology that is so much smaller and more lightweight when compared to competitive devices that use an "external wristworn device" to obtain an accurate "PAT" measurement (i.e., Itamar's devices).  Defendants cannot magically change the underlying technology powering the NightOwl product depending on the audience, but they persist in such false and misleading conduct as part and parcel of their "shock and awe" campaign designed to target and harm Itamar.

33.     As further evidence of Defendants' selective and misleading marketing of the NightOwl and EZ Slep products, they have also opportunistically used the PAT® Marks to attract consumer attention when Itamar and its products have garnered recognition or made changes in relevant medical practices.  For example, NightOwl's operation manual in Europe previously used the term "PPG" and not "PAT" when describing the underlying technology.  After the AASM guidelines adopted "PAT" measurements as an acceptable method in 2017, however, Ectosense began using the term "PAT" on its product even though the NightOwl does not contain PAT® technology.  Ectosense's opportunistic use of the PAT® Marks is an attempt to free ride off the AASM guidelines achieved by Itamar and the associated focus on Itamar's PAT® technology.

34.     At two recent annual meetings focused on sleep issues, materials were distributed and information was presented containing false and misleading statements about the NightOwl product.  At the American Academy of Dental Sleep Medicine annual meeting, which took place from June 7 to 9, 2019, in San Antonio, Texas, Ectosense presented information and distributed materials about the NightOwl product that contained false and misleading statements, including statements that the product was "[b]ased on Peripheral Arterial Tonometry" technology.

35.     Immediately following that event, Ectosense continued providing false and misleading information about the NightOwl product.  At the SLEEP annual meeting, which took place from June 10 to 12, 2019, the materials again represented that the NightOwl product was "[b]ased on Peripheral Arterial Tonometry" technology.

36.     Defendants have repeatedly made similar false and misleading statements regarding the technology underlying the NightOwl product.  For example, promotional materials state that the NightOwl product is based on "PAT" technology or is "PAT-based."  However, the NightOwl product uses PPG, not "PAT" technology.

37.     The front page of the NightOwl brochure claims that the NightOwl is a "PAT-based HSAT according to AASM guidelines."



However, the AASM guidelines for HSATs include PAT® technology as technically adequate when combined with oximetry and actigraphy, but they do not include HSATs based on oximetry or PPG, with or without actigraphy, which is all that is provided by the NightOwl.

38.     The AASM guidelines also require that a "PAT" based device report rapid eye movement ("REM"), which the NightOwl product does not do.  The false statements that the NightOwl product qualifies as a "PAT-based" device according to the AASM guidelines misleads physicians and potential consumers to believe that the NightOwl reports REM as part of its analysis, which it does not.

39.     The NightOwl Instructions For Use also claims that the product diagnoses sleep apnea "based on an analysis of the peripheral arterial tone ('PAT')," and that the product "generates a diagnostic report containing information on . . . the presence or absence of a substantial change in peripheral arterial tone (PAT)."  However, the NightOwl measures only basic PPG and does not provide a "PAT" measurement.

40.     The frequency and intensity of Defendants' unlawful conduct is only going to increase and become more problematic as time passes.  As part of the Defendants' "shock and awe" marketing campaign to invade the U.S. market, Defendants have also recently begun distributing marketing materials promoting the NightOwl product to "physicians in all 50 states" and have claimed that the "multi-use Disposable Home Sleep Apnea Testing HSAT" device is "now shipping."  Among other things, the marketing materials state:  "Dentists are provided with NightOwl® Home Sleep Apnea Testing (HSAT) devices on consignment (no need to purchase expensive HSAT devices again) to send home with their patients."  The marketing materials provide the contact information for the three locations of Ectosense's distributor VirtuOx:  Coral Springs, Florida; San Francisco, California; and Washington, D.C.  The longer this distributor is allowed to operate by misleading and confusing consumers, the more harm that Itamar will suffer.

41.     Indeed, Defendants have become more aggressive in their marketing and attempts to trade off Itamar's goodwill.  A recently distributed pamphlet compares the EZ Slep product to Itamar's WatchPAT® devices, and when distributing this pamphlet VirtuOx and falsely stated that the product "uses the same tech as Itamar."  VirtuOx also stated, among other things, that the product is "a PAT device," and that the "MSRP is $100 for 100 hours," while the "WatchPat is about $75-85 for 1 night test."  The EZ Slep brochure also prominently displays the following

graphic directly contrasting Defendants' product with Itamar's WatchPAT ONE®, and explicitly states that the product contains the same "PAT Technology" used in the WatchPAT ONE® product, even though it does not:



42.     Defendants' malfeasance is not just limited to written promotional materials. Both Ectosense and VirtuOx have an army of salespeople and distributors that are aggressively — and misleadingly — peddling the products throughout the United States.  For example, the president of VirtuOx has been in frequent communication with a home sleep apnea supplier based in the United States, claiming that the NightOwl product is an economical replacement for Itamar's WatchPAT® devices.  Yet, it is not a replacement as these are two fundamentally different products that utilize different technology.  Itamar is unaware of all the oral misrepresentations and false statements made by Defendants' salesforces in their concerted efforts to steal away Itamar's clients and mislead potential consumers, but it expects that discovery will uncover a variety of falsehoods and actionable conduct.

43.     The NightOwl advertisements reference the Common Procedural Technology ("CPT") code 95800, which requires the use of "PAT" or Airflow in the patient's treatment. Because the NightOwl product uses PPG technology, Defendants' use of the CPT code 95800

for the NightOwl product is false and misleading, as it implies that the NightOwl employs PAT®
technology.

44.     In short, Defendants are attempting to benefit from the acceptance and use of
PAT® based technology by medical professionals and consumers by making false and misleading
statements that the NightOwl and EZ Slep products are based on PAT® technology and qualify
as a "PAT-based HSAT according to AASM guidelines."  Itamar has used its PAT® Marks,
including the PAT® mark, for over two decades to identify and promote its sleep apnea devices
and other medical devices.  Defendants' use of the term "PAT" on promotional materials for the
products will confuse consumers regarding the origin of the products, Itamar's sponsorship of the
products, and the similarity between the products and Itamar's products, including the
WatchPAT® product.  Defendants' use of the "PAT" term— including in presentations at
conferences in the United States, distribution of materials at conferences in the United States,
promotion of products on websites accessible in the United States, and marketing of the
NightOwl in the United States after recently receiving clearance from the FDA to market the
NightOwl—has led and will continue to lead consumers to forego purchasing Itamar's products
to purchase these products, thus diverting sales from Itamar and causing consumers and Itamar
substantial harm.  This pervasive and unauthorized use of the PAT® Marks has also harmed, and
will continue to harm, the goodwill and reputation of these marks and cause irreparable damage
to Itamar.

45.     Indeed, Defendants are actively approaching Itamar's current customers (both
within the United States and around the world) and offering what they falsely claim as the "PAT-
based" NightOwl product as a replacement for Itamar's products, which are actually based on
PAT® technology.  Defendants have provided NightOwl devices for piloting to Itamar's

prospective and current clients.  For example, Ectosense provided the NightOwl product for

piloting to two hospitals in the Netherlands while both hospitals were in the process of

evaluating Itamar's WatchPAT® product.  Ectosense also provided the NightOwl product for a

pilot to a primary care company that is already using Itamar's WatchPAT® product as part of a

large commercial activity with Itamar's client in the Netherlands.  Additionally, Ectosense has

recently attempted to gain a larger foothold in the European market for the NightOwl product by

referencing its first dental sleep client in the United Kingdom and Ireland.  Itamar has received

multiple communications from clients stating that Ectosense has been attempting to increase its

foothold in Australia and Asia and has been actively seeking distributors for the NightOwl

product in Asian markets, including Malaysia and Singapore.

   46. Ectosense recently touted its FDA clearance in promoting its NightOwl product

outside of the U.S.  Ectosense's Electronic System Design Engineer stated publicly that

"[Ectosense has] long been trying to convince doctors that the NightOwl is as effective at

detecting sleep apnea as some of the more traditional and clunky equipment used in medical

sleep labs."

   47. Defendants' misstatements are misleading to consumers, physicians, and the rest

of the marketplace.  Defendants' statements are knowingly false, specifically designed to harm

Itamar's goodwill, and derive an illegitimate commercial benefit by passing off the NightOwl

and EZ Slep products as "PAT-based product[s]" and products that use "PAT Technology,"

thereby diverting sales of Itamar's valid PAT® products to sales of the NightOwl and EZ Slep

products.

### Harm to Itamar Caused by Defendants' Activities

   48. Because of Defendants' wrongful conduct, Itamar was forced to retain counsel

and incur fees and expenses (and continues to incur fees and expenses).  On August 7, 2019,

Itamar's counsel sent Ectosense a cease and desist letter that informed Ectosense of its unlawful conduct arising out of its false and misleading marketing and deceptive trade practices. Itamar explained that it would take legal action if Ectosense failed to stop issuing false and misleading promotional materials and making sales efforts based on those deceptive materials, and also if Ectosense failed to stop infringing Itamar's trademarks, including the PAT® mark. On November 8, 2019, Counsel for Ectosense responded to Itamar's cease and desist letter, denying any wrongdoing. Itamar is now forced to bring this action to protect its valuable trademark rights, goodwill, and reputation as a source of high quality PAT® based diagnostic devices.

49.     Defendants' activities have caused and will continue to cause irreparable harm to Itamar for which it has no adequate remedy at law because Defendants' conduct interferes with Itamar's goodwill and customer relationships and will substantially harm Itamar's reputation as a source of high quality PAT® products and the value of the PAT® Marks.

50.     Itamar's interests in protecting its intellectual property rights and products from customer confusion outweigh any potential harm to Defendants that could possibly flow from an injunction requiring Defendants to correct their false and misleading statements regarding the NightOwl and EZ Slep products or cease infringing the PAT® Marks. Moreover, the public interest is best served by granting the requested relief to Itamar against Defendants in this case.

## FIRST CLAIM FOR RELIEF

## Lanham Act – Federal Trademark Infringement – 15 U.S.C. § 1114

51.     Itamar realleges and incorporates by reference all of the factual allegations set forth above.

52.     Itamar is the owner of all rights, title, and interest in and to the PAT® Registrations, including the right to sue for and recover all past, present, and future damages for infringement of the rights conferred by the PAT® Registrations.

53.     The trademarks reflected in the PAT® Registrations are strong and distinctive. The trademarks reflect that Itamar is the source of all products advertised, marketed, sold, or used in connection with the PAT® Marks, and indicate that Itamar has authorized such products for sale and that such products satisfy Itamar's quality control standards.

54.     As described above, Defendants have made unauthorized use of the PAT® Marks in commerce in relation to the NightOwl and EZ Slep products, indicating that the products use PAT® technology or are PAT-based when they are not.

55.     In promoting the NightOwl and EZ Slep products as PAT-based, Defendants did not have authorization, license, or permission from Itamar to use the PAT® Marks.

56.     Defendants' unauthorized use of the PAT® Marks in the above-described manner was intended to confuse consumers into incorrectly believing that the NightOwl and EZ Slep products were, in fact, based on Itamar's proprietary PAT® technology.  Accordingly, such unauthorized use of the PAT® Marks by Defendants in connection with the unauthorized promotion and sale of the NightOwl and EZ Slep products was knowing, intentional, and willful.

57.     Defendants' unauthorized use of the PAT® Marks in the above-described manner was likely to cause confusion or mistake, or to deceive as to the source, origin, affiliation, sponsorship or authorization of the NightOwl and EZ Slep products.  This constitutes trademark infringement.

58.     As a direct and proximate result of Defendants' wrongful conduct, Itamar has been damaged.

59.     Unless an injunction is issued enjoining any continuing or future use of the PAT® Marks by Defendants, such continuing or future use is likely to continue to cause confusion,

mistake, or deception as to source, origin, affiliation, or sponsorship, and will thereby irreparably harm Itamar.

60.     Defendants' activities have caused and will continue to cause irreparable harm to Itamar, for which it has no adequate remedy at law, because: (i) the PAT® Marks constitute a unique and valuable property right that has no readily determinable market value; (ii) Defendants' infringement constitutes interference with Itamar's goodwill and customer relationships and is harming and will continue to substantially harm Itamar's reputation as a source of high-quality goods and services; and (iii) Defendants' wrongful conduct, and the damages resulting to Itamar, are continuing.  Accordingly, Itamar is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

61.     Pursuant to 15 U.S.C. §1117(a), Itamar is entitled to an order: (i) requiring Defendants to account to Itamar for any and all profits derived from their infringing actions, to be increased in accordance with the applicable provisions of law; and (ii) awarding all damages sustained by Itamar that were caused by Defendants' conduct.

62.     Defendants' conduct was and is intentional and without foundation in law, and, pursuant to 15 U.S.C. § 1117(a), Itamar is therefore entitled to an award of treble damages against Defendants.

63.     Defendants' acts make this an exceptional case under 15 U.S.C. § 1117(a); thus Itamar is entitled to an award of attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### Lanham Act – Unfair Competition and False Designation of Origin – 15 U.S.C. § 1125(a)(1)(A)

64.     Itamar realleges and incorporates by reference all of the factual allegations set forth above.

65.     Defendants were aware of the PAT® Marks, including because Defendants were on constructive notice based on Itamar's federal registrations, and Ectosense was on actual notice at least as early as August 7, 2019, the date of Itamar's communication with Ectosense regarding Ectosense's infringement of the PAT® Marks and its false and misleading statements and promotional materials about the NightOwl product.

66.     Defendants have without authorization, on or in connection with their goods in interstate commerce made or contributed to the making of false designations of origin and/or false or misleading descriptions or representations of fact which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Itamar or as to the origin, sponsorship, or approval of the NightOwl and EZ Slep products.

67.     Defendants' acts constitute unfair competition and false designation of origin, and/or induce or contribute to acts or unfair competition and false designation of origin.

68.     Defendants' conduct has deceived and unless restrained will continue to deceive the public, including medical professionals, governmental and commercial payors, consumers, and retailers, and has injured and unless restrained will continue to injure Itamar and the public, including medical professionals, governmental and commercial payors, consumers, and retailers, causing damages to Itamar in an amount to be determined at trial and other irreparable injury to the goodwill and reputation of Itamar and its products.

69.     As a direct and proximate result of Defendants' wrongful conduct, Itamar has been damaged.

70.     Unless an injunction is issued enjoining any continuing or future use of the PAT® Marks by Defendants, such continuing or future use is likely to continue to cause confusion,

mistake, or deception as to source, origin, affiliation, or sponsorship, and will thereby irreparably harm Itamar.

71.     Defendants' activities have caused and will continue to cause irreparable harm to Itamar, for which it has no adequate remedy at law, because: (i) the PAT® Marks constitute a unique and valuable property right that has no readily determinable market value; (ii) Defendants' infringement constitutes interference with Itamar's goodwill and customer relationships and is harming and will continue to substantially harm Itamar's reputation as a source of high-quality goods and services; and (iii) Defendants' wrongful conduct, and the damages resulting to Itamar, are continuing.  Accordingly, Itamar is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

72.     Pursuant to 15 U.S.C. §1117(a), Itamar is entitled to an order: (i) requiring Defendants to account to Itamar for any and all profits derived from their infringing actions, to be increased in accordance with the applicable provisions of law; and (ii) awarding all damages sustained by Itamar that were caused by Defendants' conduct.

73.     Defendants' conduct was and is intentional and without foundation in law, and, pursuant to 15 U.S.C. § 1117(a), Itamar is therefore entitled to an award of treble damages against Defendants.

74.     Defendants' acts make this an exceptional case under 15 U.S.C. § 1117(a); thus Itamar is entitled to an award of attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**

**Lanham Act – False Advertising – 15 U.S.C. § 1125(a)(1)(B)**

75.     Itamar realleges and incorporates by reference all of the factual allegations set forth above.

76.     Defendants are using false, deceptive, and/or misleading descriptions and/or misrepresentations in commercial advertising and marketing that misrepresent the nature, characteristics, and/or qualities of the NightOwl and EZ Slep products in interstate commerce.

77.     Defendants prominently feature "PAT" and "PAT-based" in advertising the NightOwl and EZ Slep products.  Because Itamar's PAT® technology is proprietary, the products cannot be "PAT-based" as Itamar has not authorized Defendants to use this technology. Defendants have also advertised the NightOwl to be reimbursable under the same CPT code that covers Itamar's PAT® based devices, implying that the NightOwl is also based on PAT® technology, which is false.  Further, the NightOwl product's specifications also demonstrate that it does not actually use Itamar's PAT® technology; rather, it uses PPG technology.  Accordingly, Defendants' advertising is literally false.

78.     Defendants' advertising is also misleading, as detailed above, because it claims that the NightOwl and EZ Slep products are smaller and more lightweight, leading consumers to incorrectly believe that their products have improved on Itamar's proprietary technology when they have not.

79.     Defendants' false and misleading statements actually deceive or have the tendency to deceive a substantial segment of their audience.

80.     Defendants' false and misleading statements are material and are likely to influence the purchasing decisions of actual and prospective purchasers of the NightOwl and EZ Slep devices and/or Itamar's medical devices.

81.     Defendants' false and misleading statements have diverted sales to Defendants at the expense of Itamar and/or have lessened the goodwill enjoyed by Itamar's medical devices.

82.     Defendants' acts of false advertising have deceived and unless restrained will continue to deceive the public, including medical professionals, governmental and commercial payors, consumers, and retailers, and have injured and unless restrained will continue to injure Itamar and the public, including medical professionals, governmental and commercial payors, consumers, and retailers, causing damages to Itamar in an amount to be determined at trial and other irreparable injury to the goodwill and reputation of Itamar and its medical devices.

83.     Itamar has no adequate remedy at law to compensate it for all of the damages that have been caused and will continue to be caused by Defendants' wrongful acts unless those acts cease immediately.

84.     Pursuant to 15 U.S.C. §1117(a), Itamar is entitled to an order: (i) requiring Defendants to account to Itamar for any and all profits derived from their infringing actions, to be increased in accordance with the applicable provisions of law; and (ii) awarding all damages sustained by Itamar that were caused by Defendants' conduct.

85.     Defendants' acts of false advertising are willful, intentional, and egregious and make this an exceptional case within the meaning of 15 U.S.C. § 1117(a).  Itamar is entitled to an award of attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF

### Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*

86.     Itamar realleges and incorporates by reference all of the factual allegations set forth above.

87.     This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq*.

88.     Defendants have engaged in the conduct of trade and commerce in the State of Florida.

89.     Defendants have violated the FDUTPA by engaging in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices by using the PAT® Marks without authorization to mislead consumers into falsely believing to their detriment that Defendants are associated with or related to Itamar and its products and technology.

90.     Defendants have further violated the FDUTPA by engaging in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices by making false and misleading statements about their products, as outlined above, to mislead consumers to their detriment.

91.     Both consumers and Itamar have been injured by Defendants' violations because consumers have been misled to not make purchases of Itamar's products based on Defendants' misleading claims that the NightOwl and EZ Slep products offer consumers the equivalent technology and capabilities in a superior and less expensive format.

92.     Itamar is entitled to recover its reasonable attorney's fees and costs pursuant to Fla. Stat. § 501.2105.

**FIFTH CLAIM FOR RELIEF**

**Florida Common Law Unfair Competition and Trademark Infringement**

93.     Itamar realleges and incorporates by reference all of the factual allegations set forth above.

94.     Itamar first adopted and has consistently used the PAT® Marks in the United States medical device market.  The PAT® Marks have accrued substantial goodwill and developed a strong reputation and these marks identify and distinguish Itamar's medical products from similar products marketed by others in the United States.

95.     Itamar adopted the PAT® Marks as a means of establishing its reputation, garnering goodwill, and distinguishing its products from similar products offered by others. Itamar has built up valuable goodwill in the PAT® Marks and the distinctive quality and characteristics of Itamar's medical devices in this District and in the State of Florida.

96.     For more than twenty years, the association of the PAT® Marks with Itamar's medical products in the United States medical device market has acquired a special significance as the name of the specific medical products marketed and sold through distributors by Itamar, and the PAT® Marks are inherently distinctive and, by actual usage, have come to identify Itamar's medical devices.

97.     Defendants' use of the PAT® Marks and claims that the NightOwl and EZ Slep products are PAT-based permits Defendants to promote the products as if they are affiliated with or sponsored by Itamar when they are not.

98.     With full knowledge of the PAT® Marks, Defendants intended to and did trade off the goodwill associated with these marks.  Defendants have commenced, or intend to commence, the use of an identical or confusingly similar name, mark, symbol, logo, and design to indicate or identify similar medical device products marketed by Defendants in competition with Itamar in the same trade area in which Itamar has already established the PAT® Marks for Itamar's medical device products.

99.     Defendants have misled medical professionals, consumers, and the public into incorrectly believing that the NightOwl and EZ Slep products are, in fact, PAT-based when they are not.

100.    Defendants have misled and will continue to mislead medical professionals, consumers, and the public into falsely believing that there is a connection between Defendants and Itamar when there is not.

101.    As a consequence of Defendants' actions, or threatened actions, customer confusion as to source or sponsorship of the medical device products offered, or to be offered, by Defendants is likely or inevitable.

102.    Defendants' activities constitute acts of unfair competition in violation of the common law of the State of Florida and unjustly enrich Defendants to Itamar's detriment.

## **PRAYER**

WHEREFORE, Itamar prays for the following relief:

A.    An injunction ordering Defendants, and their officers, directors, members, agents, servants, employees, and attorneys, and all other persons acting in concert or participating with them, who receive actual notice of the injunction order by personal or other service (the "Enjoined Parties"), to:

1.    never advertise, market, package, label, or sell any product under the name or trademark PAT® or any similar name or mark;

2.    never publish, display, distribute, disseminate, or use, or permit or enter into or perform any agreement for the publication, display, distribution, or use of any advertising which communicates any claims or messages or which in any way state or imply that (a) the NightOwl or EZ Slep products are PAT-based when they are not; (b) the NightOwl or EZ Slep products use PAT® technology when they do not; and (c) the NightOwl or EZ Slep products are PAT-based HSATs according to the AASM guidelines when they are not;

3.       never use any false designation of origin, false representation, or any false or misleading description of fact, that can, or is likely to, lead the consuming public or individual members thereof, to believe that any products or services produced, offered, promoted, marketed, advertised, provided, or sold by Defendants are in any manner associated or connected with Itamar, or are licensed, approved, or authorized in any way by Itamar;

4.       never represent, suggest in any fashion to any third party, or perform any act that may give rise to the belief that Defendants, or any of their goods or services, are related in any way to Itamar; and

5.       never unfairly compete with Itamar in any manner whatsoever, or engage in any unfair, fraudulent, or deceptive business practices that relate in any way to the production, distribution, marketing, and/or sale of products and services bearing the PAT® Marks.

B.       An order pursuant to 15 U.S.C. § 1116(a), directing the Enjoined Parties to file with the Court and serve upon Itamar's counsel, within thirty (30) days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which the Enjoined Parties have complied with the injunction.

C.       An order, pursuant to 15 U.S.C. § 1118, directing the Enjoined Parties to deliver up and destroy all infringing products, labels, signs, prints, packages, wrappers, receptacles, advertisements, plates, molds, matrices, and/or other means of making the same.

D.       An order finding that, by the acts complained of above, Defendants have infringed Itamar's federally registered PAT® Marks in violation of 15 U.S.C. § 1114.

E.      An order finding that, by the acts complained of above, Defendants have created a false designation of origin and false representation of association, and have engaged in false advertising, in violation of 15 U.S.C. § 1125(a).

F.      An order finding that, by the acts complained of above, Defendants have violated the FDUTPA.

G.      An order finding that, by the acts complained of above, Defendants have engaged in unfair competition in violation of Florida common law.

H.      An order directing an accounting by Defendants of their profits by reason of their unfair competition, false advertising, and deceptive acts and practices.

I.      An order that Defendants bear the obligation and expense of publication, display, distribution, and dissemination of corrective advertising to dispel the false, misleading, and deceptive advertising already communicated to consumers and the public regarding the NightOwl and EZ Slep products.

J.      A judgment on all Claims for the damages suffered by Itamar as a result of Defendants' infringing activities, false advertising, unfair competition, and deceptive acts and practices, in an amount to be determined at trial.

K.      An order awarding Itamar:

        1.      Pursuant to 15 U.S.C. § 1117(a), Itamar's actual damages, as well as all of Defendants' profits or gains of any kind from their acts of trademark infringement, false designation of origin, and unfair competition, and false advertising, including an appropriate increase in those damages and profits; and

2.      treble, enhanced, and/or exemplary damages because of Defendants'

willful and wanton acts.

L.      An order pursuant to 15 U.S.C. § 1117(a) finding that this is an exceptional case.

M.      An order awarding Itamar its reasonable attorneys' fees.

N.      An order awarding Itamar all of its costs, disbursements and other expenses

incurred due to Defendants' unlawful conduct, pursuant to 15 U.S.C. § 1117(a).

O.      An order awarding Itamar interest.

P.      An order awarding Itamar such other relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Itamar demands a trial by

jury.

Dated: March 23, 2021                          Respectfully submitted,


By: */s/Robert D. W. Landon, III*
Robert D. W. Landon, III (FL Bar No. 961272)
Elizabeth B. Honkonen (FL Bar No. 0149403)
KENNY NACHWALTER, P.A.
Four Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Telephone: (305) 373-1000
rlandon@knpa.com
ebh@knpa.com


Allen M. Gardner (admitted *pro hac vice*)
Chase A. Chesser (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2270
Allen.Gardner@lw.com
Chase.Chesser@lw.com

Jennifer L. Barry (admitted *pro hac vice*)
Patrick C. Justman (admitted *pro hac vice*)
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Jennifer.Barry@lw.com
Patrick.Justman@lw.com

*Attorneys for Plaintiff Itamar Medical Ltd.*