**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case Number: 20-cv-60719-WPD

ITAMAR MEDICAL LTD.,
      Plaintiff,

v.

ECTOSENSE NV,
      Defendant.

_____/

## ECTOSENSE NV'S  RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

Defendant / Counter-Plaintiff, Ectosense *nv*, (hereinafter "Ectosense"), by and through the undersigned attorneys, hereby responds in opposition to the Motion to Compel De-Designation of Documents Marked Attorneys' Eyes Only, ECF 98, filed by Itamar Medical Ltd. ("Itamar"), and states as follows:

### Background

Ectosense produced, in native format, its communications with the FDA during the 510(k) review process of NightOwl and the entirety of Ectosense's four submissions to the FDA:

    (1) Ectosense's initial NightOwl 510(k) premarket notification package dated April 18, 2019;
    (2) Ectosense's Response to a Refusal to Accept dated May 13, 2019;
    (3) Ectosense's Response to a Refusal to Accept dated June 12, 2019; and
    (4) Ectosense's Additional Information dated February 3, 2020.

These four submissions were provided to the FDA via compact disc with a table of contents and structured in a manner to consolidate years of research, development, product testing, design, and formulation. Disclosure of this information to Ectosense's direct competitor, Itamar, would be harmful to Ectosense's commercial interests as it would give Itamar and intimate view of Ectosense's research, product development, and ability to navigate a complex regulatory process.

Moreover, it would disclose how much Ectosense knows about Itamar and its products and designs.

Itamar nevertheless asks this Court to de-designate Ectosense's four submissions to the FDA and the series of email communications between Ectosense and the FDA during the 510(k) review process of NightOwl—all of which are documents that were produced in native format and that Ectosense properly designated Attorneys' Eyes Only. Despite there being only four submission files, Itamar breaks the files into "315 documents" and argues that "not one document warranted the AEO designation." ECF 98 at 2. Itamar's approach distorts the nature of what was produced. Each of these submissions were provided to the FDA as one complete file on a CD that contains a legend of the documents and navigation table through the documents. The paper equivalent would be four single binders, not 315 binders. Indeed, a premarket notification with the FDA is a single comprehensive document made up of several individual pages and PDFs.

Moreover, Itamar's request for de-designation is in pursuit of claims that have not been, and cannot be, brought by Itamar. Ectosense has defended the case on the basis that the FDA's clearance of NightOwl as a PAT-based device renders Itamar's claims precluded, preempted, and substantively without merit from a scientific perspective. During the motion to dismiss phase, Itamar heavily argued that there was no way at the pleadings stage to determine if the FDA even considered the questions of whether NightOwl measures PAT, and thus preclusion and preemption should not apply.

After the Court ruled upon the Motion to Dismiss, Ectosense voluntarily sent to Itamar's counsel a series of emails and communications between Ectosense and the FDA demonstrating that the FDA did indeed consider this very question—at length—and ultimately agreed with

Ectosense that NightOwl measures PAT. Ectosense requested Itamar immediately drop its false advertising claims because Itamar presumably would concede that the FDA is a reasonable expert in the field of medical devices, and thus, even setting aside preclusion and preemption for a moment, with the FDA having agreed with Ectosense on the science, Itamar has no good faith basis to proceed with a literal falsity claim.

Itamar declined the request to drop the false advertising claims and has since cast spurious aspersions through counsel that Ectosense must have committed a fraud on the FDA. These aspersion of fraud do not appear anywhere in any of the three complaints filed by Itamar in this case, and represent nothing more than an threadbare effort to avoid a decision by the FDA that Itamar simply does not like. The decision was that NightOwl indeed measures PAT, and is by extension of course a PAT-based device. Thus, the relevance of these documents is only to demonstrate that the FDA actually looked at whether NightOwl measures PAT, and Itamar's push for further review seeks to invade competitively sensitive confidential research and product development information that Ectosense has cultivated over years of research.

<u>**Argument and Legal Memorandum**</u>

Section II of the Protective Order sets forth:

> "Highly Confidential – Attorneys' Eyes Only" as "certain limited CONFIDENTIAL material or information that is competitively sensitive and constitutes or contains: (1) technical information such as product design or formulation, (2) information within the definition of trade secret provided by state or federal law, (3) formulae or source code, (4) research and development information, (5) customer lists, (6) sales, cost, pricing, or other financial information, (7) plans for strategic business initiatives or marketing plans, or (8) any other information that contains the Designating Party's trade secrets or other confidential research, development, or commercial, personal and/or financial information of an extremely sensitive nature that may cause significant competitive harm to, and/or breach the privacy of, the Designating

Party if disclosed to persons other than those described in Section VII.

Submissions made to the FDA, communications with the FDA, and the FDA's responses to submissions by a medical device manufacturer are highly confidential by law. Pursuant to the FDCA and the FDA's own Regulations, the FDA is actually required to maintain the confidentiality of submissions made regarding the testing, clearance, and approval of medical products, especially when trade secrets are implicated. The Federal Food, Drug and Cosmetic Act provides generally for the protection of trade secrets from public disclosure. 21 U.S.C. § 331(j). FDA regulations exempt trade secrets and commercial or financial information submitted to the government, or information compiled for law enforcement reasons, from disclosure to the public. 21 C.F.R. §§ 20.60, 20.61 and 20.64. Further, the Code of Federal Regulations provides specific confidentiality protection for submissions made during the course of a premarket clearance process. See 21 C.F.R. § 807.95(e) (incorporating by reference § 20.60).

The context of a document is important to determining whether it is competitively sensitive or a trade secret. Indeed, a trade secret can exist in a combination of characteristics and components, even when any singular component may by itself be in the public domain or may not inherently contain confidential information because it is the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret. Meaning, "[e]ven if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret." *Capital Asset Rsch. Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998); *see Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 10 So. 3d 202, 206 (Fla. 4th DCA 2009).

*(a) Ectosense's four submissions to the FDA and email communications are properly designated Attorneys' Eyes Only.*

The documents Ectosense designated Attorneys' Eyes Only contain technical information such as product design and include detailed analyses of the inner workings of NightOwl, peripheral arterial tone, clinical trials and testing, and the assembly of academic and scientific information by Ectosense related to peripheral arterial tone and Itamar because Itamar's device was the predicate device. Moreover, the documents produced are competitively sensitive as between Ectosense and Itamar as they demonstrate how Ectosense navigated the 510(k) process, as well as Ectosense's research of Itamar's devices, technology, and features. It is not just the specific content of any individual communication, but the totality of competitively sensitive information that can be gleaned from even a fractured mosaic of these documents. Allowing Itamar to review Ectosense's submissions to the FDA and communications between Ectosense and the FDA would provide Itamar with an improved understanding of:

- the types of sensitivities of the FDA in relation to the formulation of clinical claims and the intended use;
- the FDA's evolved view on PAT-based HSAT devices, which may expedite or delay Itamar's own submission to the 510(k) for new products, and therefore influence the timing of the introduction of products that are competitive to NightOwl;
- which disagreements or deficiencies the FDA seeks to resolve through Acceptance Review Communication, Substantive Interaction, or Interactive Review (see Types of Communication During the Review of Medical Device Submissions, Guidance for Industry and Food and Drug Administration Staff, 2014), or understanding the need for Q-Submission program meetings (*see* Requests for Feedback and Meetings for Medical Device Submissions: The Q-Submission Program);
- the FDA's preferred clinical trial design and reporting on clinical performance metrics;
- acceptable risk management and human factor engineering approaches, software configuration management, electronics and biocompatibility testing reporting, for the given type of medical device and medical claims.

The 510(k) process is by its very nature a presentation of a medical device manufacturer's product design, research, development, and clinical testing. Navigating the process is an

important undertaking that comes at significant expense to applicants and often reflects years of

work and investment. Itamar has gone through the process at least a dozen times, and in each

instance was guided by sophisticated regulatory counsel, often from multinational law firms. In

its investment disclosures, Itamar acknowledges how cumbersome and important the process is

by disclosing to its investors how rigorous the review is and the kind of information that can be

obtained from the information exchanged in the process:

> The application process to receive clearances or approvals of Our Products by the pertinent regulatory authorities is costly and generally lasts between approximately three to 24 months. Delays in receipt of, or failure to receive, clearances or approvals, the loss of previously received clearances or approvals, or the failure to comply with existing or future regulatory requirements could adversely impact our operating results.
>
> The FDA and other regulators can delay, limit or deny clearance or approval of a device for many reasons, including:
> - our inability to demonstrate to the satisfaction of the FDA or the applicable regulatory entity or notified body that Our Products are safe or effective for their intended uses;
> - the disagreement of the FDA or the applicable foreign regulatory body with the design or implementation of our clinical trials or the interpretation of data from pre-clinical studies or clinical trials;
> - serious and unexpected adverse effects experienced by participants in our clinical trials;
> - the data from our pre-clinical studies and clinical trials may be insufficient to support clearance or approval, where required;
> - our inability to demonstrate that the clinical and other benefits of the device outweigh the risks;
> - the manufacturing process or facilities we use may not meet applicable requirements; and
> - the potential for clearance or approval policies or regulations of the FDA or applicable foreign regulatory bodies to change significantly in a manner rendering our clinical data or regulatory filings insufficient for clearance or approval.

A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is as safe, effective, and substantially equivalent to a legally marketed device. All safety and effectiveness determinations made by the FDA must be based upon valid scientific evidence. *See* 21 C.F.R. § 860.7(c)(1) ("Although the manufacturer may submit any form of evidence to the Food and Drug Administration in an attempt to substantiate the safety and effectiveness of a device, the agency relies upon only valid scientific evidence to determine whether there is reasonable assurance that the device is safe and effective."). Valid scientific evidence is defined as:

> …evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device under its conditions of use. The evidence required may vary according to the characteristics of the device, its conditions of use, the existence and adequacy of warnings and other restrictions, and the extent of experience with its use. Isolated case reports, random experience, reports lacking sufficient details to permit scientific evaluation, and unsubstantiated opinions are not regarded as valid scientific evidence to show safety or effectiveness. Such information may be considered, however, in identifying a device with questionable safety or effectiveness

Thus, consistent with the requirements of the FDCA, Ectosense gathered years of product development information, research, clinical trials, academic publications, and prepared its premarket notification binders and submitted them to the FDA. Itamar is a direct competitor in this market and has spent millions of dollars getting its own devices through 510(k) processes. Ectosense's submissions are competitively sensitive as they would divulge Ectosense's years of product development, research, and know how. Ectosense therefore properly designated the FDA submissions and communications Attorneys' Eyes Only.

**(b)** *Itamar cannot demonstrate prejudice by Ectosense's designations because Itamar's experts can access the documents.*

Itamar's claims present scientific questions about NightOwl's ability to measure PAT and because (1) Ectosense has already produced detailed documents and interrogatory answers explaining exactly how NightOwl is PAT-based, and (2) to the extent Itamar believes the FDA submissions are necessary for answering the limited issues presented by Itamar's claims, Itamar's experts are allowed to review the submissions and communications thereby removing any purported prejudice to Itamar.

Despite the relative doctrinal and regulatory complexity of this case, the factual issues framed by Itamar's claims against Ectosense are actually very simple. Itamar opens its allegations acknowledging that PAT is a physiological signal alleging that it has technology for the "measuring, recording, and analysis of the peripheral arterial tonometry ("PAT") signal." ECF 78 ¶ 1. Ectosense advertised its device as a PAT-based device (i.e. one that measures the peripheral arterial tone signal) according the guidelines promulgated by the American Academy of Sleep Medicine ("AASM"). From this, Itamar alleges that Ectosense's description of NightOwl® as a PAT-based HSAT according to AASM guidelines violated Itamar's federal and common law trademark rights, ECF 73 ¶ 51 – 63 Count I, ¶ 93 – 102 Count V, amounted to a false designation of origin, ECF 73 ¶ 64 – 74 Count II, and is literally false advertising as to the NightOwl's ability to measure peripheral arterial tone, ECF 73 ¶ 75 – 85 Count III. Itamar also claims that Ectosense representing NightOwl as being PAT-based was an unfair and deceptive trade practice in violation of FDUTPA. (ECF 73 ¶ 82 – 88 Count IV).

Itamar's specific factual allegations are that Ectosense's marketing of its device as being based upon peripheral arterial tonometry/tone, or PAT, is literally false because NightOwl does not measure PAT and instead uses PPG technology. In summary of these points, Itamar alleges:

"Defendants have repeatedly made similar false and misleading statements regarding the technology underlying the NightOwl product. For example, promotional materials state that the NightOwl product is based on 'PAT' technology or is 'PAT-based.' However, the NightOwl product uses PPG, not 'PAT' technology." ECF 73 ¶ 36. Itamar alleges that Ectosense's marketing is *literally false*. ECF 73 ¶ 77. This presents a scientific question. In order to prevail on a literally false advertising claim, Itamar would have to prove that no reasonable expert could conclude that NightOwl measures PAT. As the Fourth Circuit has observed—at the pleadings stage no less—with respect to literal falsity claims:

> Plaintiffs urge that it is inappropriate for the court to resolve a "battle of the experts" on the pleadings. However, we need not resolve any "battle of the experts" in order to decide whether the CAC states a claim for false advertising. When litigants concede that some reasonable and duly qualified scientific experts agree with a scientific proposition, they cannot also argue that the proposition is "literally false."

*In Re GNC*, 789 F.3d 505, 515 (4th Cir. 2015).  Thus, the factual questions presented for the false advertising claims is simply whether NightOwl can measure the peripheral arterial tone signal.

Because of Itamar's claims that NightOwl does not measure PAT, and that Itamar could not know what the FDA reviewed or considered, Ectosense voluntarily produced to Itamar a string of communications between Ectosense and the FDA outside the ordinary channels of discovery as they should have warranted immediate dismissal of Itamar's claims. Ectosense later produced the entirety of the communications and submissions pursuant to Itamar's document requests. Importantly, the relevance of Ectosense's communications and submissions to the FDA during the 510(k) review process is that they demonstrate that the FDA specifically considered the question of whether NightOwl measures PAT, and that because the FDA has and because the FDA agreed with Ectosense that NightOwl measures PAT, Itamar's claims are precluded,

preempted, and otherwise without scientific merit. The last point supposes that Itamar would concede that the FDA is most certainly a reasonable expert when it comes to medical devices, but by refusing to dismiss its claims, it appears that Itamar intends to put the FDA's credentials as an expert on medical devices and its ability to make decisions based upon valid scientific evidence on trial.

In its Motion to Compel, Itamar excerpted portions of the communications so Ectosense herein provides a more complete context of the dialogue Itamar excerpted for the Court's consideration.[1] On February 27, 2020, Dr. Elizabeth Katz of the FDA review committee wrote to Ectosense:

> The NightOwl device does not appear to be based on PAT but PPG technology. As per our understanding, PAT technology involves application of a uniform pressure to the surface of the finger to interrupt the arterial flow momentarily to allow measurement of pulsatile volume changes. NightOwl on the other hand does not appear to use such method but is based on red and infrared LED emitters typically seen in oximeter applications for measurement of saturation levels. Therefore, please remove claims about PAT and pAHI. We suggest that instead you use a different terminology to describe the parameters claimed to be PAT or pAHI, and provide an updated 510(k) Summary and device labeling that utilizes the revised/alternative terms.

This email describes a pneumatic sensor method of measuring PAT, rather than an optical sensor method that is present in both NightOwl and WatchPAT, and prompted the email Itamar excised the quote from that there "appears to be a fundamental misunderstanding about the PAT-based technology." From this email, a dialogue between Ectosense and the FDA continued about what PAT is, and how Ectosense incorporates it into NightOwl—a dialogue that involved an in-depth analysis of the scientific publications regarding PAT and comparative analysis between

---

[1]  In order to avoid burdening the Court with Motions to File Under Seal, Ectosense stipulated that Itamar could include the quotes it included in the Motion provided that Ectosense could reciprocally include additional quotes for context without waiver of the designations. The Parties so stipulated.

NightOwl and Itamar's competing device, WatchPAT. Ectosense initially provided a preliminary explanation of how PAT works and requested that the FDA do a more comprehensive analysis of PAT before asking that Ectosense remove the claims of being PAT-based from labeling and the 510(k) Summary.

On February 29, 2020, Mr. Bart Van Pee wrote to Ms. Rachana Visaria, Assistant Director, Division of Anesthesia, Respiratory and Sleep Devices at the FDA: "Would you be fine that we hold off with returning the revised final labeling and 510(k) until we have converged on the understanding of the PAT-related scientific principles?" The FDA agreed to do so replying later the same day: "Yes, we can hold off the revisions to final labeling and 510k Summary until we reach an agreement or decision." Ectosense and the FDA continued their dialogue regarding how NightOwl is PAT-based. With respect to the information Ectosense was providing, the FDA stated that it "discussed [the documents and information] internally at lengths…." Ectosense explained the importance of the FDA allowing NightOwl to be marketed as a PAT-based device stating: "Taking all of our clinical and other evidence into consideration, we believe that allowing NightOwl to describe itself in terms of a 'PAT-based' device, allows clinical practitioners to most adequately evaluate what type of HSAT they are dealing with, when the use of such HSAT is appropriate, and what to expect from its performances." The FDA cleared NightOwl a few days later and published the 510(k) Summary with the conclusion that NightOwl measures and analyzes PAT.

The facts that the FDA found NightOwl substantially equivalent to WatchPAT, and, more particularly, that the FDA agreed with Ectosense that NightOwl is a PAT-based device, do not render each and every one of Ectosense's submissions to the FDA about Itamar or Itamar's particular methodology of measuring PAT any less deserving of an AEO designation.

Ectosense's scientific and academic research exchanged with the FDA, product presentation through a comprehensive regulatory review, evaluations and understanding of Itamar's methods of measuring and analyzing PAT, are competitively sensitive and compiled together constitute trade secrets—indeed these are the types of things companies guard the most from their competitors.

Itamar now argues that it needs to be the one to review the documents and that it is being prejudiced by the AEO designations because only Itamar can determine the accuracy of Ectosense's description and assessments of *Itamar's technology, not of Ectosense's technology*. Itamar contends that "Only Itamar—not its attorneys, nor a potential expert—can determine whether certain statements about Itamar, its actions, and its products' capabilities are accurate." ECF 98 at 5. Statements made by Ectosense to the FDA about Itamar's technology are not at issue in this case. Itamar's case is about NightOwl's ability to measure PAT. Over a year into this litigation and Itamar is contending that not even its own experts can determine whether NightOwl measures PAT and is thus PAT-based. If it is true that Itamar cannot find an expert to review the technical and scientific issues here (i.e. determine whether NightOwl measures PAT), then Itamar simply cannot carry on this litigation at all and should promptly dismiss its claims.

Finally, Itamar's reliance on this Court's rulings in *Israel v. Bellsouth Telecomms., Inc.*, 2013 WL 12090046, at *5 (S.D. Fla. Jan. 29, 2013) and *Select Exp. Corp. v. Richeson*, 2011 WL 13227869, at *6 (S.D. Fla. Jan. 4, 2011) is misplaced. In both cases, the non-moving party was resisting production of documents altogether—that is neither case involved a party that voluntarily produced the competitively sensitive documents under an AEO designation. *See Richeson*, 2011 WL 13227869, at *6 (involving a refusal to produce any documents pursuant to a subpoena under claims of accountant-client privilege and general descriptions of trade secrets).

Moreover, *Isreal* involved disclosure of medical records, not competitively sensitive or trade secret information, and to manage the tensions between privacy and concerns about potential retaliation from the Defendant, this Court suggested "Should the parties agree to designate certain of the records 'attorney's eyes only,' particularly in light of the Plaintiff's concerns that his employer will use information contained in the records as a pretext to terminate his employment, they can certainly make an application to the Court to amend the existing Consent Protective Order to permit such a designation." 2013 WL 12090046, at *5. In this instance, the parties have already consented to the designations of attorneys' eyes only for seven categories of competitively sensitive documents. *See* ECF 59 at 3. Itamar's reliance on the aforementioned cases fails to support its position and in fact support Ectosense's designation as proper given the competitively sensitive information here.

### (c) Itamar is pursuing these documents for claims it has not, and cannot, plead.

Although Itamar contends it needs to review Ectosense's premarket notification documents in order to prosecute this case, Itamar's conduct outside the litigation suggests a much more dubious explanation. Ectosense produced the documents in question on March 26, 2021 under an AEO designation for use in this case and *only for use in this case pursuant to the protective order*. ECF 59 at 2. On April 12, 2021, an attorney named Gene Kleinhendler with GKAdvisory reached out to an independent director of Ectosense requesting a meeting with one of Ectosense's minority shareholders, Saffelberg. Mr. Kleinhendler stated that he had been representing Itamar 'for a couple of weeks' and was asked to look into Ectosense's submissions to the FDA. He further stated that the requested meeting had nothing to do with the litigation in the Southern District of Florida, and that it instead had to do with liability to Saffelberg for supposed misconduct of Ectosense during the 510(k) review process.

Ectosense has not produced or shared these FDA documents and submissions with any third parties. Saffelberg's representative in Belgium promptly called Mr. Kleinhendler to inquire about what was going on. Mr. Kleinhendler claimed that he had reviewed Ectosense's submissions to the FDA and that either he or his client (Itamar) believes that Ectosense committed a fraud upon the FDA. Mr. Kleinhendler was not specific during his call about any particular representations that Itamar takes issue with and Saffelberg requested clarification on what exactly Mr. Kleinhendler or Itamar believe constituted fraud on the FDA, and clarification as to why he reached out to Saffelberg—an Ectosense investor—with these issues.

Mr. Kleindhandler then sent a demand letter to Saffelberg wherein he broadly claimed on behalf of Itamar that Ectosense somehow tricked the FDA into getting PAT incorporated in the NightOwl 510(k) Summary, and then used the FDA clearance to qualify for reimbursement under that Current Procedural Technology (CPT) code 95800, which he claimed only applies to Itamar's technology. Thus, he was accusing Ectosense of first committing a fraud upon the FDA and then using the FDA clearance to then commit insurance fraud by promoting NightOwl as qualifying for reimbursement under CPT 95800. The CPT code, maintained by the American Medical Association, of course, is not exclusive to Itamar's technology and simply reimburses for a "Sleep study, unattended, simultaneous recording; heart rate, oxygen saturation, respiratory analysis (e.g., by airflow or peripheral arterial tone), and sleep time." It is not only Itamar's method of measuring PAT that matters, but rather any sleep study that conducts a respiratory analysis using peripheral arterial tone qualifies. These allegations are without merit because, as the FDA concluded and published in NightOwl's 510(k) Summary, NightOwl analyzes peripheral arterial tone, regardless of Itamar's unsubstantiated beliefs to the contrary.

**Most shocking about Itamar's threats was that Mr. Kleinhendler demanded that Saffelberg open an investigation into Ectosense and warned that Saffelberg could face _criminal prosecution_ for the purported false claims**: "False claims for Medicare reimbursement based on a fraudulent submission to the FDA are aggressively prosecuted by U.S. criminal and civil authorities." The threat makes no sense doctrinally or factually, and was clearly designed to intimidate a minority shareholder of Ectosense.

Ectosense is unaware at this time whether Mr. Kleinhendler actually reviewed the documents Ectosense submitted to the FDA and produced in this case with an AEO designation, or whether he just claims to have done so. For this reason, Ectosense does not mean to suggest that the AEO designation was breached by Itamar's counsel in this case. Nevertheless, the chronology and Itamar's conduct—with or without reviewing the documents—is extremely concerning and reflects an improper effort to, at best, intimidate one of Ectosense's shareholders, or, at least manufacture an investigation by the investor with a threat of potential criminal prosecution.

Simultaneous to Mr. Kleindhendler's efforts, Itamar has commenced efforts in this case suggesting it is shifting focus to Ectosense's submissions to the FDA, rather than the claim actually pled by Itamar. Specifically, Itamar propounded Requests for Admission asking Ectosense to admit that it was truthful and accurate in all of its statements to and communications with the FDA, and recently moved to compel documents related to the FDA submissions. Again, the factual issue framed by Itamar's complaint is simply whether NightOwl measures and analyzes PAT, and Ectosense's defense is simply that the FDA reviewed this question from a scientific basis and because the FDA cleared the device as such, Itamar's claims are precluded, preempted, and scientifically meritless. Itamar has been provided multiple

NightOwl devices for testing, interrogatory answers explaining how NightOwl measures and analyzes PAT, and detailed documents supporting the interrogatory answers. Itamar has plenty of evidence to determine whether NightOwl measures PAT. It's pursuit of the AEO documents has nothing to do with this case, and the AEO designation is not prejudicing Itamar in any way.

Realizing that the FDA's agreement with Ectosense about the science of PAT is case dispositive, Itamar is now trying to transform this matter into a fraud-on-the-FDA case, and, worse, is resorting to back-channel threats of criminal prosecution against Ectosense's investors. As James Beck, an attorney cited by the United States Supreme Court on matters related to the 510(k) process in *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 350 (2001), and author of Drug and Device Product Liability Handbook (2004), writes[2]:

> Private plaintiffs love to scream "fraud on the FDA"!  Agency fraud is their magic potion for dissolving any FDA action that they don't like.  Just assert that the FDA was bamboozled and invite some jury somewhere to ignore what the FDA actually did. Unfortunately for the other side, *Buckman Co. v. Plaintiffs Legal Committee*, 531 U.S. 341 (2001), precludes private plaintiffs from bringing such allegations bases on state tort law.
>
> In *Buckman*, the Court held (unanimously), first, that "fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives."  *Id*. at 350.  That's rather obvious, because the logic of any agency fraud claim is that "fraud" allows a factfinder to conclude that, if not defrauded, the agency wouldn't have done what it did.  That presents a rather raw conflict with whatever the agency actually did, which (unless revoked by the affected agency) is a federal decision presumably still in effect.

Mr. Beck is correct on all points here. Itamar has always known that Ectosense was cleared as a PAT-based device as this is readily published in the 510(k) Summary for NightOwl on the FDA's website. Yet, three complaints and one year later, only after Itamar realized that the FDA

---

[2]  Bexis, ON PREVENTION OF FEDERAL FRAUD ON THE FDA CLAIMS THAT AVOID *BUCKMAN* , October 29, 2018, https://www.druganddevicelawblog.com/2018/10/on-prevention-of-federal-fraud-on-the-fda-claims-that-avoid-buckman.html (last accessed May 26, 2021).

did indeed specifically agreed with Ectosense on the scientific evidence that NightOwl measures PAT, did Itamar start casting aspersions of fraud on the FDA. Itamar has not, and of course, cannot, bring such claims in this litigation and its pursuit of the FDA document submissions are not efforts to advance any claim currently plead by Itamar, but rather to continue its anticompetitive war against Ectosense on any front available to Itamar.

Although *Buckman* addressed state law tort claims, the same principles apply with equal force to Lanham Act claims: The FDA has exclusive enforcement authority of the FDCA and is well equipped to handle any supposed fraud or misrepresentations during the premarket review process. The Honorable Judge Beth Bloom summarized the legal issues presented by claims that invade the FDA's enforcement authority when ruling upon a motion for preliminary injunction in *Intra-Lock Int'l, Inc. v. Choukroun*, 14-CV-80930, 2015 WL 11422285, at *7 (S.D. Fla. May 4, 2015). The plaintiff in *Intra-Lock* accused the defendant of selling component parts of a medical device in violation of FDA regulations asserting that the defendant had not obtained a necessary 510(k) pre-market clearance. *Id.* In denying the motion for preliminary injunction for a variety of reasons, Judge Bloom observed the following:

> As a final note, the Court questions the ultimate efficacy of Plaintiff's allegations regarding misrepresentation. Plaintiff repeatedly protests the fact that the Competing Components and the Competing Device have not obtained 510(k) pre-market clearance from the FDA. Although Plaintiff's claims are brought pursuant to Section 43(a) of the Lanham Act, such allegations appear to be a thin attempt to circumvent the appropriate regulatory authority, the FDA. The Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as amended by the Medical Device Amendments of 1976 ("MDA"), PL 94–295 (S 510), PL 94–295, May 28, 1976, 90 Stat 539, regulate medical devices. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 344 (2001) ("Regulation of medical devices is governed by the [FDCA and the MDA]."). Violations of the FDCA are reserved to the sound discretion of the FDA, not the judicial branch. *See* 21 U.S.C. § 372. Furthermore, in order to investigate and restrain such

violations, the FDCA provides the FDA with a variety of enforcement remedies. *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010) (citing *Buckman*, 531 U.S. at 349; *Heckler v. Chaney*, 470 U.S. 821, 835 (1985)). One thing is abundantly clear. The FDA is the sole enforcer of the FDCA and private enforcement is prohibited: "[a]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a); *see also Buckman*, 531 U.S. at 349 n.4 ("The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions[.]"). Accordingly, the Ninth Circuit has held that "[b]ecause the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when ... the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation." *See PhotoMedex*, 601 F.3d at 924. Likewise in *Mylan*, the Fourth Circuit held that "permitting [the plaintiff] to proceed on the theory that the defendants violated § 43(a) merely by placing their [products] on the market would, in effect, permit [the plaintiff] to use the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act ("FDCA") and the regulations promulgated thereunder." *See* 7 F.3d at 1139. Here, it appears that Plaintiff is attempting to do the same.

Itamar's shift in focus from the science of NightOwl and PAT to the submissions to the FDA is an effort to convert this case from a scientific inquiry of whether NightOwl measures the peripheral arterial tone signal to putting the FDA's decision and Ectosense's submissions to the FDA on trial. The FDA possesses exclusive enforcement authority for a claim of this nature, and for good reason. *Id.* It cannot be the case that after the FDA reviews scientific evidence during a premarket clearance process and clears a device, that a private litigant can use the Lanham Act to present the same evidence the FDA considered to a jury in an attempt to convince the jury that the FDA was duped into issuing a clearance and that the statements the FDA cleared are literally false.

Itamar's pursuit of the FDA submissions has nothing to do with prosecuting the case it has pled, and is instead an effort toward either (1) continuing its intimidation of Ectosense's investor, or (2) attempting to prove a violation of the FDCA (i.e. that Ectosense supposedly tricked the FDA) that the FDA itself did not find. This concern was exactly what drove the decision in *Buckman*. *See* 531 U.S. at 349 (explaining that the FDA is empowered and well equipped to handle any supposed fraud during the 510(k) review process and finding fraud on the FDA claims preempted). Itamar does not need to review Ectosense's premarket notification packages at all to pursue its claims. Itamar filed this case over a year ago pleading that NightOwl does not measure PAT. Itamar is not being prejudiced in its presentation of a case here whatsoever because the central question of Itamar's claims is a scientific one and to the extent Itamar in earnest believes that Ectosense's submissions to the FDA shed light on the scientific question, Itamar's experts can certainly review the FDA submissions and communications.

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Ectosense hereby requests a one hour hearing on Itamar's Motion. Ectosense believes a hearing could assist in presenting the documents in question to give the Court a more complete insight into the composition and structure of the documents and how they are competitively sensitive.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 26th day of May, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

/s/ *Seth J. Donahoe*
**PAUL O. LOPEZ**
Florida Bar # 983314
pol@trippscott.com
**SETH J. DONAHOE**
Florida Bar #1004133
sjd@trippscott.com
TRIPP SCOTT, P.A.
110 S.E. 6th Street, 15th Floor
Ft. Lauderdale, FL  33301
(954) 525-7500 telephone
(954) 761-8475 facsimile

1897104v1 998877.0001

**SERVICE LIST**
**CASE NO: 20-cv-60719-WPD**

| **Counsel for Plaintiff:** | **Counsel for Defendant:** |
|---|---|
| ROBERT D.W. LANDON, III ESQ. <br> rlandon@knpa.com <br> ELIZABETH B. HONKONEN, ESQ. <br> ebh@knpa.com <br> Kenny Nachwalter, P.A. <br> Four Seasons Tower <br> 1441 Brickell Avenue, Suite #1100 <br> Miami, FL 33131 <br> Telephone: (305) 373-1000 <br><br> Allen M. Gardner, Esq. (admitted *pro hac vice*) <br> Allen.Gardner@lw.com <br> Chase A. Chesser, Esq. (admitted *pro hac vice*) <br> Chase.Chesser@lw.com <br> Latham & Watkins LLP <br> 555 Eleventh Street, NW, Suite #1000 <br> Washington, DC 20004 <br> Telephone: (202) 637-2270 <br><br> Jennifer L. Barry (admitted *pro hac vice*) <br> Patrick C. Justman (admitted *pro hac vice*) <br> LATHAM & WATKINS LLP 12670 High Bluff Drive San Diego, CA 92130 Telephone: (858) 523-5400 <br> Jennifer.Barry@lw.com <br> Patrick.Justman@lw.com | PAUL O. LOPEZ, ESQ. <br> eservice@trippscott.com (primary) <br> pol@trippscott.com (secondary) <br> sxc@trippscott.com (secondary) <br> SETH J. DONAHOE, ESQ. <br> eservice@trippscott.com (primary) <br> sjd@trippscott.com (secondary) <br> sgc@trippscott.com (secondary) <br> Tripp Scott, P.A. <br> 110 SE 6th Street, 15th Floor <br> Fort Lauderdale, FL 33301 <br> Telephone: (954) 525-7500 <br> Telefax: (954) 761-8475 <br><br> **Co-Counsel for Defendant:** <br><br> Scott J. Bornstein, Esq. <br> (*pro hac vice to be filed*) <br> GREENBERG TRAURIG, LLP <br> MetLife Building <br> 200 Park Avenue <br> New York, NY 10166 <br> bornsteins@gtlaw.com <br><br> Stephen Baird, Esq. <br> (*pro hac vice to be filed*) <br> GREENBERG TRAURIG, LLP <br> 90 South 7th St., Suite 3500 <br> Minneapolis, MN 55402 <br> bairds@gtlaw.com <br><br> Paul B. Ranis, Esq. <br> Florida Bar No. 64408 <br> GREENBERG TRAURIG, P.A. <br> 401 E. Las Olas Boulevard, Suite 2000 <br> Fort Lauderdale, Florida 33301 <br> ranisp@gtlaw.com <br> scottlaw@gtlaw.com <br> FLService@gtlaw.com |