## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case Number: 20-cv-60719-WPD

ITAMAR MEDICAL LTD.,
      Plaintiff,

v.

ECTOSENSE NV,
VIRTUOX, INC.
      Defendants.

_____/

## ECTOSENSE NV'S MOTION TO DISMISS THIRD AMENDED COMPLAINT
## PURSUANT TO RULE 12(b)(6) AND MEMORANDUM IN SUPPORT

**TABLE OF AUTHORITIES** ........................................................................ iii – iv

**INTRODUCTION** ........................................................................................ 1

**FACTS** ........................................................................................................ 3

**ARGUMENT** .............................................................................................. 7

    **I.** Legal Standard and Pleading Burden ............................................ 7

    **II.** Itamar's Third Amended Complaint is rife with inconsistencies regarding the relationship between Ectosense and VirtuOx, and should be dismissed as implausible ........................................ 9

    **III.** Itamar failed to identify use of the PAT trademark on a good and the infringement or false designation of origin and Counts I, II, and V should be dismissed... ................................................. 10

    **IV.** Itamar's false advertising claim is precluded by the FDCA, and, even if it were not, Itamar failed to set forth a plausible claim ........................................................................................... 14

    **V.** Itamar's state law claims are preempted, and fail for the same reasons Itamar's federal claims fail... ........................................ 19


**CONCLUSION AND RELIEF REQUESTED** ........................................ 21

**REQUEST FOR ORAL ARGUMENT** .................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arbor Pharm., LLC v. ANI Pharm., Inc.,*
2018 WL 3677923 (D. Minn. Aug. 2, 2018) .........................................................................8

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................................................................7

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 .......................................................................................................................7

*Brooks v. Blue Cross & Blue Shield of Florida, Inc.,*
116 F.3d 1364 (11th Cir. 1997) ........................................................................................ 7-8

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH,*
843 F.3d 48, 52 (2d Cir. 2016) ....................................................................................17, 18

*Day v. Taylor,*
400 F.3d 1272 (11th Cir. 2005) .........................................................................................7

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.,*
797 F.3d 1248 (11th Cir. 2015) ........................................................................................10

*In re GNC Corp.,*
789 F.3d 505 (4th Cir. 2015) ............................................................................................16

*In re Siny,*
920 F.3d 1331 (Fed. Cir. 2019) .........................................................................................11

*Jellibeans v. Skating Clubs,*
716 F.2d 833 (11th Cir. 1983) ..........................................................................................10

*Kellogg Co. v. Nat'l Biscuit Co.,*
305 U.S. 111 (1938) ..........................................................................................................13

*Kelsey v. Alcon Laboratories, Inc.,*
No. 180902756, 2019 WL 1884225 (Utah Dist.Ct. Apr. 22, 2019) .........................................8

*POM Wonderful LLC v. Coca-Cola Co.,*
573 U.S. 102 (2014) ..........................................................................................................15

*Potucek v. Taylor,*
738 F. Supp. 466 (M.D. Fla. 1990) ...........................................................................10, 11, 12

*Roor v. 902 N. Dixie,*
2016 WL 10952930 (S.D. Fla. 2016) ........................................................10

*Singer Mfg. Co. v. June Mfg. Co.*,
163 U.S. 169 (1896) ........................................................................13

*Southco v. Fivetech*,
982 F. Supp. 2d 507 (E.D. Pa. 2013), *aff'd*, 611 F. App'x 681 (Fed. Cir. 2015) ...........10, 11

**Statutes**

15 U.S.C. § 117(a) ..................................................................................21

15 U.S.C. § 1125 ....................................................................................11

15 U.S.C. § 1127 ..............................................................................10, 11, 14

21 U.S.C. § 337 ......................................................................................14

Fla. Stat. §501.2105(1) ..............................................................................21

**Court Rules**

Fed. R. Civ. P. 8(a)(2)..................................................................................7

Fed. R. Civ. P. 12(b)(6).........................................................................1, 7, 8, 21

Local Rule 7.1 .....................................................................................1, 21

**Code of Federal Regulation**

21 C.F.R. § 807.92(a) ..................................................................................20

21 C.F.R. § (c)(1) ...................................................................................17

Defendant Ectosense NV ("Ectosense") moves to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.1.

## INTRODUCTION

On March 6, 2020, after vetting Ectosense's product—NightOwl®—through the 510(k) process for Class II medical devices, the Food and Drug Administration ("FDA") cleared NightOwl for marketing in the United States finding it "substantially equivalent" to the previously-cleared predicate device, Itamar Medical Ltd.'s ("Itamar") WatchPAT200U. A key aspect of this process was a determination that NightOwl, like WatchPAT, measures peripheral arterial tone ("PAT"). In a transparent anti-competitive effort to block Ectosense from entering the U.S. market, Itamar responded to the FDA's 510(k) clearance letter by suing its incoming competitor—before Ectosense even launched in the U.S.—asserting trademark infringement, passing off, and false advertising claims taking issue with Ectosense's various alleged statements that NightOwl is "PAT-based according to AASM guidelines."

This case has been litigated for over a year now. During this time, Itamar has amended its operative pleading a total of three times, and although Itamar has shifted positions several times in several material ways, for purposes of this Motion to Dismiss, Ectosense focuses only on the ways in which the core allegations against Ectosense reflect an untenable application of the Lanham Act.

Itamar acknowledges that "PAT" is an initialism for **p**eripheral **a**rterial **t**one/**t**onometry, and explains that this physiological signal is used in diagnosing, without limitation, sleep apnea. Itamar is a publicly traded company that sells Home Sleep Apnea Testing (HSAT) devices. To state the obvious, Itamar is not a physiological signal or technique for measuring physiological changes in the human body to detect respiratory events.

1

According to the American Academy of Sleep Medicine ("AASM"), peripheral arterial tone is: "A measure of pulsatile volume changes at the fingertip that reflects changes in sympathetic tone." The same AASM definitions provide: "Peripheral arterial tonometry (PAT): A technique allowing noninvasive moment-to-moment measurement of sympathetic tone using finger plethysmography (measurement of pulsatile volume changes in the fingertip that reflects changes in sympathetic tone).[...] used to detect respiratory events." Thus, PAT is regarded by the AASM as a measure of certain physiological changes in the human body and the technique of using the same to detect respiratory events.

During the first stage of briefing in this case, Itamar made short shrift of the FDA's 510(k) process likening it to a *pro hac vice* motion, and argued that the FDA publishing NightOwl's 510(k) Summary with a specific finding that the device analyzes PAT was not case dispositive because there was no way to know at the pleadings stage whether the FDA specifically looked at the science of PAT or whether the FDA squarely considered whether NightOwl measures PAT. Itamar has since been provided extensive emails and documents establishing that the 510(k) clearance took nearly a year and that the FDA directly and thoroughly vetted the specific question of whether NightOwl analyzes PAT. Indeed, the FDA stated that it discussed the very topic "at length." Thus, Itamar cannot at this stage make the same argument in good faith and should concede that the FDA agreed that NightOwl measures PAT, which is a fact that changes the outcome of the preclusion, preemption, and plausibility arguments previously heard by this Court.

The Lanham Act trademark protections do not allow Itamar to be the sovereign power of defining what constitutes measuring pulsatile volume changes in peripheral tissue because trademarks (whether by the infringer or the registered owner) must be used in a manner to indicate origin, not to indicate an idea, concept, or physiological signal. Moreover, a literal falsity claim

cannot be used to put the conclusions of the FDA on trial. The Court was persuaded in the first round of briefing that without having to interpret the FDCA, preclusion would not apply. While preclusion and preemption certainly bar cases that would require a Court to interpret or apply the FDCA on an issue that the FDA itself has not spoken on, they should apply with even more vigor for an issue that the FDA has unequivocally taken a position on—particularly with respect to the regulation of drugs and medical devices under the purview of its review powers. In this case, impeding on the FDA's domain by interpreting the FDCA is not the core concern. Itamar's claims are far more intrusive because they ask this Court to undermine the FDA's scientific conclusions about NightOwl.

Itamar's claims have always been an inappropriate effort to prevent a competitor from entering the market and are an affront to the competence of the FDA. In advancing this anti-competitive goal, Itamar sued before Ectosense ever entered the U.S. market, and is still clenching to incompatible claims contradicted by settled law, and claims that are precluded and preempted by the FDCA. Itamar's Lanham Act claims rise to the level of exceptional and this Court should dismiss the Amended Complaint and award Ectosense its attorneys' fees.

## FACTS

Itamar is a medical device manufacturer. ECF 121 ¶ 1. Itamar's products include various WatchPAT models, Endo PAT, and a health platform named CloudPAT. ECF 121 ¶ 2. Itamar claims ownership of four registered trademarks, PAT, WatchPAT, Endo PAT, and CloudPAT, which it collectively defines as the PAT Marks throughout the Third Amended Complaint, although it does not identify an actual tangible good named PAT and instead calls it PAT-technology. Itamar acknowledges that PAT is an acronym for peripheral arterial tone/tonometry. ECF 121 ¶ 1. Itamar pleads ownership of several patents "based on methods and apparatus for

measuring 'PAT' […]." ECF 121 ¶ 19. However, Itamar concedes that Ectosense does <u>not</u> use Itamar's claimed PAT technology, and the two patents referenced by Itamar were filed in 1999 and are thus expired either way. *See* ECF 121 ¶ 37.

Itamar alleges that Ectosense's statement that the NightOwl® device is a 'PAT-based HSAT according to AASM guidelines' violated Itamar's federal and common law trademark rights, ECF 121 ¶ 70 – 86 Count I, ¶ 122 – 133 Count V, amounted to a false designation of origin, ECF 121 ¶ 87 – 98 Count II, and is literally false advertising as to the NightOwl's ability to measure peripheral arterial tone, ECF 121 ¶ 99 – 112 Count III. Finally, Itamar also claims that Ectosense representing NightOwl® as being PAT-based was an unfair and deceptive trade practice in violation of FDUTPA. ECF 121 ¶ 113 – 121 Count IV. Because the state law unfair competition and trademark infringement claim, Count V, contains no distinct allegations relevant to the dismissal analysis, it will be addressed with Counts I – III.

Now on its fourth operative pleading, Itamar asserts that infringement occurred in a pamphlet disseminated at two adjoining scientific conferences in San Antonio, Texas, that focused on sleep medicine, stating: "At two recent annual meetings focused on sleep issues, materials were distributed and information was presented containing false and misleading statements about the Ectosense NightOwl product." ECF 121 ¶ 39. Itamar excised a ~one-inch snippet from the pamphlet referenced and grounds most of its claims on the words that appear in the snippet. ECF 121 ¶ 42. The snippet reads in relevant part: "PAT-based HSAT according to AASM guidelines." ECF 121 ¶ 42. For the trademark claims, Itamar's primary allegations of infringement are:

> that Ectosense's use of the term "PAT" on promotional materials for the NightOwl will confuse consumers regarding the origin of the products, Itamar's sponsorship of the products, and the similarity between the NightOwl and Itamar's products, including the WatchPAT® product. Ectosense's use of the "PAT" term— including in presentations at conferences in the United States,

4

> distribution of materials at conferences in the United States,
> promotion of products on websites accessible in the United States,
> and marketing of the NightOwl in the United States after recently
> receiving clearance from the FDA to market the NightOwl—has led
> and will continue to lead consumers to forego purchasing Itamar's
> products to purchase the NightOwl, thus diverting sales from Itamar
> and causing consumers and Itamar substantial harm."

ECF 121 ¶ 48. Itamar does not identify a product packaging or point of sale advertisement that was marked with PAT. Now on its fourth complaint, Itamar still only identifies pamphlets that on their face say the device was only available to the European market at the time, and websites that indicated the device had not launched in the US yet. Itamar does not identify any coupling of the mark with the device anywhere in its Third Amended Complaint.

For false designation of origin, Itamar claims: "Defendants' acts constitute unfair competition and false designation of origin, and/or induce or contribute to acts or unfair competition and false designation of origin." ECF 121 ¶ 91. Critically, for the false advertising and FDUTPA claims, Itamar does not set out any facts to suggest that NightOwl fails to be PAT-based under "AASM guidelines" as the AASM defines PAT, but instead claims that only Itamar can define what constitutes PAT because Itamar is allegedly the progenitor of the physiological measurement peripheral arterial tone. ECF 121 ¶ 1.

As will be detailed in the argument section below, Itamar's trademark and false designation claims are unclear because Itamar is assuming that its mark should be expanded from its registered use in connection with a medical apparatus to now cover "PAT technology" more broadly asserting to hold exclusive rights to any possible implementation of such technology. *See e.g.* ECF 121 ¶ 20 (setting forth four trademarks, none of which reference technology); *cf* ¶ 75 (claiming infringement for Ectosense describing NightOwl as using PAT technology on the basis that PAT is Itamar's "proprietary technology"). Throughout the trademark claims, Itamar wavers away from identifying

5

a particular instance that it specifically claims is infringement or false designation of origin, and instead seems to be more broadly claiming that it owns "PAT technology" such that anytime Ectosense allegedly asserted that NightOwl is PAT-based, this purportedly constitutes trademark infringement, false designation of origin, false advertising, and an unfair and deceptive trade practice. The elements of these claims are not compatible alternatives.

Itamar continues to base its infringement claims upon any advertisements by Ectosense that NightOwl is PAT-based or measures PAT, but also contends that these exact same statements constitute literally false advertising and a deceptive trade practice because "NightOwl and the EZSlēp devices [allegedly] do not and cannot measure PAT, and they are not and cannot be PAT-based." ECF 121 ¶ 31. Itamar claims that "NightOwl measures only basic PPG and does not provide a 'PAT' measurement", ECF 121 ¶ 47. Thus, Itamar's claims for literal falsity and FDUTPA pose a singular scientific question: can NightOwl measure PAT. The FDA concluded that NightOwl indeed measures PAT, but through this private lawsuit, Itamar requests the court to undermine the FDA's finding.

The notion that the Claimed PAT Marks make Itamar the sovereign authority of what constitutes PAT technology, is contrary to law, and contradicted by Itamar's own allegations. Itamar recognizes that the AASM publishes requirements for PAT-based home sleep apnea tests, and it acknowledges that CPT codes (uniform codes and definitions used for the reimbursement of diagnostic procedures with healthcare payors) exist for PAT-based tests. ECF 121 ¶ 44 – 46. The CPT code referenced by Itamar, CPT 95800, is defined as "Sleep study, unattended, simultaneous recording; heart rate, oxygen saturation, respiratory analysis (e.g., by airflow or peripheral arterial tone), and sleep time." Neither the AASM guidelines nor CPT 95800, both of which are referenced

and relied upon by Itamar in the Amended Complaint, require Itamar's claimed "proprietary PAT technology." *See e.g.* ECF 121 ¶ 57.

## ARGUMENT

### I. LEGAL STANDARD AND PLEADING BURDEN

Pursuant to Rule 12(b)(6), a complaint that fails to articulate sufficient facts necessary to state a claim upon which relief can plausibly be granted should be dismissed. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Supreme Court in *Twombly* held that while Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 554 (internal citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* Thus, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *accord. Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

In ruling on a motion to dismiss, the court can look to the content of the exhibits attached to a complaint as well as the content of documents that are not attached to the complaint but are "central to the plaintiff's claim" and whose authenticity is unchallenged. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Itamar centrally relies upon two documents: (a) the pamphlet distributed at two research conferences in June 2019, and (b) the pamphlet referenced in Paragraph 56. *See* ECF 121 ¶ 42 ¶ 56. These documents are attached hereto as **Exhibits A** and **B**, respectively, and can be properly considered in this Rule 12(b)(6) motion. *See Brooks v. Blue Cross & Blue*

*Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("However, where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."). Itamar does not allege that either of these pamphlets were made available at a point of sale or included in product packaging.

Itamar also alleges that Ectosense used the FDA's March 6, 2020 510(k) decision letter clearing NightOwl for marketing in the U.S. and the enclosed summary reflecting the basis of the FDA's conclusion (hereafter "510(k) Summary") to mislead the market, ECF 121 ¶ 45, 50,  and thus it is attached as **Exhibit C**. Ectosense maintains that the Court may also take judicial notice of the 510(k) Summary and review it to understand the basis of the FDA's clearance of NightOwl. *See e.g. Kelsey v. Alcon Laboratories, Inc.,* No. 180902756, 2019 WL 1884225, at *4 (Utah Dist.Ct. Apr. 22, 2019) (specifically considering FDA communications through judicial notice); *Arbor Pharm., LLC v. ANI Pharm., Inc.*, 2018 WL 3677923, at *4 (D. Minn. Aug. 2, 2018) (analyzing a motion to dismiss a Lanham Act claim where defendant raised FDCA preclusion argument and stating "The Court takes judicial notice of the information contained on the FDA website").[1] Although it had previously endeavored to sweep its earlier complaints clear of references to the 510(k) Summary to survive a motion to dismiss, Itamar now relies on to the content of the 510(k) Summary through its last amendment. ECF 121 ¶ 45 ("However, the 510(k) Summary for the NightOwl does not indicate that the device not measures REM.").

---

[1]  The NightOwl 510(k) Summary is made publicly available by the FDA on the FDA's website at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K191031.

1917448v1 998877.0001

II.     **Itamar's Third Amended Complaint is rife with inconsistencies regarding the relationship between Ectosense and VirtuOx, and should be dismissed as implausible.**

In earlier briefing of the Amended Complaint, Ectosense attacked the manner in which Itamar ascribed a series of statements to Ectosense without citation to indicate where or when the statements were made. Itamar included series of quotes, without citation, that Ectosense had no knowledge of. Upon researching and sourcing the statements, Ectosense attached them to its earlier motion to dismiss revealing that Itamar was excising random LinkedIn comments of third parties and obfuscating what statements it claimed were made by Ectosense and what statements were made by third parties but being attributed to Ectosense. Itamar argued that its allegations had to be accepted as true, and in doing so forced an adoption of these orphaned statements onto Ectosense by telling the Court that it had to accept as true that Ectosense claimed to be on a "shock-and-awe" campaigns and advertises as using the "same tech as Itamar."

The problem was that Itamar's allegations that Ectosense made these statements were never true. Throughout the Third Amended Complaint, Itamar now attributes these statements to VirtuOx—a distinct entity that Itamar claims is simultaneously a customer, distributor, principal, and agent of Ectosense and that Ectosense is similarly a principal and agent of VirtuOx. *See* ECF 121 ¶¶ 4, 6. This legal absurdity leaves Ectosense bewildered as to whether Itamar is attempting to hold Ectosense liable for the statements of VirtuOx or VirtuOx liable for the statements of Ectosense. The case is too far progressed, and far too much discovery has been provided to allow such facially absurd allegations to continue.

Itamar's continued indiscriminate confusion of the parties and failure to specify its claims improperly circumvents the pleading requirements for contributory and secondary liability doctrines for claims of infringement or false advertising premised on statements of another party.

*See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (adopting the contributory liability doctrine of secondary trademark infringement and applying it to false advertising claims, and noting: "This means that the plaintiff must allege that the defendant had the necessary state of mind—in other words that it "intended to participate in" or 'actually knew about' the false advertising."). Itamar makes no efforts to meet this pleading burden, and instead just repeatedly attributes series of quotes and materials and then claims that the two defendants are simultaneously each other's principals and agents.

### III. ITAMAR FAILED TO IDENTIFY USE OF THE PAT TRADEMARK ON A GOOD AND THE INFRINGEMENT OR FALSE DESIGNATION OF ORIGIN AND COUNTS I, II, AND V SHOULD BE DISMISSED.

Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods ... from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. Itamar's Claimed PAT Marks are for goods. Itamar cannot satisfy 15 U.S.C. § 1127's[2] "use in commerce" requirement. That requires: (1) a trademark; (2) is placed on a good, ancillary documents, or associated displays; and (3) the good is actually used in commerce.[3] Itamar describes all conduct at issue in Paragraph 48. That paragraph demonstrates "use in commerce" is absent. Itamar alleges Ectosense distributed written materials

---

[2] "For purposes of this chapter, a mark shall be deemed to be in use in commerce — (1) on goods when – (A) it is placed in any manner on the goods or their contains or the displays associated therewith or the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce[.]" 15 U.S.C. § 1127. Section 1127 governs the construction of the Lanham Act. *See Roor v. 902 N. Dixie,* 2016 WL 10952930, *2 (S.D. Fla. 2016)(applying to trademark infringement); *Potucek v. Taylor*, 738 F. Supp. 466 (M.D. Fla. 1990)(applying to false origin/unfair competition); *Jellibeans v. Skating Clubs*, 716 F.2d 833, 838 (11th Cir. 1983)(applying to false advertising).

[3] The alternate test applicable where "the nature of the goods makes such placement impracticable" only applies if a good's physical characteristics render affixing a trademark impracticable. *Southco v. Fivetech,* 982 F. Supp. 2d 507, 510 (E.D. Pa. 2013), *aff'd,* 611 F. App'x 681 (Fed. Cir. 2015).

referencing "PAT," gave conference presentations, and has an internet presence. Itamar has not alleged those materials simultaneously accompanied the goods, as required by 15 USC 1127's "use in commerce" definition. "[M]ere advertising or promotion . . . is insufficient to constitute 'use' of the mark 'in commerce[.]'" *Southco v. Fivetech*, 982 F. Supp. 2d 507, 511–12 (E.D. Pa. 2013), *aff'd*, 611 F. App'x 681 (Fed. Cir. 2015). Ancillary documents or displays only constitute "use in commerce" if (1) it is impracticable to place the mark on the good; and (2) the ancillary document or display accompanies the good in close proximity. There is a "requirement that for such a display to show the requisite use in commerce, it must be a "point of sale" display and not mere advertising." *In re Siny*, 920 F.3d 1331, 1334–35 (Fed. Cir. 2019). Websites, advertisements and documents, and displays separated from the good are not "use in commerce." They must be coupled with the unmarked good. "[M]ere advertising and documentary use of a notation apart from the goods do not constitute technical trademark use." *Id.*

Moreover, Itamar is attempting its Claimed PAT Marks for goods to "proprietary technology." Itamar's pursuit of dominion over any "technology" that measures peripheral arterial tone is negated by trademark law. Itamar acknowledges in the opening paragraph that it is a medical device manufacturer, and not a physiological signal. Its trademark for PAT is for goods, not technology. Trademarks for goods must be used for goods, and they do not extend to proprietary ideas or concepts. *See Potucek v. Taylor,* 738 F. Supp. 466, 470 (M.D. Fla. 1990). The court in *Potucek* observed:

> The confusion in Plaintiffs' unfair competition claim is caused by Plaintiffs' assertion that "goods" as used in 15 U.S.C. § 1125 (Lanham § 43(a)) includes proprietary information. Plaintiffs have not cited any cases that support Plaintiffs' contention that "goods" in section 43(a) extends to ideas, concepts, or manufacturing expertise. The cases cited by Plaintiffs do not support this proposition; but either merely restate the general rule that a photograph of a competitor's product used in advertising to

11

> represent another's product is false advertising and a violation of section 43(a) or the obvious rule that a publisher's "goods" are magazines and other printed material.

Itamar does not have a trademark to PAT-technology, and it cannot extend the PAT mark to the concept or allegedly proprietary methods of measuring PAT. *See* ECF 121 ¶ 23 (claiming Itamar owns the rights to "proprietary PAT® technology."); *cf Potucek,* 738 F. Supp. At 470  (recognizing that a mark for goods does not protect proprietary methods of doing something, it protects a tangible good). Itamar is using "PAT® technology" throughout the Third Amended Complaint not as a single-source identifying trademark, but rather as code for its definition of the techniques *it says* are required to measure or monitor peripheral arterial tone. *See e.g.* ECF 121 ¶¶ 23, 57, 75.

Having established that Itamar is not a physiological signal, and that whatever trademark rights exist in PAT only extend to goods—not this vague concept of proprietary PAT technology— Itamar is left with several additional allegations that demonstrate legitimate scientific uses of PAT by the FDA, the AASM guidelines, and the CPT reimbursement code. The AASM guidelines set forth:

- Peripheral arterial tone: A measure of pulsatile volume changes at the fingertip that reflects changes in sympathetic tone.

- Peripheral arterial tonometry (PAT): A technique allowing noninvasive moment-to-moment measurement of sympathetic tone using finger plethysmography (measurement of pulsatile volume changes in the fingertip that reflects changes in sympathetic tone). [...] used to detect respiratory events.

Despite the obvious non-trademark uses for PAT evident on the face of the complaint, Itamar improperly alleges that its purported rights to the Claimed PAT Marks cover "all products" and seemingly all uses of "PAT"—regardless of whether such uses are fair, descriptive, non-trademark, or used in a manner that is not affixed to a good. *See* ECF 121 ¶ 1, 11, 20. But Itamar's alleged

rights to and registrations of the Claimed Pat Marks do not and cannot create a monopoly to practice in and control the science of measuring physiological signals.

This is because trademark law, unlike patent law, does not provide any rights to exclude others from practicing a certain kind of "technology." What is more, trademark law does not prevent the use of words or acronyms that fairly describe a certain type of technology—even if such technology was previously patented. *Kellogg Co. v. Nat'l Biscuit Co*., 305 U.S. 111, 118 (1938) ("Since during the life of the patents 'Shredded Wheat' was the general designation of the patented product, there passed to the public upon the expiration of the patent, not only the right to make the article as it was made during the patent period, but also the right to apply thereto the name by which it had become known.")

In this case, the alleged rights and registrations for the Claimed PAT Marks, even if valid, only extend to the use of a mark as a source indicator for "medical apparatus, namely, non-invasive, diagnostic units used to assess and measure body functions and states and physiological conditions which affect the vasculature." ECF 121 ¶ 20. Itamar is conflating patent and trademark law, and attempting to shoehorn a patent protections into a trademark. This position conflicts with over a hundred years of patent and trademark law. *See id.* at 117 – 118 (discussing that patent law does not provide monopoly over product descriptions once such patents have expired)*; see also Singer Mfg. Co. v. June Mfg. Co*., 163 U.S. 169, 185 (1896) ("It equally follows from the cessation of the monopoly and the falling of the patented device into the domain of things public that along with the public ownership of the device there must also necessarily pass to the public the generic designation of the thing which has arisen during the monopoly in consequence of the designation having been acquiesced in by the owner […]").

The distinctions between a trademark for goods and an un-protectable concepts is not abstract. These distinctions define what a trademark owner must do for the goods it sells under the mark, and limits how a purported infringer can infringe on a trademark for goods.  Itamar provides no allegation that Ectosense ever marked its NightOwl-branded product with PAT within the meaning of § 1127. Without the coupling, Itamar is left with an internet presence, and a few pre-market brochures that were not at point of sale—indeed the product was not yet for sale.[4] This conduct cannot constitute infringement of a trademark for goods because Ectosense did not mark its NightOwl branded product with any of Itamar's trademarks.

#### IV.   ITAMAR'S FALSE ADVERTISING CLAIM IS PRECLUDED BY THE FDCA, AND, EVEN IF IT WERE NOT, ITAMAR FAILED TO SET FORTH A PLAUSIBLE CLAIM.

Itamar alleges that Ectosense engaged in false advertising by claiming NightOwl is a "PAT-based HSAT according to AASM guidelines." To support this, Itamar first references the June 2019 pamphlet that forms the basis of the trademark claims, but also later asserts:

> The NightOwl Instructions For Use also claims that the product diagnoses sleep apnea "based on an analysis of the peripheral arterial tone ('PAT')" and that the product "generates a diagnostic report containing information on … the presence or absence of a substantial changes in peripheral arterial tone (PAT)." However the NightOwl measures only basic PPG and does not provide a "PAT" measurement.

ECF 121 ¶ 47. Itamar's false advertising and FDUTPA claims are, respectively, precluded and preempted by 21 U.S.C. § 337(a), wherein Congress provided the FDA exclusive enforcement powers for the Food, Drug and Cosmetic Act ("FDCA"). Contrary to the FDA's conclusions reflected in the 510(k) Summary of NightOwl explicitly stating that the device analyzes peripheral arterial tone, Itamar seeks to have this Court undermine the FDA and reach a different outcome.

---

[4] Ectosense maintains that Itamar failed to plead anything beyond fair use as previously argued, but recognizes that no meaningful developments have occurred that warrant raising the argument with this Court again in light of the Court's prior ruling. *See* ECF 121 at 6 ("Defendant Ectosense has failed to demonstrate that a fair use defense is clear from the face of the complaint.").

1917448v1 998877.0001

In doing so, Itamar is claiming scientific statements cleared by the FDA are literally false and deceptive. These claims are precluded and preempted.

In prior motion practice, the parties briefed the impact of the primary case on the intersection between the exclusive enforcement provision of the FDCA and the private right of actions provided by Lanham Act is *POM Wonderful LLC v. Coca-Cola Co*., 573 U.S. 102 (2014) (holding that the FDA's exclusive enforcement authority did not preclude a Lanham Act claim for false advertising simply because FDA-regulated labeling was implicated). Ectosense pointed out that because *POM Wonderful* involved food labels, several courts have subsequently recognized that preclusion should still bar claims that require interpretation of the FDCA or directly conflict with a decision of the FDA. Itamar's primary argument during the earlier briefing on preclusion was summarized by this Court:

> Plaintiff argues that the nature of the 510(k) clearance process demonstrates that the FDA has not "approved" statements that the NightOwl relies on a PAT measurement and that the 510(k) Clearance Letter from the FDA does not support preclusion. Plaintiff argues that Ectosense, even considering the 510(k) Clearance Letter, cannot show the FDA agrees with every claim made in the 510(k) Summary. Further, Plaintiff contends the Clearance Letter clearly states that the FDA has not made a determination that the NightOwl's labeling meets any Federal statutes or regulations.

ECF 52 at 13. Further, during hearing on the earlier motion to dismiss, Itamar likened the 510(k) clearance process to a *pro hac vice* motion, ECF 51 T. at 35, and relied upon the *Medtronic* cases to cast the 510(k) process out as something insignificant. ECF 51  T. at 34 ("By sharp contrast, as the *Medtronic* case explains, the 510(k) process, and the Medtronic case said is in no way comparable to the PMA process. It is a very short process. It takes only 17 about 20 hours total, and there's very little information provided to the FDA."). This Court was persuaded by these arguments and found that because the Court does not need to interpret the FDCA, and because

there is no specific regulation that could conflict with Itamar's claims, preclusion and preemption are no bar. ECF 52 at 14, 20.

Itamar substantially mischaracterized the 510(k) process and ignored a host of regulations that demonstrate how exacting the 510(k) process actually is. However, the Court need not resolve this disagreement to determine whether Itamar's claims are precluded or otherwise implausible. Itamar alleges that NightOwl cannot analyze PAT. This is a scientific question that Itamar alleges is literally false and deceptive. When pursuing a literal falsity claim for a scientific question, the bar is high. In *In re GNC* the plaintiff asserted a false advertising claim on the basis that the advertised benefits of a glucosamine and chondroitin were contrary to "the vast weight of competent and reliable scientific evidence." 789 F.3d 505, 510 (4th Cir. 2015). The Fourth Circuit found it fatal to the claim that "Plaintiff does not allege that all scientists agree that glucosamine and chondroitin are ineffective at providing the promised joint health benefits" because the notion that it is simply contrary to the vast weight of scientific evidence concedes that reasonable scientists may disagree. *Id.* at 515. Despite, plaintiff's argument that this issue should not be resolved at the pleading stage and is better resolved through a battle of the experts, the court went on to indicate that this is indeed a *pleading* burden:

> Plaintiffs urge that it is inappropriate for the court to resolve a "battle of the experts" on the pleadings. However, we need not resolve any "battle of the experts" in order to decide whether the CAC states a claim for false advertising. When litigants concede that some reasonable and duly qualified scientific experts agree with a scientific proposition, they cannot also argue that the proposition is "literally false."

Returning to the nature of the 510(k) process, while not the same level of review as premarket approval, the precise level of review is not critical here. It is dispositive to Itamar's specific claims because the 510(k) clearance is indeed a safety and effectiveness determination that looks at the particular device being applied for, and all safety and effectiveness determinations

1917448v1 998877.0001

made by the FDA <u>must be based upon valid scientific evidence</u>. *See* 21 C.F.R. § 860.7(c)(1) ("Although the manufacturer may submit any form of evidence to the Food and Drug Administration in an attempt to substantiate the safety and effectiveness of a device, the agency relies upon only valid scientific evidence to determine whether there is reasonable assurance that the device is safe and effective.").

Itamar can no longer cast aspersions of doubt on whether the FDA, who Itamar presumably would concede is an expert on medical devices, considered the question of whether NightOwl analyzes PAT. Itamar has been provided volumes of documents showing the extensive dialogue between the FDA and Ectosense on this very question. <u>Thus, the difference in this round of briefing is that Itamar, if it is to be candid with this Court, must admit that the FDA (1) vetted NightOwl and agreed that it measures PAT.</u> Because Itamar can no longer argue that there are matters to be sorted out in discovery regarding whether the FDA reached the scientific conclusion that NightOwl measures PAT, Itamar is left with *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 52 (2d Cir. 2016), wherein the Second Circuit found a Lanham Act could proceed despite a 510(k) clearance. However, the factual distinctions here necessitate a different outcome.

In *Church & Dwight*, the plaintiff argued that the defendant's advertising was misleading, and the Court specifically noted that the FDA itself had actually (1) issued public warning letters, (2) specifically found that the advertisements in question had the capacity to deceive, and (3) imposed advertising guidelines to redress the potential deception—advertising guidelines that the defendants actually violated. Meaning, the plaintiffs in *Church & Dwight* <u>were fundamentally arguing that the FDA was correct that the advertisements were deceiving</u>, and were using the Lanham Act to counteract the deception. In that sense, the Lanham Act and the FDCA were

complimenting one another by allowing a competitor to privately enforce a false advertisement after the FDA itself concluded that the advertisement had the capacity to deceive. The Second Circuit reasoned that preclusion did not bar these claims:

> Notwithstanding that the FDA's regulation of Defendant's labeling addressed the same issue as raised by Plaintiff in its Lanham Act suit—the risk that consumers will misunderstand Defendant's messages as implying that the Product utilizes the same metric for pregnancy duration as used by medical professionals—there is no reason to assume that Congress would see the FDCA's precautions as undermined by a court's decision, upon a competitor's suit, that protection of the competitor against unfair competition through false advertising requires still greater protection against consumer miscomprehension than was mandated by the FDA

*Id.* at 64. This reasoning makes sense because the plaintiff's claims were consistent with the FDA's conclusions and concerns. Here, <u>Itamar is arguing that the FDA was incorrect in determining that NightOwl measures PAT</u>. Itamar is not alleging that Ectosense's claim of being PAT-based is contextually false or misleading, but rather that NightOwl cannot do something that the FDA concluded NightOwl can do: analyze PAT. Unlike *Church & Dwight*, all of Itamar's claims conflict directly with the basis of the FDA's decision to clear NightOwl rather than allegations that are consistent with the FDA's conclusions about the device at issue.

As Itamar is aware, the FDA actively edited the NightOwl 510(k) Summary with Ectosense, reviewed clinical trials, academic literature, and scientific evidence, prior to issuing the 510(k) clearancefor NightOwl. Itamar's claims necessarily challenge the competence of the FDA to make a determination based upon scientific evidence, and seek to have this Court enter an order stating that the FDA was incorrect. <u>This case is not about whether the Court has to interpret the FDCA, but rather whether a private litigant can use an Article III Court to collaterally undermine a scientific conclusion made by the FDA about a device the FDA cleared for use in the United States.</u> Allowing Itamar's allegations to continue would provide a dangerous precedent that would

1917448v1 998877.0001

allow every incumbent in the medical device industry to challenge new market entrants immediately upon their obtainable of the FDA's finding of substantial equivalence, directly contrary to FDCA's ambition to foster a competitive marketplace with the 510(k) process. Itamar's claims do not fall within the harmonized separate aims of the Lanham Act and the FDCA, its claims are direct efforts to put the FDA's scientific conclusions on trial.

Itamar asks this Court to enter an injunction directing Ectosense to never publish or advertise that "(a) The NightOwl or EZSlēp products are PAT-based when they are not; (b) the NightOwl or EZSlēp products use PAT® technology when they do not; and (c) the NightOwl or EZSlēp products are PAT-based HSATs according to the AASM guidelines when they are not." ECF 121 p. 36 ¶ A.2. Such an injunction would directly conflict with the FDA-issued 510(k) Summary, and would conceivably require that the proposed injunction be directed at the FDA itself for publishing the NightOwl 510(k) Summary. Here, the Lanham Act yields to the exclusive enforcement provision of FDCA because the FDA has affirmatively reviewed and cleared the statements that Itamar is claiming are false. Thus, Itamar's claims are precluded.

## V.  ITAMAR'S STATE LAW CLAIMS ARE PREEMPTED, AND FAIL FOR THE SAME REASONS ITAMAR'S FEDERAL CLAIMS FAIL.

Similar to the preclusion issue, Itamar's claims that Ectosense has engaged in false and deceptive trade practice by accurately describing its product as a PAT-based HSAT according to AASM guidelines is preempted. This Court previously ruled that preemption did not apply because the FDA had not imposed a specific requirement on NightOwl that would conflict with Itamar's claims. This Court stated: "state requirements are pre-empted 'only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device....'" and that "Ectosense has failed to point to any device specific "requirements" that would preempt Plaintiff's claims, any authority that would

support their claim that the 510(k) process constitutes or imposes a "requirement" under the FDCA's preemption provision, or any other general federal labeling requirement that would preempt Plaintiff's FDUPTA claim." ECF 52 at 21.

The Court was persuaded that the 510(k) clearance is not device specific in a field preemption view (i.e. no state can supersede FDA regulations where there are regulations for a specific type of medical device), but did not focus on the fact that this not a field preemption question—it is an issue specific preemption question. The 510(k) Summary *is device specific*. Pursuant to 21 C.F.R. 807.92(a) "A 510(k) summary shall be in sufficient detail **to provide an understanding of the basis for a determination of substantial equivalence**." These determinations must be based upon "valid scientific evidence." The FDA issues a clearance letter that attaches the 510(k) summary and publishes them together on its website under the 510(k) summary webpage for each device. The 510(k) Summary for NightOwl states that the device measures peripheral arterial tone and found that the device is substantially equivalent to Itamar's WatchPAT. Itamar alleges that NightOwl does not measure peripheral arterial tone and that any advertisement of NightOwl of being PAT-based is consequently false and deceptive. Itamar seeks damages and injunctive relief prohibiting Ectosense from stating that NightOwl measures peripheral arterial tone. The untenable result would be that Ectosense could send its 510(k) Summary in 49 of the 50 states to establish that the FDA cleared NightOwl as a PAT-based device, but would be prohibited from doing so in Florida. This is precisely what is prohibited by the FDA's exclusive enforcement powers because it would allow a state law to undermine the FDA's own scientific conclusions about a particular device. Simply put, the injunction would bar Ectosense from *accurately* advertising its product with the attributes that formed the basis of FDA clearance. These claims are preempted.

**CONCLUSION AND RELIEF REQUESTED**

For the reasons set forth herein, Itamar has failed to state a claim for which relief can be granted, and this Court should dismiss the Amended Complaint, ECF 121, pursuant to Rule 12(b)(6), and award Ectosense its attorneys' fees pursuant to 15 U.S.C. § 117(a) and section 501.2105(1), Florida Statutes.

**<u>Request for Oral Argument</u>**

Defendant Ectosense NV, by and through undersigned counsel and pursuant to Local Rule 7.1(b)(2), respectfully requests oral argument relating to this Motion to Dismiss the Third Amended Complaint. It is respectfully submitted that oral argument would be helpful to the Court for the adjudication this motion.  A hearing is desired due to the breadth of legal issues implicated by the Plaintiff's Amended Complaint and this Motion.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 23rd day of July, 2021, I served filed the following

document via email upon counsel for Plaintiff Itamar Medical Ltd.

/s/ *B. George Walker*

PAUL O. LOPEZ

Florida Bar #983314

pol@trippscott.com

SETH J. DONAHOE

Florida Bar #1004133

B. GEORGE WALKER

Florida Bar No.: 0071409

TRIPP SCOTT, P.A.

110 S.E. 6th Street, 15th Floor

Ft. Lauderdale, FL  33301

(954) 525-7500 telephone

(954) 761-8475 facsimile

**SERVICE LIST**
**CASE NO: 20-cv-60719-WPD**

| Counsel for Plaintiff: | Counsel for Defendant ECTOSENSE: |
|---|---|
| LAURA GANOZA, ESQ.<br>Florida Bar No. 0118532<br>lganoza@foley.com<br>atownsend@foley.com<br>HAWWI EDAO, ESQ.<br>Florida Bar No. 1026550<br>hedao@foley.com<br>hmoreno@foley.com<br>**FOLEY & LARDNER LLP**<br>One Biscayne Tower, Suite 1900<br>2 South Biscayne Boulevard<br>Miami, Florida 33131<br>(305) 482-8400<br>(305) 482-8600 (fax)<br><br>**Co-Counsel for Plaintiff:**<br><br>JESSICA N. WALKER, ESQ.<br>jwalker@foley.cOM | PAUL O. LOPEZ, ESQ.<br>eservice@trippscott.com (primary)<br>pol@trippscott.com (secondary)<br>sxc@trippscott.com (secondary)<br>SETH J. DONAHOE, ESQ.<br>eservice@trippscott.com (primary)<br>sjd@trippscott.com (secondary)<br>sgc@trippscott.com (secondary)<br>B. GEORGE WALKER, ESQ.<br>bgw@trippscott.com<br>sxc@trippscott.com<br>cab@trippscott.com<br>Tripp Scott, P.A.<br>110 SE 6th Street, 15th Floor<br>Fort Lauderdale, FL  33301<br>Telephone:  (954) 525-7500<br>Telefax:  (954) 761-8475 |

22

| | |
|---|---|
| **FOLEY & LARDNER LLP**<br>555 South Flower Street, Suite 3300<br>Los Angeles, CA 90071-2418<br>(213) 972-4675<br><br>GENE KLEINHENDLER, ESQ.<br>gene@gk-ad.com<br>ANNA ADAMSKY, ESQ.<br>anna@gk-ad.com<br>**GK ADVISORY**<br>72 Ahad Haam St.<br>Tel Aviv 6520512, Israel<br>(972) 3-735-6168 | **Co-Counsel for Defendant ECTOSENSE:**<br><br>Stephen Baird, Esq.<br>(*pro hac vice to be filed*)<br>GREENBERG TRAURIG, LLP<br>90 South 7th St., Suite 3500<br>Minneapolis, MN  55402<br>bairds@gtlaw.com<br><br>Paul B. Ranis, Esq.<br>Florida Bar No. 64408<br>GREENBERG TRAURIG, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, Florida 33301<br>ranisp@gtlaw.com<br>scottlaw@gtlaw.com<br>FLService@gtlaw.com<br><br>***Counsel for VirtuOx Inc.***<br><br>Jonathan B. Morton<br>Florida Bar No. 956872<br>Jonathan.Morton@klgates.com<br>**K&L Gates LLP**<br>Southeast Financial Center<br>200 South Biscayne Boulevard, Suite 3900<br>Miami, Florida 33131-2399<br>Telephone: 305-539-3357<br><br>Darlene F. Ghavimi, *Admitted Pro Hac Vice*<br>Texas Bar No. 24072114<br>Darlene.Ghavimi@klgates.com<br>Stewart Mesher, *Admitted Pro Hac Vice*<br>Texas Bar No. 24032738<br>Stewart.Mesher@klgates.com<br>**K&L GATES LLP**<br>2801 Via Fortuna Suite 350<br>Austin, Texas 78746-7568<br>Telephone: (512) 482-6919 |

## EXHIBITS

A.  June 2019 pamphlet

B.  VirtuOx Flyer

C.  NightOwl 510(k) Summary

1917448v1 998877.0001