UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

ITAMAR MEDICAL LTD.,

          Plaintiff,

v.

ECTOSENSE NV, and
VIRTUOX, INC.

_____Defendants_____/

Case No. 20-60719-CIV-
DIMITROULEAS/SNOW

**<u>ECTOSENSE'S FACTUAL SUBJECT MATTER JURISDICTION MOTION TO
DISMISS ITAMAR'S "THIRD-AMENDED" COMPLAINT</u>**

This is a factual subject matter jurisdiction attack on a case Itamar should never have filed. Itamar knew even before filing it lacked Article III standing to even file a lawsuit. Ectosense's previous 12(b)(6) motion argued Itamar's Complaint contained false statements of fact on that material issue. A legitimate grievance, and corresponding concrete, redressable injury is the fundamental heart of every case. Ectosense informed the Court Itamar lacked an injury – that it was impossible, even. Instead of acknowledging the problem, Itamar invited the Court to accept a an over-simplified[1] articulation of the 12(b)(6) standard of review they knew would require the Court to draw an incorrect inference. Ectosense told the Court Itamar had not suffered a redressable injury. Itamar, rather than acknowledging that truth, implied that was not the case. First, it told the Court it didn't have to even plead it had been injured, and made a distracting accusation that Ectosense made a groundless argument. Itamar then told the Court that, assuming Itamar did have to plead an actual injury, Itamar had pleaded it. Finally, Itamar relied on the four corners rule in written responses, and in open Court:

> **Ectosense tacks on another equally groundless argument . . . stating that Itamar did 'not plead lost profits.' . . . [E]ven if Itamar were required to plead past lost profits, it did in fact do so. . . . Itamar alleged that "[b]oth consumers and Itamar have been injured by Ectosense's violations[.] . . . Itamar lost not only the revenue from those [consumer] sales but also the profits inherent in them. Those are past lost profits, which can constitute actual damages**. [D.E. 35, pg. 28].

> **[T]his is a motion to dismiss. It's a 12(b)(6). . . . [don't] look to outside materials to dispute all of the various allegations that are in our complaint [because] that goes directly against the fundamental principle that on a 12(b)(6), the court accepts all our allegations to be true . . . [W]e've alleged what it is and how it's used, and those are to be accepted as true.** *Motion to Dismiss Hearing Transcript*, pg. 28:2-10. [D.E. 51].

---

1.      Over-simplified, because Itamar left out half of the rule. "When reviewing a motion to dismiss, a court must construe a plaintiff's complaint in the light most favorable to plaintiff and take the factual allegations stated therein as true . . . [however], the Court may consider the USPTO registration, which are matters of public record, maintained by the government . . . in considering a motion to dismiss." *Sream v. K&R*, 2017 WL 6409014, *3 (S.D. Fla. 2017)(dismissing complaint under 12(b)(6) because [Plaintiff] has failed to establish that it has [what is] necessary to establish standing to assert its Lanham Act claims.").

So, Itamar relied on an over-simplified legal premise, knowing the Court would infer an incorrect fact that Itamar knew or should have known was false as Itamar had been advised that Ectosense had not even entered the U.S. market.  That is the exact opposite of what a litigant is supposed to do when it is aware that the Court is under a false impression.

Ectosense, in preparing its response to Itamar's "Third-Amended" Complaint ("TAC"), determined the 11th Circuit holds the Lanham Act's "use in commerce" requirement governs subject matter jurisdiction.  First, Itamar must <u>plead</u> sufficient "use in commerce" to invoke subject matter jurisdiction for all its Lanham Act claims.  Second, this factual subject matter jurisdiction attack shifts a burden of proof on Itamar, forcing Itamar to <u>also provide evidence</u> of subject matter jurisdiction.  Itamar's burden is insurmountable.  Establishing a predicate "use in commerce" is a fundamental, core Lanham Act jurisdiction issue – Article III standing requires it exist at all times in a lawsuit.  Itamar must demonstrate <u>not only</u> that standing exists now, <u>but also</u> when Itamar filed this case, on April 8, 2020, to escape Ectosense's factual subject matter jurisdiction attack.

<strong><u>Itamar cannot</u></strong>.

**I.    <u>FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) PERMITS ECTOSENSE TO OFFER – AND THE COURT TO CONSIDER – EXTRINSIC EVIDENCE DEMONSTRATING THE FALSITY OF ITAMAR'S ALLEGATIONS PURPORTEDLY GIVING RISE TO SUBJECT MATTER JURISDICTION</u>.**

This is an assault on Itamar's demonstrably false allegations it used to manufacture the <u>appearance</u> of standing.  A factual attack requires the Court to interrogate the alleged subject matter jurisdiction's underlying factual premise, and review it with a skeptical eye.  Ectosense is entitled to use evidence beyond the confines of Itamar's TAC in this its attack, and this Court must consider Ectosense's evidence.  That is appropriate, and necessary.  Itamar's false allegations are unreliable.

"'Factual attacks' . . . challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits,

2

are considered." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). Factual subject matter attacks magnify arguments that can also be raised in facial subject matter jurisdiction attacks, by imposing an evidentiary burden on the plaintiff. "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion – the court must consider the allegations of the complaint to be true." *Id.* "When the attack is factual,

> the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – <u>its very power to hear the case</u> – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. . . . no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

*Id*. (quoting *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1980), *cert. denied*, 449 U.S. 953 (1981)).[2] Ectosense's factual attack shifts the burden of proof to Itamar. *Sream v. K&R*, 2017 WL 6409014 (S.D. Fla. 2017). Itamar can't meet its burden of proof with sufficient evidence, because Itamar has no evidence that federal subject matter jurisdiction existed at all. Further, Itamar has no evidence that subject matter jurisdiction existed to assert Lanham Act claims at the inception of its case. The Court should dismiss Itamar's TAC with prejudice. Itamar is unable to overcome a factual challenge to its jurisdictional allegations masquerading as a basis for federal jurisdiction.

## II.     <u>ITAMAR CAN'T ESTABLISH SUBJECT MATTER JURISDICTION.</u>

### A.     **Itamar Used False Representations of Fact to Fabricate Subject Matter Jurisdiction at the Genesis of Its Case.**

Itamar's Original Complaint alleged Ectosense had already "made unauthorized use of the PAT Marks <u>in commerce</u> by making false and misleading statements about the NightOwl product." [D.E. 1, ¶ 36]. <u>This statement was false</u>. Itamar also alleged Ectosense had already "attempted to

---

2.      *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981)("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit . . . as that court existed on September 30, 1981, handed down by that court to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and bankruptcy courts in the circuit.").

derive financial benefits from residents of the State of Florida." [D.E. 1, ¶8].  This statement was false.  Further, Itamar alleged at the time of the Original Complaint, "Virtuox, Inc. is Ectosense's United States distributor." [D.E. 1, ¶16].  This statement was false.  Moreover, Virtuox has never been Ectosense's agent or legal representative, and Ectosense has never given Virtuox the authority to speak on Ectosense's behalf.  Itamar alleged "[t]he NightOwl Instructions for use also claims that the product diagnoses sleep apnea," implying Ectosense had already disseminated it in the U.S.  [D.E. 1, ¶23].  The implication Itamar created is false, which Itamar knew.  Moreover, Itamar is referring to a manual describing a software-only product for the European market, not the United States.  Itamar claimed Ectosense's materials describing NightOwl as "PAT-based," disseminated in the U.S., ([D.E. 1, ¶¶8; 17-21]) were already "diverting sales" when the lawsuit was filed.  [D.E. 1, ¶29].  That was false.

Ectosense didn't "use in commerce" Itamar's marks as the Lanham Act requires.  *See infra*.  Ectosense didn't "use in commerce" its own devices until months after Itamar filed its case to preemptively prevent a competitor from entering the market.  When this lawsuit was filed, it was impossible for Ectosense to engage in U.S. "commerce."  Ectosense didn't have a registered U.S. Agent with the FDA – a prerequisite to importing medical devices to the U.S. – until weeks after Itamar filed this case.  It was impossible for Ectosense to even attempt to "derive financial benefits from residents of the State of Florida" when Itamar falsely claimed to the contrary.  Ectosense didn't have a U.S. distributor before Itamar falsely claimed to the contrary. Virtuox was not and never was Ectosense's U.S. distributor.  This is particularly problematic because all the conduct Itamar points to related to a sleep conference in Texas that was held months before Ectosense even received FDA clearance, and nearly a year before it entered the market. Ectosense wasn't already U.S. "diverting sales," but Itamar falsely claimed to the contrary.  Ectosense hadn't distributed its NightOwl instructions in the U.S., when Itamar falsely claimed to the contrary.

**B.      Itamar Lacked Subject Matter Jurisdiction under a Federal Question from the Moment it Filed this Lawsuit, and that is an Incurable Problem.**

The absence of subject matter jurisdiction existing at the inception of this case infects the entirety of this case.  Itamar can't cure its lack of jurisdictional <u>facts</u> existing at the inception of this case by amending its jurisdictional <u>allegations</u>.  <u>Itamar shouldn't have been granted the privilege to amend before, because that incorrectly assumed Itamar's jurisdictional allegations were based in reality, instead of being incorporeal figments conjured from the ether</u>.  So, complaints about the timing of this challenge to subject matter jurisdiction, now that Itamar purportedly travels under a "fourth" operative pleading, should fall on deaf ears.  "Purports" is appropriate, because "where a plaintiff never had standing to assert a claim against the defendants, it does not have standing to amend the complaint and control the litigation[.]"   *Summit v. U.S. Steel*, 639 F.2d 1278, 1282-83 (5th Cir. 1981)).[3]

Article III standing was a core prerequisite to Itamar filing this case.  There is an "irreducible constitutional minimum of standing" for all federal cases.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, n.5 (1992).  "Standing is to be determined at the commencement of suit." *MSPA v. Covington*, 212 F. Supp. 3d 1250, 1258 (S.D. Fla. 2016)(quoting *Focus v. Pinellas*, 344 F.3d 1263, 1275 (11th Cir. 2003)).  It is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at [every] stag[e] of the litigation." *Lujan*, 504 U.S. at 561.  "Article III requires [ ] a plaintiff's claim be live not just when he first brings suit, but throughout the litigation."  *Id.* at 1258 (citing *Summit*, 639 F.2d at 1282-83).

---

3.      It is not unheard of for federal courts to discover subject matter jurisdiction did not exist upon filing – even after a case is fully-litigated and appealed all the way to the Supreme Court.  "The rule is inflexible and without exception . . . [it] requires this court . . . to deny its own jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States[.]"  *Morris v. Gilmer*, 129 U.S. 315, 325-26 (1889).

Changed circumstances in this case can't retroactively cure Itamar's lack of jurisdictional facts when it first filed. A "[p]laintiff cannot create standing by referencing this later [occurring event]." *Id.* (citing *Tucker v. Phyfer*, 819 F.2d 1030, 1034 (11th Cir. 1987) (abrogated on other grounds)). "The rule that subject-matter jurisdiction 'depends on the state of things at the time of the action brought' does not suggest a different interpretation. The state of things and the originally alleged state of things are not synonymous; demonstration that the original allegations were false will defeat jurisdiction." *Rockwell v. U.S.*, 549 U.S. 457, 474-74 (2007)(emphasis supplied). "Plaintiff filed his [document that could create standing] *after* he filed his [first pleading asserting a cause of action based on that document]. Because 'subject-matter jurisdiction depends on the state of things at the time of the action brought, the Court looks to the [first pleading asserting a cause of action based on the documents allegedly giving rise to standing] to determine jurisdiction . . . [so the Court was without subject matter jurisdiction[.]" *Logan v. IRS*, 2018 WL 3067892, *5 (M.D. Fla. 2018)(quoting *Rockwell*, 549 U.S. at 474-74).

Ectosense's previous federal question counterclaim is no longer pending. If Ectosense did have an operative federal question counterclaim, it would still not save federal jurisdiction after Itamar's claims are dismissed due to lack of subject matter jurisdiction. *Kevin v. Bucket*, 2018 WL 335294, *7 (M.D. Fla. 2018), *rprt. and recomm.*, 2018 WL 3344550 (M.D. Fla. 2018). "Section 1338 . . . provides in relevant part that '[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . copyrights and trademarks." *Holmes v. Vornado*, 535 U.S. 826, 829 (2002). "[A] counterclaim – which appears as part of the defendant's answer, not as part of the plaintiff's complaint – cannot serve as the basis for 'arising under' jurisdiction." *Id.* at 831 (applied specifically to § 1338's "arising under" jurisdiction for claims involving trademarks, copyrights, and patents, and noting that the rule broadly applies to claims "arising under the Constitution, laws, or treaties of the United States" under § 1331.).

Federal courts presiding over trademark, patent, and copyright cases have encountered this problem before, the aberration Itamar created for itself is not entirely anomalous. *Wellness Pub. v. Barefoot*, 2008 WL 108889, *10-11 (D. N.J. 2008) (holding dismissal and refiling of new action only appropriate outcome); "[b]ecause of the initial defect, [Plaintiff's] standing problem cannot be cured [later]." *Nat'l Licensing v. Inland Joseph*, 361 F. Supp. 2d 1244, 1257-59 (E.D. Wash. 2004) (applying rule to cases relying on federal trademark and patent claims for jurisdiction).

Itamar may argue dismissing the lawsuit will be inefficient, because it will simply result in Itamar inevitably filing a new action. Subject matter jurisdiction is not a matter of efficiency or convenience. Courts have considered that issue, also. "It appears that the proper course for a plaintiff who has filed a jurisdictionally deficient copyright infringement claim, upon satisfying the jurisdictional prerequisite of registration, is to file a new action. [An argument can be made] that, because a dismissal for lack of subject matter jurisdiction would simply result in the plaintiff filing a new complaint, the interests of efficiency warrant allowing the plaintiff to simply amend its old complaint rather than file a new action . . . [h]owever, an amendment cannot relate back to a complaint over which the Court did not have subject matter jurisdiction." *Wellness*, 2008 WL 108889 at *10.

C.     **Itamar Didn't Plead Diversity Jurisdiction – and It Wouldn't Save Itamar, Even if It Had, Because it Can't Exist Here.**

Itamar may argue diversity jurisdiction should be considered now, but Itamar would be wrong. Diversity jurisdiction never existed, whether Itamar pleaded it or not. U.S. CONST., Article III, Section 2 defines the jurisdiction of U.S. federal courts:

> The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls; . . . admiralty and maritime; . . . to controversies to which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states;

between citizens of the same state claiming lands under grants of different states, and <u>between a state, or the citizens thereof, and foreign states, citizens or subjects.</u>

U.S. Const. Art. III, Sec. 2 (emphasis supplied).  Missing from Article III, Section 2's grant of power is any provision allowing suits by "citizens or subjects" of a "foreign state" against "citizens or subjects" of another "foreign state." So, "[l]ike the complete diversity rule in cases between citizens of different states, alienage jurisdiction prohibits an alien from suing another alien in federal court[.]"  *Molinos v. Lama*, 633 F.3d 1330, 1340 (11th Cir. 2011).  "Itamar is a limited corporation, with its principal place of business in Caesarea, Israel."  [D.E. 1, ¶5]; [D.E. 9, ¶9]. "Ectosense *nv* . . . is a Belgium-based company."  [D.E. 1, ¶6]; [D.E. 9, ¶10].

## III.   "USE IN COMMERCE" IS A JURISDICTIONAL PREREQUISITE TO ALL OF ITAMAR'S LANHAM ACT CLAIMS.

### A.   The Lanham Act Itself; the Constitution's Commerce Clause; and Rules for the Exercise of the Lanham Act Over Extraterritorial Activity, Constrain and Preclude Itamar From Establishing Lanham Act Subject Matter Jurisdiction.

Itamar has a host of problems with its attempted Lanham Act use.  Itamar's lawsuit violates a core jurisdictional predicate of the Lanham Act requiring Itamar demonstrate Ectosense's "goods" were "used in commerce."  If the Lanham Act was applied here as sought by Itamar, it would violate the Commerce Clause.  It would regulate purely intrastate conduct that has no substantial impact on interstate commerce, and non-commercial activity.  Applying the Lanham Act against Ectosense under these circumstances would violate Constitutional provisions the Supreme Court created to protect citizens of other countries from Congressional global overreach, and would offend basic notions of comity the United States extends to foreign sovereigns of equal dignity.

1.   <u>Itamar Can't Demonstrate the Jurisdictionally Required Predicate of the "Use in Commerce" of its Goods by Ectosense.</u>

The Constitutional basis Congress relied on to enact the Lanham Act is the Interstate Commerce Clause. The Lanham Act does not identify the Foreign Commerce Clause[4] as a distinct jurisdictional base, but Lanham Act may be applied extraterritorially, subject to restrictions applicable here. The restrictions apply to commerce between U.S. persons or entities, and foreign persons or entities. This is true whether the commerce is partially or completely extraterritorial. Substantially more economic activity is required to demonstrate "commerce" justifying extraterritorial application of the Lanham Act over a citizen of a foreign sovereign.

Itamar must demonstrate Ectosense "used in commerce" one of its trademarks. Itamar needed to meet this jurisdictional requirement as a factual matter, before Itamar filed this case. "Federal courts have subject-matter jurisdiction when a defendant uses a plaintiff's trademark in interstate commerce." *Frida v. Tupperware*, 2014 WL 11880681, *2 (S.D. Fla. 2014)(quoting *Planetary Motion v. Techsplosion*, 261 F.3d 1188, 1194-95 (11th Cir. 2001)). "[U]se in commerce [is a] jurisdictional prerequisite." *Planetary Motion*, 261 F.3d 1194-95. "Use in commerce" must also be pleaded and proven, at some point in the litigation. *Sun-Maid v. Sunaid* 356 F.2d 467, 469 (5th Cir. 1966). Ectosense's factual jurisdictional attack requires Itamar demonstrate "use in commerce" in response to this motion. "A factual attack disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. Here, Defendant disputes [Plaintiff's] [standing]. Because Defendant has challenged the factual basis for jurisdiction with evidence . . . [Plaintiff] must come forward with 'competent proof' to support its allegations of jurisdiction . . . [but Plaintiff] has not supported its burden of establishing subject matter jurisdiction exists [so the Lanham Act] claims are dismissed." *Sream*, 2017 WL 6409014.

---

4.        U.S. CONST. Art. I, Sec. 8, Clause 3 provides Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]"

The Lanham Act phrase "use in commerce" is defined in 15 U.S.C. § 1127.  That section provides rules of construction and definitions applicable to the entire Lanham Act:

> <u>In the construction of this chapter</u> . . . [t]he term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.  <u>For purposes of this chapter, a mark shall be deemed to be in use in commerce — (1) on goods when – (A) it is placed in any manner on the goods or their contains or the displays associated therewith or the tags or labels affixed thereto</u>, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce[.][5]

15 U.S.C. § 1127.  The phrase "this chapter" indicates the definition applies to the entire Lanham Act, contained in U.S. Code Title 15, Chapter 22, 15 U.S.C. §§1051 – 1141n.   15 U.S.C. § 1127 also states an intent that the term "use in commerce" be applied to all of Itamar's claims.[6]

Itamar's claims are subject to the "use in commerce" requirement.  The "use in commerce" requirement is explicitly incorporated by reference throughout the Lanham Act, which facially states an intent to apply the requirement to all causes of action at issue here.  So, the 11th Circuit has, in sweeping language, applied "use in commerce" to the entire Lanham Act.  The 11th Circuit noted the existential importance of "establishing the 'use in commerce' jurisdictional prerequisite of the Lanham Act." *Planetary Motion*, 261 F.3d at 1195, n.9; *see also*, *Frida* 2014 WL 11880681, *2 (applying "use in commerce" as jurisdictional requirement to same causes of action Itamar asserts; "[f]ederal courts have subject-matter jurisdiction over claims brought under the Lanham Act when a defendant uses a plaintiff's trademark in interstate commerce"); *Roor v. 902 N. Dixie,*

---

5.      Subsection (2) of the 15 U.S.C. § 1127 "use in commerce" definition defines "use in commerce" as to services in a similar, but slightly different fashion.  This section is inapplicable, because goods are at issue in this lawsuit, not services.

6.      The Lanham Act's "intent [is] to regulate commerce within the control of Congress by making actionable the <u>deceptive and misleading use of marks in such commerce</u>; to protect registered marks <u>used in such commerce . . . against unfair competition</u>; [and] <u>prevent fraud and deception in such commerce by the use of</u> reproductions, copies, counterfeits, or colorable imitations of [such] marks."  15 U.S.C. § 1127.  The clause states an intent to apply a "use in commerce" requirement over Lanham Act claims for trademark infringement; unfair competition and false designation of origin; and false advertising – the exact, and only, Lanham Act claims Itamar asserts.

2016 WL 10952930, *2 (S.D. Fla. 2016)("use in commerce" requirement applies to trademark infringement); *Potucek v. Taylor*, 738 F. Supp. 466 (M.D. Fla. 1990)(rule applies to false designation of origin/unfair competition claims; "subject matter is predicated on Plaintiffs' demonstrating a cognizable claim under the Lanham Act[;]" the jurisdictional requirement applies to Lanham Act cases involving the use of "goods"); *Jellibeans v. Skating*, 716 F.2d 833, 838 (11th Cir. 1983)(rule applies to false advertising claims; "[t]he 'use in commerce' requirement under Lanham Act false advertising claims is a 'subject matter jurisdiction [issue because] th[e] grant of jurisdiction may not exceed the constitutional limitations of Congress to regulate service marks.'").

Under 15 U.S.C. § 1127, establishing "use in commerce" for Lanham Act jurisdiction requires: (1) a protected trademark; (2) is placed on a good, or its packaging, associated displays, tags or labels; and (3) the good is actually used in interstate (or foreign) commerce.  The alternate test applicable where "the nature of the goods makes such placement impracticable" only applies if a good's physical characteristics render affixing a trademark impracticable.  *Southco v. Fivetech,* 982 F. Supp. 2d 507, 510 (E.D. Pa. 2013), *aff'd,* 611 F. App'x 681 (Fed. Cir. 2015)(good at issue was computer screw).  The statute also requires the plaintiff to own the trademark at issue.  *Frida*, 2014 WL 11889681 at *2 ("[f]ederal courts have subject-matter jurisdiction over claims brought under the Lanham Act when a defendant uses a plaintiff's trademark in interstate commerce."). This is important if Itamar argues aspects of Ectosense's conduct or documents give rise to a claim, but the conduct or documents have not "use[d] in commerce" any of Itamar's protected marks.  If Itamar suggests Lanham Act jurisdiction exists to police Itamar's "ideas, concepts, or manufacturing expertise," there are "not  . . . any cases that support [the] contention that 'goods' . . . extends to ideas, concepts, or manufacturing expertise.'"  *Potucek*, 738 F. Supp. at 470.

> 2.  Enforcing Itamar's Attempted Use of the Lanham Act Would Violate the Commerce Clause of the U.S. Constitution.

The jurisdictional basis of the Lanham Act is the U.S. Commerce Clause.  U.S. CONST. Art. I, Sec. 8, Clause 3.  So, the limits on what "commerce" is for constitutional purposes act as additional limit to the scope of the word "commerce" in the phrase "use in commerce."  The scope of the Commerce Clause has been debated since before it was even enacted.  "The powers delegated by the proposed Constitution to the Federal Government, are few and defined.  Those which are to remain in the State Governments are numerous and indefinite."  FEDERALIST PAPER No. 45.  The modern articulation of areas subject to regulation through the Commerce Clause was announced and applied in *U.S. v. Lopez*, 514 U.S. 549, 560 (1995).  *Lopez* represented an over-expansive application of the Commerce Clause by Congress.  So, the Supreme Court narrowed application of the Commerce Clause substantially.  Had it not, it "would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local.  This we are unwilling to do."  *Id.* at 567-68.  So, the Commerce Clause "may regulate the use of the channels of interstate commerce[;]" "the instrumentalities of interstate commerce, or persons or things in interstate commerce[;]" and "those activities that substantially affect interstate commerce."  *Id.*at 558-59.  The policy behind *Lopez* is a fear expressed by the Founders of the insidious "danger which might favor the [federal government's] ascendancy over the governments of the particular States."  FEDERALIST PAPER, No. 45.  The Supreme Court zealously guards against that danger to prevent the U.S. from devolving into a police state.  "[I]f these police regulations . . . are to be considered as a part of the immense mass of commercial powers . . . [d]espotism will have its day of triumph, and will accomplish the purpose at which it too certainly aims."  *Gibbons v. Ogden*, 22 U.S. 1, 68, 69 (1824).

The *Lopez* Court also approved "regulations of activities that arise out of or are connected <u>with a commercial transaction</u>, which viewed in the aggregate, substantially affects interstate

commerce." *Id.*at 561.  Aggregation can only be used to find an activity "substantially affects interstate commerce" where the activity is economic in nature.  "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, 514 U.S. at 560.  "Economic activity" means "commercial," and more specifically, "connected with a commercial transaction." *Id.* at 561, 566.  "Transaction" presupposes economic "intercourse" between two parties. *Champion v. Ames*, 188 U.S. 321, 325 (1903).  The Commerce Clause itself offers that point of reference by describing the power to regulate activity occurring "between" or "among" separate entities. *Gibbons*, 22 U.S. at 2.[7]  "[W]hether an intrastate activity is commercial . . . is [a] limi[t] to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as have enforceable outer limits, congressional legislation under the Commerce Clause [will also be limited]." *Lopez*, 514 U.S. at 561.  Thus, non-commercial activity can't be used as a justification to exercise the Commerce Clause. *Id.*[8]

Finally, *Lopez* and its progeny also hold when viewing an activity to determine whether it is "commercial," courts are not permitted to find a link to commerce by inferring an eventual or indirect relation to commerce.  Instead, "the activity in question [itself] has [to be] some sort of [commercial] endeavor." *U.S. v. Morrison*, 529 U.S. 598, 610-11, 615 (2000)(using terms "economic activity" and "commercial activity" interchangeably).  Otherwise, "we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority

---

7.        *Lopez* resurrects, in part, a restrictive view of the Commerce Clause dating back to *Gibbons*, an opinion authored by Chief Justice John Marshall, creator of the power of judicial review in *Marbury v. Madison*, 5 U.S. 137 (1803).  Thus, the pedigree of the modern articulation of the Commerce Clause is impressive.

8.        *Lopez* and its progeny exclude from constitutional "commerce" at least intrastate commercial activity not substantially affecting interstate commerce, local gun possession, agriculture, horticulture, stock raising, domestic fisheries, mining, violent crimes, activity leading to violent crime, family law, marriage, divorce, and education. *Lopez*, 514 U.S. at 564-65; *Morrison* at 610-11.  THE FEDERALIST PAPERS, relied on by *Lopez* to identify the historically-intended scope of the Commerce Clause, also excludes core First Amendment activity, (*e.g.*, "Arts" in FEDERALIST PAPERS No. 21) standing alone, from "commercial activity,"  and transferring property, testamentary succession, and land taxes.   *Lopez*, 514 U.S. at 551-52, 576-77, 586, 590, n.3, n.4, n.9 (referencing FEDERALIST PAPERS Nos. 3; 4; 17; 21; 33-36; 42; 44-46; 51).

under the Commerce Clause to a general police power[.]"  *Lopez,* 514 at 567.  "[T]he Commerce Clause [would] completely obliterate the Constitution's distinction between national and local authority [if we] follow the but-for-causal chain from the initial occurrence of [the activity at issue] to every attenuated effect upon interstate commerce."  *Morrison*, 529 U.S. at 615.

3.   The Foreign Commerce Clause Limits Regulation of Extraterritorial Commerce.

Beyond the Interstate Commerce Clause, the Lanham Act may also regulate extraterritorial commercial activity with the Foreign Commerce Clause, subject to significant limitations present in this case.  "An unbounded reading of the Foreign Commerce Clause allows the federal government to intrude on the sovereignty of other nations – just as a broad reading of the Interstate Commerce Clause allows it to intrude on the sovereignty of the States."  *U.S. v. Baston*, 818 F.3d 651, 668 (11th Cir. 2016).  Similar limits to the Interstate Commerce Clause apply to the Foreign Commerce Clause.  *Id.*  "Congress's power under the Foreign Commerce Clause includes . . . the power to regulate the 'channels' of commerce between the United States and other countries[;] 'instrumentalities' of commerce between the United States and other countries[;] and activities that have a 'substantial effect' on commerce between the United States and other countries."  *Id.*  The Interstate Commerce Clause and Foreign Commerce Clause occupy distinct spheres of commercial activity.  The Interstate Commerce Clause can't regulate purely intrastate local activity with no substantial impact on interstate commerce.  The Foreign Commerce Clause can't regulate "conduct . . . in the territorial [area] of a foreign nation, by foreign nationals using a foreign [instrumentality], of [goods] not bound for the United States."  *U.S. v. Davila-Mendoza*, 972 F.3d 1264, 1276 (11th Cir. 2020).  Such conduct does not "substantially affect[t] United States commerce with foreign nations."  *Id.*  Like the Interstate Commerce Clause, the activity at issue must itself constitute "commerce."  Inferring eventual connections to "United States commerce

14

with foreign nations, requires a chain of inferences like that rejected by the *Lopez* court." *Id.*  The power to regulate extraterritorial commercial activity with substantial effects in the United States is the Foreign Commerce Clause's limit.  *Frida,* 2014 WL 11880681, at *2-4 (Lanham Act case).

Recurring examples demonstrate these principles.  Even activity which would definitely have a commercial character under normal circumstances, is not commercial activity substantially affecting the United States if the activity in a given case occurred for purposes unrelated to commerce.  *Id.* (citing *McBee v. Delica Co., Ltd.*, 417 F.3d 107, 123-24 (1st Cir. 2005); no substantial impact where Plaintiff induced sale under false pretenses to secure Lanham Act jurisdiction).  Advertising materials from foreign countries about a defendant and its products, sent to the United States, standing alone, do not cause substantial effects in the United States.  *Id.* (applying *McBee*, 417 F.3d at 123-24, to Lanham Act jurisdictional requirements).  This is true whether the defendant is a U.S. entity as in *Frida*, or foreign entity as in *McBee*.  Even where a defendant is allegedly engaging in extraterritorial commercial conduct, the Defendant's simultaneous creation and dissemination of marketing materials <u>even in the United States</u> doesn't create a substantial impact in the United States.  *Frida*, 2014 WL 11880681, *3 (S.D. Fla. 2014)(citing *McBee,* 417 F.3d at 124; "websites hosted in the U.S. – YouTube and Facebook – . . . fail to establish that Defendants have used [Plaintiff's] trademark 'in commerce.'").  Even when advertisements are created extraterritorially; directed into the United States; and combined with marketing materials in the United States, there isn't a substantial impact on the United States.

Under the Lanham Act, "[e]xtraterritorial application . . . permits federal courts to [adjudicate] conduct that occurs outside of the . . . United States when: (1) the defendant 'is a United States corporation;' (2) 'the foreign activity had substantial effects in the United States[, an inquiry limited by the burden to establish "substantial effects" under the Foreign Commerce Clause];' and (3) exercising jurisdiction would not interfere with the sovereignty of another

nation." *Id.* (quoting *Int'l Cafe v. Hard Rock,* 252 F.3d 1274, 1278 (11th Cir. 2001)). "The absence of one of the factors might well be determinative and the absence of two is certainly fatal." *Frida*, 2014 WL 11880681, at *4; *Int'l Cafe*, 252 F.3d at 1278. (Identical language).

### B.   Itamar Can't Establish Subject Matter Jurisdiction Under the Interstate Commerce Clause, or the Foreign Commerce Clause.

Itamar can't overcome the limits in the Lanham Act statute, and in the Interstate and Foreign Commerce Clauses, all of which apply here. Itamar can't establish jurisdiction. After entertaining undeservedly lenient inferences, Ectosense can make an educated guess[9] on what Itamar attempts to establish jurisdiction. Itamar falsely claims Ectosense had already "attempted to derive benefits" from U.S. citizens before Itamar filed suit. Itamar falsely states Virtuox was Ectosense's distributor at the time Itamar filed suit. Virtuox has never been the legal agent or representative of Ectosense, or authorized to speak on its behalf. Itamar complains Ectosense attended a sleep medicine conference in the United States before Itamar filed suit, but failed to recognize or concede that such conduct was not a use of Itamar's mark in commerce. It was impossible for Ectosense to engage in such commerce as its device had not yet been cleared by the FDA. Itamar falsely claims Ectosense distributed NightOwl instructions in the U.S. before Itamar filed suit, but Itamar is referring to documents distributed in Europe for a product never made available in the U.S. Itamar falsely claims Ectosense represented NightOwl as equivalent to Itamar's product before Itamar filed suit. Itamar falsely claims Ectosense had already "diverted sales" from the U.S. before Itamar filed suit. Itamar complains Ectosense's promotional materials state NightOwl is "PAT-based." Itamar complains Ectosense's brochure represents NightOwl satisfies AASM guidelines for PAT-based HSATs. Itamar complains Ectosense conducted a

---

9.      Given Itamar's "absurd" and "bewildering" allegation "[a]t all . . . times, Ectosense acted as the principal, agent, and/or representative of Virtuox, <u>and</u> Virtuox acted as the principal, agent, and/or representative of Ectosense." [D.E. 121, ¶6]*Mortg. Elec. Registration Sys., Inc. v. Ditto*, 488 S.W.3d 265, 288 (Tenn. 2015)("absurd"); *Culhane v. Aurora*, 826 F. Supp. 2d 352, 369 (D. Mass. 2011), *aff'd,* 708 F.3d 282 (1st Cir. 2013)("bewildering").

scientific clinical validation study confined to Florida.  Itamar complains Ectosense hosted a website accessible in Florida and began a marketing campaign on it, but the website had not been materially updated in two years, and did not contain a direct advertisement of NightOwl.  It referenced European products.  Itamar also states Ectosense is "intending," "attempting," and "planning."  [D.E. 1, ¶¶24, 27, 63].  Finally, Itamar complains about Ectosense's purely extraterritorial conduct.  [D.E. 1, ¶27].

After Itamar's false allegations are stripped out, all that is left is Ectosense distributing a pamphlet at a U.S. sleep medicine conference representing NightOwl is "PAT-based according to AASM Guidelines", but that disclosed that NightOwl was not yet available on the US market; Ectosense having a website that referenced European products, but did not advertise NightOwl; conducting a scientific clinical validation study purely within Florida, for scholarly medical research; and purely extraterritorial conduct.  These activities don't satisfy the "use in commerce" requirement of 15 U.S.C. § 1127, and violate limits on the Interstate and Foreign Commerce Clauses.  "Courts have noted that where, as here, a defendant simply expresses an intent to use a particular mark by filing an application with the PTO or by presenting an idea at a conference, these activities, without more, are not sufficient to constitute use in commerce."  *Combe v. Dr. Aug. Wolff GmbH*, 309 F. Supp. 3d 414, 419 (E.D. Va. 2018).  Ectosense's distribution of a pamphlet at a single conference in the U.S. is not "'use in commerce' [even if the] defendant had [a] website, product catalogue, and price quotes but had not sold or transported the good in United States commerce."  *Id.* at n.8 (quoting *Southco*, 982 F.2d at 511).  That merely conveys "ideas, concepts, or [describes] manufacturing expertise," which doesn't meet 15 U.S.C § 1127's requirement that trademarks be affixed to goods, packaging, associated displays, ancillary documents, tags, or labels.  *Potucek*, 738 F. Supp. at 470.  There are "not . . . any cases that support

Plaintiffs' assertion that 'goods' as used in [the Lanham Act] includes proprietary information [or] ideas, concepts, or manufacturing expertise." *Id.*

Ectosense's goods are easily susceptible to trademarks being applied directly on them.[10] So, the alternate "use in commerce" test reserved for goods with characteristics rendering application of a mark to the good impracticable, doesn't apply.  The presence of trademarked terms in ancillary documents accompanying goods, like a manual, can't be used as the Lanham Act's required predicate for "use in commerce" — nor consequently, Lanham Act jurisdiction.  Itamar must look elsewhere for Lanham Act "use in commerce" supporting jurisdiction.

Documents alone can't satisfy the "use in commerce" requirement for goods, so the documents Itamar describes (promotional materials in the U.S., and an irrelevant website) don't as to Ectosense's.  *Frida*, 2014 WL 11880681 at *2-4 (citing *McBee*, 417 F.3d at 124; ("mere existence of a website does not show that a defendant is directing its business activities towards every forum where the website is visible").  This is true whether a defendant hosts U.S., or foreign-based websites.  *Id.* (discussing U.S.-based YouTube and Facebook channels, and foreign-based websites).[11]  [P]reparatory steps to enter the United States [like those described above] are not sufficient" [and don't satisfy] 'use in commerce' for trademark infringement, dilution, and unfair competition." *Combe*, 309 F.Supp.3d at 419, n.8.

Itamar describes conduct similar to interacting with the U.S. government, filing USPTO applications, registering a trademark, seeking FDA approval for a device; Itamar also speculates about scienter – those aren't sufficient Lanham Act "use in commerce."  *Id.* at 423; *Maca v. Microsoft*, 152 F. Supp. 2d 535, 539 (D. Vermont 2001).

---

10.     Ectosense applies its own trademarks directly on them.  Ectosense could apply the term "PAT" to a NightOwl device if Ectosense wanted, but it does not.
11.  *See also*, *Futuristic Fences v. Illusion Fence*, 558 F. Supp. 2d 1270, 1277 (S.D. Fla. 2008); *TNT v.TrafiExpress*, 434 F. Supp. 2d 1322, 1331-32 (S.D. Fla. 2006).

Ectosense's scientific clinical validation study doesn't create Lanham Act subject matter jurisdiction for at least six reasons. First, it doesn't satisfy the "use in commerce" requirement of 15 U.S.C. § 1127. Neither the devices used for the study, nor their packaging, associated displays, tags or labels were stamped with any Itamar trademark. Ectosense has never affixed Itamar's trademarks on its products. Second, while Itamar made no allegations regarding this, an Ectosense team member carried the NightOwl devices used onto a plane, and brought them to Florida himself. At a basic level, that isn't commerce. It isn't a "commercial <u>transaction</u>" or "economic activity" contemplated by *Lopez*.[12] Third, once in Florida, the same Ectosense team member drove the devices to study locations, all within Florida. That isn't "commerce" for the same reasons personally bringing them to Florida isn't. That also isn't "commercial activity" – it is activity undertaken in connection with publishing scholarly medical research. That is a First Amendment activity. *Lopez*, 514 U.S. at 586 (distinguishing "Arts" from "commerce"). Fourth, intrastate activity purely within Florida doesn't satisfy the "interstate" component of the Interstate Commerce Clause. *Lopez*, 514 U.S. at 559-60. Fifth, a single person solitarily carrying goods around so scholarly medical research can be completed and published, is not a "commercial transaction" or "economic activity" any more than carrying a pencil used to take notes for the research. *Lopez* and *Morrison* prohibit drawing attenuated links between activity remotely connected to "commerce" through a series of inferences. *Id.* at 567; *Morrison* 529 U.S. at 615. The same rule applies to the extraterritorial portion of the Ectosense team member's trip. *U.S.* at 972 F.3d at 1276. Sixth, the constitutional limits on using the Lanham Act extraterritorially rule out subject matter jurisdiction. Ectosense is (1) not a U.S. corporation, it is foreign; (2) the activity in question has no substantial impact on the United States; and (3) applying the Lanham Act would

---

12.     Nor is it "trade," or "intercourse" "among" or "between" more than one person, as contemplated by the cases on which *Lopez* relies. *Lopez*, 514 U.S. at 561, 566; *Champion*, 188 U.S. at 323; *Gibbons*, 22 U.S. at 2.

offend the reciprocal international comity enjoyed between the United States and multiple foreign countries. *Int'l Cafe S.A.L.*, 252 F.3d at 1278. The only activity left to address is Ectosense's completely extraterritorial conduct. That can't be regulated by the Lanham Act for the same reasons already discussed. As applied to the Lanham Act, the Foreign Commerce Clause can't regulate wholly extraterritorial conduct. *Davila-Mendoza*, 972 F.3d at 1276.

## IV.   CONCLUSION AND RELIEF REQUESTED

The Court shouldn't reward Itamar for hiding a fatal jurisdictional defect, or be tempted to err on the side of finding subject matter jurisdiction given the history of successive amendments. The history of successive amendments erroneously alleging subject matter jurisdiction is Itamar's fault – not Ectosense's. Itamar's untrue statements shouldn't be rewarded again by giving Itamar the benefit of the doubt on a critical jurisdictional question. Itamar secreted a fake jurisdictional rabbit into an empty top hat while its audience was distracted, but now the trick is revealed. Magic isn't real, and rabbits can't be created by waving a wand. Ignoring the jurisdictional defect hidden by Itamar to avoid dismissal would encourage other litigants to hide material facts from the Court. Substantively, it would encourage overreach of Congressional power through the Lanham Act, and send the world the message the U.S. is the global trademark police, whether wanted or not. Further amendment will not cure the jurisdictional defect Itamar concealed. Ectosense requests the Court dismiss the entire action with prejudice, and grant attorney's fees and costs. Finally, Ectosense requests the Court set a hearing to determine the amount of appropriate attorney's fees and costs, and all other relief to which it is justly entitled.



Respectfully submitted,

/s/   *B. George Walker*
B. George Walker, Esq. (FL Bar No. 0071049)
**Tripp Scott PA**
**Counsel for Ectosense *nv***

## CERTIFICATE OF SERVICE

Counsel for Ectosense *nv* hereby certifies that on the 23rd day of July 2021, I electronically filed the foregoing document via cm/ecf and served this document on all counsel of record as listed in the Service List below.

**Counsel for Ectosense *nv*:**

/s/   *B. George Walker*

Paul O. Lopez, Esq.
Florida Bar No. 983314
pol@trippscott.com (primary)
eservice@trippscott.com (secondary)
sxc@trippscott.com (secondary)
Seth J. Donahoe, Esq.
Florida Bar No. 1004133
sjd@trippscott.com (primary)
sgc@trippscott.com (secondary)
B. George Walker, Esq.
FL Bar No. 0071049
bgw@trippscott.com (primary)
Tripp Scott, P.A.
110 SE 6th Street, 15th Floor
Fort Lauderdale, FL  33301
Telephone: (954) 525-7500
Telefax: (954) 761-8475

21

**SERVICE LIST**
**CASE NO: 20-cv-60719-WPD**

| **Counsel for Plaintiff:** | **Counsel for Defendant ECTOSENSE:** |
|---|---|
| LAURA GANOZA, ESQ.<br>Florida Bar No. 0118532<br>lganoza@foley.com<br>atownsend@foley.com<br>HAWWI EDAO, ESQ.<br>Florida Bar No. 1026550<br>hedao@foley.com<br>hmoreno@foley.com<br>**FOLEY & LARDNER LLP**<br>One Biscayne Tower, Suite 1900<br>2 South Biscayne Boulevard<br>Miami, Florida 33131<br>(305) 482-8400<br>(305) 482-8600 (fax)<br><br>**Co-Counsel for Plaintiff:**<br><br>JESSICA N. WALKER, ESQ.<br>jwalker@foley.cOM<br>**FOLEY & LARDNER LLP**<br>555 South Flower Street, Suite 3300<br>Los Angeles, CA 90071-2418<br>(213) 972-4675<br><br>GENE KLEINHENDLER, ESQ.<br>gene@gk-ad.com<br>ANNA ADAMSKY, ESQ.<br>anna@gk-ad.com<br>**GK ADVISORY**<br>72 Ahad Haam St.<br>Tel Aviv 6520512, Israel<br>(972) 3-735-6168 | PAUL O. LOPEZ, ESQ.<br>eservice@trippscott.com (primary)<br>pol@trippscott.com (secondary)<br>sxc@trippscott.com (secondary)<br>SETH J. DONAHOE, ESQ.<br>eservice@trippscott.com (primary)<br>sjd@trippscott.com (secondary)<br>sgc@trippscott.com (secondary)<br>B. GEORGE WALKER, ESQ.<br>bgw@trippscott.com<br>sxc@trippscott.com<br>cab@trippscott.com<br>Tripp Scott, P.A.<br>110 SE 6th Street, 15th Floor<br>Fort Lauderdale, FL 33301<br>Telephone: (954) 525-7500<br>Telefax: (954) 761-8475<br><br><br>**Co-Counsel for Defendant ECTOSENSE:**<br><br>Stephen Baird, Esq.<br>(*pro hac vice to be filed*)<br>GREENBERG TRAURIG, LLP<br>90 South 7th St., Suite 3500<br>Minneapolis, MN 55402<br>bairds@gtlaw.com<br><br>Paul B. Ranis, Esq.<br>Florida Bar No. 64408<br>GREENBERG TRAURIG, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, Florida 33301<br>ranisp@gtlaw.com<br>scottlaw@gtlaw.com<br>FLService@gtlaw.com<br><br>***Counsel for VirtuOx Inc.***<br><br>Jonathan B. Morton<br>Florida Bar No. 956872<br>Jonathan.Morton@klgates.com |

**K&L Gates LLP**
Southeast Financial Center
200 South Biscayne Boulevard, Suite 3900
Miami, Florida 33131-2399
Telephone: 305-539-3357

Darlene F. Ghavimi, *Admitted Pro Hac Vice*
Texas Bar No. 24072114
Darlene.Ghavimi@klgates.com
Stewart Mesher, *Admitted Pro Hac Vice*
Texas Bar No. 24032738
Stewart.Mesher@klgates.com
**K&L GATES LLP**
2801 Via Fortuna Suite 350
Austin, Texas 78746-7568
Telephone: (512) 482-6919