**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case Number: 20-cv-60719-WPD

ITAMAR MEDICAL LTD.,
    Plaintiff,
v.

ECTOSENSE NV
VIRTUOX, INC.,
    Defendant.
_____/

**ECTOSENSE NV'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**
**PLAINTIFF'S THIRD AMENDED COMPLAINT**

ECTOSENSE *nv*, (hereinafter "Ectosense"), by and through the undersigned attorneys, hereby Replies to Plaintiff's Response to Ectosense NV's 12(b)(6) Motion to Dismiss Plaintiff's Third Amended Complaint, and states:

**I.     Itamar's allegations about VirtuOx and Ectosense are legal impossibilities.**

VirtuOx was not a party to this case when the Court decided Ectosense's prior Motion to Dismiss for Failure to State a Claim. Itamar's allegations concerning the relationship between VirtuOx and Ectosense were always confusing because different legal standards apply to different theories of relief (i.e. agency, contributory liability, or direct liability), but in the Third Amended Complaint Itamar has made a complete mess of its allegations concerning the relationship between VirtuOx and Ectosense. It is a material pleading deficiency because it deprives Ectosense of notice of whether it is being called upon to answer for the conduct of VirtuOx, whether VirtuOx is being called upon to answer for the conduct of Ectosense, and in either event whether it is doing so on a theory of agency or contributory liability.

Itamar argues that it pled an agency relationship. This is untrue. Itamar's actual allegation is that:

> At all relevant times, Ectosense acted as the principal, agent, and/or representative of VirtuOx, and VirtuOx acted as the principal, agent, and/or representative of Ectosense. Any action by one of the Defendants was within the course and scope of the agency relationship between the Defendants and was with the permission, ratification, and/or authorization of the other Defendant.

ECF 146 ¶ 6. This is a legal impossibility. Ectosense and VirtuOx cannot simultaneously be principals and agents of one another. *See e.g. Mortg. Elec.Registration Sys., Inc. v. Ditto,* 488 S.W.3d 265, 288 (Tenn. 2015) ("[C]ourts have pointed out that it is axiomatic that a party cannot simultaneously be both agent and principal . . . '[c]ourts and scholars alike have expressed reservation, even bewilderment, as to [the] claim to be . . . as it has been generalized, both principal and agent.' . . . '[The] position that it can be both the [principal] and an agent of the [principal] is absurd, at best.'") (Internal citations omitted). Even reviewing Itamar's Response, ECF 146 at 4—6, there is no clear statement by Itamar indicating which defendant is the other defendant's agent or principal.

Moreover, Itamar's argument that it is not pursuing a contributory false advertising theory of relief is wise, but establishes that Itamar has not stated a claim against Ectosense with respect to the statements alleged to have been made by VirtuOx because Itamar pleads that VirtuOx is Ectosense's "client", ECF ## ¶ 4, and "distributor", ECF ## ¶ 28. It matters not what Itamar intended to plead because these allegations necessitate application of the contributory liability

framework set forth in *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.,* 797 F.3d 1248, 1277 (11th Cir. 2015). Because Itamar fails to set forth any theory of liability under an agency framework or a contributory liability framework (which Itamar concedes it is not pursuing), Itamar fails to state a claim against Ectosense on either theory, and the Third Amended Complaint should be dismissed as to all theories of relief against Ectosense for the conduct of VirtuOx.

> II. **Ectosense is attacking sufficiency of Itamar's allegations concerning use in commerce—not re-arguing classic fair use.**

Ectosense maintains that fair use bars Itamar's claims, but it did not re-argue the affirmative defense in the Motion to Dismiss. To the contrary, Ectosense is pointing out that Itamar has not alleged that Ectosense used Itamar's trademark in commerce, as the phrase is defined in the Lanham Act. Itamar's argument that it has adequately pled use in commerce distills to one point: the definition of use in commerce set forth in 15 U.S.C. §1127 goes to trademark registrability, and does not apply in the infringement context for a claim under 15 U.S.C § 1114. This argument defies the plain text of the statute. 15 U.S.C. § 1127 sets forth that the definitions therein apply "In the construction of this chapter, unless the contrary is plainly apparent from the context." It sets forth what constitutes 'use in commerce' under the Lanham Act regarding a trademark for goods:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
> (1) on goods when—
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

Itamar does not analyze the statute itself, or even quote it. Instead, Itamar relies on *BTG Patent Holdings v. Bag2Go*, 193 F.Supp.3d 1310 (S.D. Fla. 2016) for the proposition that the Lanham Act's definition of use in commerce does not apply in an infringement context. While *BTG Patent Holdings* did reach this conclusion, the court did not address the plain text of the statute either. Instead, the *BTG* court cites secondary sources and an 11th Circuit case for the proposition that "the Eleventh Circuit expressed hesitation about whether 1127's definition of 'use in commerce' applied in the infringement context[.]" *Id*. At 1322 (citing *N. Am. Med. Corp. v. Axiom*, 193 F.Supp.3d 1310, 1321 (S.D. Fla. 2016). The *Axiom* court acknowledged "use in commerce" applied

3

to trademark infringement claims, but point outs in dicta that the definition of "use in commerce" as applied to trademark infringement contemplates something different than how that term is used in 11 U.S.C. 1127. The *Axiom* court still appears to have applied the "use in commerce" definition under 11 U.S.C. 1127 to its facts, however. *Axiom's* holding is therefore simply that when a Defendant is sued for attaching "meta tags" to a website that in fact offers and ships goods in U.S. commerce, "use in commerce" in connection with goods is satisfied. *Id.* The holding also explicitly states it should not be used as precedent: "use of [trademarks in hidden] meta tags [on websites] constitutes a 'use in commerce' . . . under the facts of this case." *Axiom*, 522 F.3d at 1220. In other words, Itamar is applying dicta from the footnote of an opinion expressly limiting its holding to its facts, to explain the 11th Circuit has its doubts as to what "use in commerce" means in the infringement setting, but the opinion actually applied the "use in commerce" definition under 15 U.S.C. 1127 to evaluate an infringement claim.

In contrast to *BTG,* this Court has indeed applied the use in commerce definition *outside* the context of registrability. *See e.g. Select Exp. Corp. v. Richeson*, 10-80526-CIV, 2011 WL 13135114, at *6 (S.D. Fla. May 5, 2011) (Dimitrouleas, J.) (analyzing use in commerce within the context of a prior use defense an applying the definition set forth in section 1127 to conclude "These sales represent a *bona fide* use in commerce of the TRIDENT mark, because they are sufficient to demonstrate that TIPL not only adopted the TRIDENT mark, but that its trademark was used in such a way as to identify it as the owner of the trademark, and that TIPL's use was not *de minimis*. See 15 U.S.C. § 1127 ("... a mark shall be deemed to be in use in commerce ... when ... it is placed in any manner on the goods or their containers or the displays associated therewith ... and ... the goods are sold or transported in commerce."); *see also GhostBed, Inc. v. Casper Sleep, Inc.,* 0:15-CV-62571-WPD, 2018 WL 2213002, at *4 (S.D. Fla. May 3, 2018)

Itamar argues it does not have to actually plead "use in commerce" as that term is defined by the Lanham Act. Because Itamar's argument is contrary to the plain text of the Lanham Act, Itamar's argument should be rejected and this Court should dismiss Itamar's trademark infringement and false designation of origin claims.

**III.    The Court can consider the 510(k) Summary because (a) Itamar relies upon it, and (b) it is the proper target of judicial notice, and Itamar's arguments concerning the 510(k) program are contrary to the code of federal regulation and the FDA's descriptions of the program.**

The 510(k) Summary can be considered. Itamar argues that nothing has changed. This is incorrect because Itamar now relies directly on the 510(k) Summary's content. In Paragraph 45, Itamar offers the 510(k) Summary as evidence to support its allegations that NightOwl does not measure REM. Thus, Itamar suggests that the content of the 510(k) is evidence of the technological capabilities of a device. Yet, Itamar argues that this Court should not review that exact same document to assess whether the FDA has cleared NightOwl as a device based on peripheral arterial tone (PAT).. Itamar wants the Court to notice that the 510(k) Summary does not say REM and draw the inference that NightOwl therefore does not record REM, but Itamar asks the Court to simultaneously ignore that it says NightOwl measures and analyzes PAT because that undermines Itamar's literal falsity claims. Itamar does not get to pick and choose how this Court should use the 510(k) Summary based upon when it is convenient for Itamar.

Itamar claims it still disputes the content of the document, but it is unclear what Itamar actually disputes. Does Itamar dispute that the words that appear in the document actually appear in the document the FDA published (i.e. the authenticity of the contents)? No. It seems Itamar instead disputes the meaning of the document. This is not a factual question for which evidence is discovery is required. It is a legal one that the Court can indeed resolve right now by looking to the code of federal regulations, which establish that the content of a 510(k) summary represents the basis of the FDA's determination to clear a device. *See* 21 CFR 807.92(a). This is a matter of law. Thus, this Court can apply the law to observe that the content of the 510(k) Summary published on the FDA's website represents the basis of the FDA's decision to clear NightOwl.

The heart of Itamar's challenge to the 510(k) Summary and Ectosense's preclusion, preemption, and plausibility arguments is that (1) we don't know what aspects of 510(k) Summary the FDA reviewed or considered, and (2) that the 510(k) process is not a safety and efficacy determination. Itamar's arguments are contrary to the code of federal regulation, and the FDA's explanation of the document and the process. *See* Guidance for Industry and Food and Drug Administration Staff, The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications 7 (2014) (hereafter FDA July 2014 Guidance").[1]

---

[1] The FDA July 2014 Guidance is available for download at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/510k-program-evaluating-substantial-equivalence-premarket-notifications-510k

Preliminarily, with respect to the former point, it should be sufficient as a matter of law that the 510(k) Summary as a whole is reviewed by the FDA and published as the basis of its decision. However, the reason the issue has resurfaced is because Ectosense was under the mistaken belief that Itamar would approach these proceedings with candor and concede that—as a factual matter—the FDA specifically reviewed the precise claim that NightOwl measures PAT and engaged in a scientific dialogue with Ectosense about the question. Whether the FDA reviewed the claim, was a feature of Itamar's earlier arguments in opposition to preclusion. It would be instructive if the Court squarely asks Itamar if it is aware of whether the FDA specifically considered the question: 'does NightOwl measure and analyze PAT,' and, if so, how Itamar intends to maintain its literal falsity claim that NightOwl is not PAT based. Itamar avoids the elephant in the room: Itamar is claiming literal falsity over something the FDA concluded is literally true. This is why preclusion and preemption bar Itamar from using the Lanham Act to challenge the FDA. Moreover, even if preclusion and preemption did not apply, Itamar would concede that the FDA is a reasonable and duly qualified expert in the field of medical device capabilities. Thus, its claims are implausible on their face.

Nevertheless, Itamar suggests again that these are factual issues that cannot be decided as a matter of law. Although Itamar's discovery of facts over the last year should prevent its counsel from claiming that they do not know whether the FDA reviewed the claim that NightOwl is PAT based, such discovery is not needed because the law establishes that the FDA cleared the statement. Ectosense acknowledges that there are cases to support the notion that the 510(k) process is not a meaningful review by the FDA, let alone one that reaches any device-specific conclusions about safety and efficacy. However, Courts are not infallible, and when it comes to court descriptions of the 510(k) process, courts have gotten the matter very wrong. *See* Munford, L.. COURTS V. FDA: A LESSON FROM PELVIC MESH LITIGATION ON RELATIVE COMPETENCE TO DECIDE A LEGAL QUESTION**,** 76 Food & Drug L.J. 6, 10 (Surveying cases discussing the 510(k) process and demonstrating that "[t]he opinions of FDA and those of the courts stand in direct conflict[,]" and explaining how this issue developed based upon a factually and legally outdated Supreme Court case, *Medtronic v. Lohr*).[2] There is, however, a more recent

---

[2] This is a recent journal article that points out the erroneous descriptions of the 510(k) process that have permeated the court opinions all over the U.S., and explains how they take root in the factually and legally obsolete reasoning of *Medtronic v. Lohr*.

trend in favor of recognizing that the 510(k) clearance process is something more robust than what was described in *Medtronic* and its progeny, and that the FDA clearance determinations can be relevant to a given case. *See e.g.* 467 N.J.Super. 42, 74-75, 249 A.3d 191, 211 ("We must bear in mind that clearance through the less-rigorous 510(k) FDA review process does provide evidence that a device manufacturer obtained regulatory authorization to market the product at issue. We are persuaded, as several of the federal cases have noted, that evidence of such authorization does have probative value in evaluating the company's design and sale of the devices."). This trend is the correct one because even though perhaps expert testimony could provide insight into what the 510(k) process is, the code of federal regulations, and FDA guidance documents set forth the information required to understand the key points of the 510(k) process that are pertinent here.

Although all devices are subject to general controls, only Class II and Class III devices are subject to special controls. The process by which the FDA reviews these devices is calibrated to ensure safety and effectiveness either through an independent review (Class III premarket approval), or through a comparative review against a device that has already been deemed sufficiently safe and effective (Class II 510(k)). The FDA states "The 510(k) review standard is comparative, whereas the PMA standard relies on an independent demonstration of safety and effectiveness. <u>Nonetheless, the principles of safety and effectiveness underlie the substantial equivalence determination in every 510(k) review</u>." FDA July 2014 Guidance at 6 (emphasis added). Because Itamar's device was the predicate device for NightOwl, there are particularly relevant statements from the FDA: "when comparing a new device to a predicate device, <u>FDA must find that the two devices have 'the same technological characteristics,' or</u> that a 'significant change in the materials, design, energy source or other features of the device' does not raise different questions of safety and effectiveness and that the device is as safe and effective as a legally marketed device." FDA July 2014 Guidance at 7.

Thus, upon reviewing the 510(k) Summary and the FDA's explanation of what the 510(k) process is, there can be no question—as a matter of law—that the FDA specifically found that NightOwl has the same technological characteristics as WatchPAT, and that <u>as condition of clearing NightOwl, the FDA had to conclude that NightOwl and WatchPAT have the same technological characteristics (i.e. that both measure PAT)</u>. Itamar has previously argued that one has to speculate as what drove the FDA's decision to clear NightOwl. Fortunately for the Court, the FDA publishes a document to give "sufficient detail to provide an understanding of the basis

for a determination of substantial equivalence." *See* 21 CFR 807.92(a). That document is, of course, a 510(k) Summary. Itamar repeats nonsense about the document being drafted by the manufacturer, and being unsure of about whether the FDA reviews the accuracy of the claims in a 510(k) Summary, but does not address at all the FDA's position on these matters. The FDA states:

> In an effort to improve the transparency and predictability of the 510(k) program and to ensure that the 510(k) Summary reflects the information provided in a 510(k) submission to support a substantial equivalence determination, FDA intends to verify the accuracy and completeness of the information included in a 510(k) Summary.
>
> Although the 510(k) Summary is a document created by the manufacturer and is included in the 510(k), revisions to the 510(k) Summary may be necessary to accurately reflect the FDA's decisionmaking process.

July 2014 FDA Guidance at 29. Thus, while Itamar argues that this is just rehashing arguments previously denied by this Court, the circumstances are different. Ectosense still contends that, as a matter of preclusion law, the Lanham Act cannot be a vehicle for challenging technological and scientific conclusions reached by the FDA—particularly so with a literal falsity claim. It is outright shocking that after having been provided Ectosense's dialogue with the FDA about how NightOwl measures PAT and the FDA's explanation that it reviewed that question "at length", Itamar does not concede that these events transpired so that the Court can more efficiently adjudicate this case. Nevertheless, the Court need not evaluate the factual underpinning because, despite a few erroneous cases, the law and the FDA are clear that the 510(k) program is indeed a device-specific determination about safety and effectiveness, one that here involved a comparative evaluation of NightOwl's technological characteristics against WatchPAT.

## Conclusion

For the reasons set forth herein, Itamar has failed to state a claim for which relief can be granted, and this Court should dismiss the Third Amended Complaint, ECF 121, pursuant to Rule 12(b)(6), and award Ectosense its attorneys' fees pursuant to 15 U.S.C. § 117(a) and section 501.2105(1), Florida Statutes.

**CERTIFICATE OF SERVICE**

Counsel for Ectosense *nv* hereby certifies that on the 17th day of August, 2021 I electronically filed the foregoing document via CM/ECF and served this document on all counsel of record as listed in the Service List below.

**Counsel for Ectosense *nv*:**

*/s/   Seth J. Donahoe*

Paul O. Lopez, Esq.
Florida Bar No. 983314
pol@trippscott.com (primary)
eservice@trippscott.com (secondary)
sxc@trippscott.com (secondary)
Seth J. Donahoe, Esq.
Florida Bar No. 1004133
sjd@trippscott.com (primary)
sgc@trippscott.com (secondary)
B. George Walker, Esq.
Florida Bar No. 0071049
bgw@trippscott.com (primary)
sxc@trippscott.com (secondary)
Tripp Scott, P.A.
110 SE 6th Street, 15th Floor
Fort Lauderdale, FL  33301
Telephone: (954) 525-7500
Telefax: (954) 761-8475

SERVICE LIST
CASE NO: 20-cv-60719-WPD

| Counsel for Plaintiff: | Counsel for Defendant ECTOSENSE: |
|---|---|
| LAURA GANOZA, ESQ.<br>Florida Bar No. 0118532<br>lganoza@foley.com<br>atownsend@foley.com<br>HAWWI EDAO, ESQ.<br>Florida Bar No. 1026550<br>hedao@foley.com<br>hmoreno@foley.com<br>**FOLEY & LARDNER LLP**<br>One Biscayne Tower, Suite 1900<br>2 South Biscayne Boulevard<br>Miami, Florida 33131<br>(305) 482-8400<br>(305) 482-8600 (fax)<br><br>**Co-Counsel for Plaintiff:**<br><br>JESSICA N. WALKER, ESQ.<br>jwalker@foley.cOM<br>**FOLEY & LARDNER LLP**<br>555 South Flower Street, Suite 3300<br>Los Angeles, CA 90071-2418<br>(213) 972-4675<br><br>GENE KLEINHENDLER, ESQ.<br>gene@gk-ad.com<br>ANNA ADAMSKY, ESQ.<br>anna@gk-ad.com<br>**GK ADVISORY**<br>72 Ahad Haam St.<br>Tel Aviv 6520512, Israel<br>(972) 3-735-6168 | PAUL O. LOPEZ, ESQ.<br>eservice@trippscott.com (primary)<br>pol@trippscott.com (secondary)<br>sxc@trippscott.com (secondary)<br>SETH J. DONAHOE, ESQ.<br>eservice@trippscott.com (primary)<br>sjd@trippscott.com (secondary)<br>sgc@trippscott.com (secondary)<br>B. GEORGE WALKER, ESQ.<br>bgw@trippscott.com<br>sxc@trippscott.com<br>cab@trippscott.com<br>Tripp Scott, P.A.<br>110 SE 6th Street, 15th Floor<br>Fort Lauderdale, FL  33301<br>Telephone:  (954) 525-7500<br>Telefax:  (954) 761-8475<br><br><br>**Co-Counsel for Defendant ECTOSENSE:**<br><br>Stephen Baird, Esq.<br>(*pro hac vice to be filed*)<br>GREENBERG TRAURIG, LLP<br>90 South 7th St., Suite 3500<br>Minneapolis, MN  55402<br>bairds@gtlaw.com<br><br>Paul B. Ranis, Esq.<br>Florida Bar No. 64408<br>GREENBERG TRAURIG, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, Florida 33301<br>ranisp@gtlaw.com<br>scottlaw@gtlaw.com<br>FLService@gtlaw.com<br><br>*Counsel for VirtuOx Inc.*<br><br>Jonathan B. Morton<br>Florida Bar No. 956872 |

|  | Jonathan.Morton@klgates.com<br>**K&L Gates LLP**<br>Southeast Financial Center<br>200 South Biscayne Boulevard, Suite 3900<br>Miami, Florida 33131-2399<br>Telephone: 305-539-3357<br><br>Darlene F. Ghavimi, *Admitted Pro Hac Vice*<br>Texas Bar No. 24072114<br>Darlene.Ghavimi@klgates.com<br>Stewart Mesher, *Admitted Pro Hac Vice*<br>Texas Bar No. 24032738<br>Stewart.Mesher@klgates.com<br>**K&L GATES LLP**<br>2801 Via Fortuna Suite 350<br>Austin, Texas 78746-7568<br>Telephone: (512) 482-6919 |