**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**Case No.  20-cv-60719-WPD**

ITAMAR MEDICAL LTD.,

                              Plaintiff,

        v.

ECTOSENSE NV, VIRTUOX INC.,

                              Defendants.

**PLAINTIFF ITAMAR'S CONSOLIDATED RESPONSE TO ECTONSENSE NV'S
MOTIONS TO COMPEL**

Defendant Ectosense *nv* ("Ectosense") filed three Motions to Compel (ECF Nos. 200-202) (the "Motions") demanding Itamar Medical Ltd.'s ("Itamar") remaining objections to three sets of requests for production be overruled and production be compelled. Each Motion ignores the serious flaws in the disputed requests, while glossing over the fact that the parties were able to reach agreement on many of the requests – and, in many instances, Ectosense has acknowledged the overbreadth and undue burden of its requests as written. On September 22, 2021, the parties conferred on outstanding issues in both parties' responses to requests for production for a couple of hours, and reached agreement on most of the issues. Indeed, Itamar accepted Ectosense's positions and compromises and did not move to compel further responses from Ectosense. On September 23, 2021, Ectosense sent an additional 6-page letter (ECF No. 201-2) summarizing its positions, and in several instances, stating it would provide further information such as narrowed time frames (*id.* at 3). But instead of providing that information, requesting a further call, or requesting an extension of the deadline to move to compel to permit further conference, Ectosense filed the Motions. This meant Itamar did not even have a chance to respond (or amend its responses, as it intended to based on the call, before the Motions were filed). As a result, the Motions needlessly include requests that, by its own admission, Ectosense believes the parties have resolved. For the remaining requests, Itamar respectfully asks the Court to deny the Motions.

**I.     ECF No. 200 Must Be Denied.**

      **a.  Ectosense's Characterization of a Production Format Agreement is False.**

In its Motion, Ectosense complains that the clinical data instructions "were previously worked out between the parties to manage production of clinical data ESI. . . . [a] process involv[ing] weeks of back and forth and culminated to an agreed protocol for the production of clinical data ESI in a standardized format that is readily accessible." (ECF No. 200, at 1.) Itamar

is not aware of any such agreement and Ectosense has never come forward with evidence that a mutually agreed protocol actually came to fruition. Further, contrary to Ectosense's statements, the one-sided protocol imposes an unnecessarily high burden on Itamar. Ectosense's goal is to capture not only raw clinical data spanning two decades, but also Itamar's analysis of said data. In addition to significant privacy implications that would necessitate multiple layers of review and approval prior to production, Ectosense's requests are disproportionate to the needs of the case. As a result, producing clinical data in the format Ectosense demands would be prohibitively expensive, time consuming and— for research spanning up to twenty years—near impossible. (Ex. 1 (Declaration of Efrat Litman), ¶ 15.) If any clinical data is to be produced, this Court should permit Itamar to produce the data in the format that Itamar maintains the data.

### b. Itamar's Objections Are Proper and Should Be Sustained.

Itamar's PAT® technology has existed for more than two decades. The fact that Itamar's WatchPAT devices have been available since 2002 does not legally entitle Ectosense to every single data point Itamar has collected regarding its product since inception. For example, in *Larweth v. Magellan Health, Inc.*, the defendant in a breach of contract action involving restrictive covenant moved to compel the plaintiff to produce documents. 2019 WL 11866498, at *8 (M.D. Fla. July 16, 2019). The court stated:

> The Court understands that Defendant has asserted a breach of contract claim based on the restrictive covenants, but the existence of the claim does not explain why Plaintiff is entitled to "all documents" between Plaintiff and members relating to base rebates, price protection rebates, and term improvements/enhancement rebates for the applicable years. **And even if relevancy seemed apparent from the face of the request, Defendant has convinced the Court that the requests are overly broad and not actually relevant.**

2019 WL 11866498, at *8 (M.D. Fla. July 16, 2019); *see also Glaxosmithkline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.*, 2007 WL 1051759, at *3-4 (D. Utah Apr. 2, 2007) (denying motion to compel deposition of a researcher who had conducted studies regarding

a cold sore product ancillary to a false advertising case challenging the efficacy of the product, finding subpoena imposed an undue burden, where moving party already "possess[ed] his published studies and the information surrounding the Federal Drug Administration's approval of Abreva," and if all the party "is truly seeking are the 'facts' of [the] research, his published studies can provide these facts.")

Here, even if Ectosense's requests are relevant to their counterclaim, which they are not, Ectosense has failed to justify why it is entitled to all raw clinical data underlying the research studies examining the WatchPAT's accuracy. The publicly accessible research articles are more than sufficient for Ectosense to evaluate its counterclaim, and Ectosense should not be permitted to undermine peer-reviewed medical research. In essence, Ectosense is putting the peer-reviewed research articles on the WatchPAT's accuracy on trial, without explaining what studies are inaccurate. This is, essentially, a fishing expedition. Although the scope of discovery is broad, it must be proportional to the needs of the case and Rule 26's proportionality requirement permits the Court to preclude or narrow discovery based on the circumstances at issue in a particular case. *See Marjam Supply Co. of Fla., LLC v. Pliteq, Inc.*, 2018 WL 1456614, at *7 (S.D. Fla. Mar. 23, 2018) (precluding certain discovery into other litigation matters based on the overbreadth of the discovery request).

Here, Ectosense's Second Requests for Production are grossly overbroad and lack any proportionality to the needs of this case. Ectosense seeks not only the publicly available research articles from across two decades; it also seeks production of all clinical study data that has occurred, including raw clinical data, scoring methodologies, and the complete analysis of the clinical data. Notably, Ectosense's Motion does not describe how these documents could ever be used in its defense of this case. Ectosense merely asserts, without support, that simply because

Ectosense is countersuing Itamar for falsely advertising its devices have "PSG-like accuracy," it is entitled to discovery as to any clinical data relative to any study analyzing the WatchPAT's accuracy. However, Ectosense has made no showing that such sweeping discovery would be proper.

As further set forth in the declaration of Efrat Litman, attached as **Exhibit 1**, Itamar is correct in asserting that 1,121 publications exist. (Ex. 1, ¶ 3.) The Second Request for Production, based on Ectosense's broad definitions and instructions, may implicate a large number of these publications. Although Itamar repeatedly invited Ectosense to do, Ectosense has not identified any specific study that it contends is false or misleading. In fact, although Ectosense recognizes that the vast number of studies were conducted by third parties rather than Itamar, Ectosense was not even willing to identify the specific studies from Itamar that it was interested in. Unless and until Ectosense identifies the specific studies it contends were false or inaccurate, Itamar should not be required to scour through its data materials – and third party data materials, of which, as detailed in the Litman Declaration, a vast amount of data is not even in Itamar's possession nor does Itamar have legal grounds to produce it in litigation given the nature of the data as personal health information which was provided for the defined purpose of the applicable study – based on nothing more than an fishing expedition. *See Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006) ("the discovery rules do not permit the [parties] to go on a fishing expedition."); *see also Benz v. Crowley Logistics, Inc.*, 2016 WL 11587289, at *2 (M.D. Fla. June 17, 2016) (Rule 26 is not an "unlimited license for fishing expeditions"); *see also Regions Bank v. Kaplan*, 2015 WL 13708610, at *1 (M.D. Fla. Sept. 17, 2015) (noting that "discovery 'has ultimate and necessary boundaries.'") (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

Even if the number of publications were narrowed to 27 studies (which Ectosense has not

5

agreed to do)[1], Ectosense's request remains excessively broad and burdensome. (Ex. 1, ¶¶ 6–7.) A significant portion of the 27 articles involving benchmark experiments are unattainable due to Itamar's inability to access to the data. (Ex. 1, ¶ 4.) For many of these studies, Itamar was not involved in any way with the publications and has no legal right to access or share the data. (Ex. 1, ¶¶ 5–7, 18.) University-sponsored studies also constitute a portion of the 27 studies cited by Ectosense. (Ex. 1, ¶ 5.) Whereas the universities own and retain a major portion of the data collected in those studies, Itamar has extremely limited data for such investigations. (Ex. 1, ¶¶ 5–6.) Obtaining this type of clinical data is a time-consuming and costly task. (Ex. 1, ¶¶ 5–7.) Itamar also cannot guarantee that the universities have retained all the clinical data Ectosense seeks. (Ex. 1, ¶ 6.) Indeed, study coordinators involved in the clinical studies concerning the WatchPAT may have since left their respective universities, which further complicates any effort to collect the clinical data. Additionally, Itamar likely will need both the patients' consent, as the consent for the purpose of the study does not cover use in litigation, and internal review board approval. (Ex. 1, ¶¶ 7, 13.)

Itamar has tremendous reasons to object to the production of the remaining clinical data in alignment with Ectosense's overbroad requests. Ectosense's overbroad requests for Itamar's raw clinical data, scoring methodologies, and proprietary material—in a format demanded by Ectosense—is highly burdensome and disproportionate to the needs of the case. *See e.g., Dixon v. Bank of Am., N.A.,* 2019 WL 4955211, at *3 (S.D. Fla. Oct. 8, 2019) (denying motion to compel responses to discovery requests as irrelevant and disproportional); *Guerrero v. Apple Computer, Inc.,* No. 18-CV-22654, 2019 WL 1333735, at *2-3 (S.D. Fla. Feb. 12, 2019) (finding plaintiff's

---

[1] In response to a direct question as to whether Ectosense was limiting its requests to the 27 articles listed in the spreadsheet attached to its conferral letter, Ectosense stated, "we were not limiting the scope of the requests to those studies."

discovery for "every instance of any products manufactured by [the] [d]efendant using the battery found in the [p]roduct, where any of the products smoked, exploded or overheated" overbroad and exceeded the scope of relevance).

The WatchPAT signals, which are transmitted in a proprietary format, have evolved over the years. (Ex. 1, ¶ 10.) In 2008, the format underwent considerable changes. (*Id.*) In order to comprehend the raw clinical data it requests, Ectosense would require not only the clinical data, but also the scoring criteria, and the WatchPAT signals. (Ex. 1, ¶ 9.) Ectosense would effectively have to reverse engineer the raw clinical data in order to make sense of it—something that is far beyond the scope of this litigation and a troubling prospect to provide to a competitor for obvious reasons. (Ex. 1, ¶ 11.)

Furthermore, Ectosense relies on HIPAA to support its Motion, yet HIPAA (and privacy, generally) is one of the primary grounds for Itamar's legitimate objections. Even if Itamar is able to delete personal health information, there are further privacy concerns. When an individual consents to participate in one of these clinical trials, they provide consent for the specific manner and scope of the use of their information. That consent does not typically include litigation with a third party. (Ex. 1, ¶ 13.) Third-party sharing is prohibited in a number of clinical studies involving the WatchPAT. (Ex. 1, ¶ 13–14.) Ectosense also seeks customer evaluation reports. If Itamar is required to produce customer evaluation reports, it will violate confidentiality.

Ectosense acknowledges in its Motion that relevant clinical research related to the WatchPAT's ability to measure PSG are publicly available online. (ECF No. 200 at 4.) These easily-accessible peer-reviewed medical journals are highly regarded. Additionally, the legitimacy of the available clinical data is bolstered by the fact that Itamar has no affiliation with the research authors. It is evident that Ectosense's request for raw clinical data, scoring methodology, and

7

proprietary information related is to promote a ludicrous conspiracy amongst the medical community to spread misinformation related to the WatchPAT's accuracy and crush competition. This absurd theory should not merit Itamar's production of highly sensitive, raw clinical data. ECF No. 200 should be denied.

**II. ECF No. 201 (First Request for Production) Is Largely Moot, and the Remainder Must Be Denied.**

Faced with document requests that were not written to include any sort of geographical or temporal limitation, and that sought "any and all documents" for each category, Itamar, in amending its responses to the First Request for Production, provided specific responses indicating it would provide discovery "as to those matters within the scope that is not disputed," consistent with this Court's Order (ECF No. 67). Ectosense acknowledges that "a geographic scope of the U.S. as a default" is reasonable (ECF No. 201 at 2), and that Itamar's objection as to "any and all" was "well-taken," (*id.*). While Ectosense takes issue with Itamar's temporal objections, Itamar has produced decades-old documents where appropriate (for example, documents that support its allegations regarding the use of the term "peripheral arterial tone" beginning in 1990) – but because the requests, as written, would seek "any and all documents" across that vast span of time, Itamar objected to the temporal scope to make clear it would not be searching for and producing *every* such document for three decades.

Ectosense asserts that "Itamar should have complied with the Court's order by producing, or stating it will produce, documents within the scope it finds non-objectionable." (ECF No. 201 at 2.) Itamar has done so, as its amended responses make clear. (**Ex. 2**.) Ectosense filed its Motions before Itamar's substantial production completion date on September 30, 2021, thus making claims that Itamar had not produced documents entirely premature. While Itamar had begun its document production before the agreed-upon substantial completion date of September 30, 2021, Itamar

8

produced approximately 43,000 documents on September 30, 2021, and has made a smaller production of about 12,000 documents since then.[2] The more than 55,800 documents produced by Itamar to date include documents responsive to the requests in the Motion.

### a. Itamar Agreed to Produce, and Produced, Documents Sought by the Motion

**RFP 11 and 15:** In response to RFP 11, Itamar agreed to produce, and produced, "non-privileged, non-work product documents sufficient to identify its use of the PAT® mark in connection with the goods and services that Itamar offers in the United States." (**Ex. 2** at 6.) In response to RFP 15, Itamar agreed to produce, and produced, "documents sufficient to identify scientific publications in which Itamar has used the term 'peripheral arterial tone' to identify Itamar's products." Itamar did not restrict either response (or its corresponding production) temporally, and thus the only issue Ectosense raises in its Motion – a time limit – does not exist, and this portion is moot.

**RFP 32 and 33:** Itamar agreed to produce, and produced, documents "sufficient to show that it advertises, markets, and promotes its products using its family of PAT® marks in the United States," and agreed to produce, and has produced, analytics of these marketing, advertising, and promotional efforts. Ectosense acknowledges Itamar's objections as to geography, products, and "any and all" are appropriate. Itamar is not withholding any advertising, marketing, or promotional documents based on whether the term "PAT" appears instead of "PAT®" – an issue Ectosense acknowledged was "corrected" and "cleared up" during the meet and confer discussions. (ECF No. 201-2 at 3.) Itamar is therefore already producing what Ectosense requests here.

**RFP 39 and 40:** As Ectosense notes, "[t]his issue may be resolved" – it is. Itamar agreed to produce, and has produced, its copies of Ectosense's false and misleading advertisements and

---

[2] Cognizant of its continuing production obligations, and aware that in finalizing its privilege log it may discover some additional documents that should be produced, Itamar anticipates it may yet produce a small number of additional documents; however, the majority of the documents it anticipates producing have been produced since the filing of the Motions.

evidence of Ectosense's marketing campaign, and agreed to produce, and has produced, correspondence with third parties regarding Ectosense's advertisements and marketing efforts. With Ectosense's clarification it is only seeking non-privileged materials in these two requests (ECF No. 201 at 5), there are no open questions, and Itamar has produced or is producing the documents sought here.

**RFP 48:** Itamar agreed to produce documents "sufficient to show" the allegations listed in this request. The objection as to time was not meant to indicate that Itamar would not produce documents dating back to 1990, 1993, and 2000, but rather underscores that a request seeking "any and all" documents relating to the usage of the term "peripheral arterial tone or tonometry" going back to 1990 is unduly burdensome, overbroad, and seeks irrelevant information. Itamar has produced, and is producing, peer reviewed medical studies, and other documents that support these allegations. As written, RFP 48 could encompass literally every use of the term "peripheral arterial tone or tonometry" within Itamar. As that is the central technology of the company, reviewing more than two decades' worth of internal documents is both burdensome and disproportionate.

### b. Itamar's Remaining Objections Are Supported By Law and Should Be Upheld

**RFP 10:** It is Ectosense that is missing the point with RFP 10, and misunderstanding the basics of trademark law. Ectosense believes that documents showing the use of the term "PAT" without the ® symbol show the term is being used "in the sense of PAT being a physiological signal capable of being measured," rather than to refer to Itamar's products. But as explained in its responses, "Itamar was not permitted to use the '®' symbol before" the date of Itamar's trademark registration. That does not mean that the term referenced anything other than Itamar's products. It is use, not registration, that creates a trademark. "The principle underlying trademark protection is that distinctive marks – words, names, symbols, and the like – can help distinguish a particular

artisan's goods from those of others. One who first uses a distinct mark in commerce thus acquires rights to that mark." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015). "Though federal law does not create trademarks, . . . Congress has long played a role in protecting them." *Id.* Registration – which confers the right to use the ® symbol – "is prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." *Id.* at 142-143. In order to register a mark, the owner must submit an application that includes "the date of the applicant's first use of the mark, the date of the applicant's first use of the mark, the goods in connection with which the mark is used, and a drawing of the mark." *Id.* at 143. The Lanham Act provides a federal cause of action for trademark infringement for owners of marks, "whether registered or not." *Id.* Any use of the term "PAT" without the '®' symbol, pre-registration, therefore, would not have the significance Ectosense ascribes. Additionally, on a practical level, as Itamar has already agreed to produce documents demonstrating its marketing and advertisement of the subject products, and countless other categories of documents relating to the products, Ectosense has received, and will continue to receive, documents with the term "PAT" both before and after federal registration.

**RFP 29:** Itamar agreed to produce "documents sufficient to identify its revenues, costs, and profits relating to Itamar's products that have been sold in the United States under Itamar's family of PAT® marks, from January 2018 to the present." (Ex. 1 at 12.) This is three years of financial data, two years of which predate Ectosense's claimed U.S. launch date in 2020. Ectosense does not explain why it needs two additional years' worth of data. Given the competitive stance of Ectosense and Itamar, Itamar's documents showing financial performance are commercially sensitive, making an overreach beyond the portions that would be relevant more of a concern.

Courts have recognized, in the context of Lanham Act claims, that "given the competitive stance of the[] parties . . . the sensitive nature of the information contained in [the producing party's] financial statements," it is appropriate to "not compel disclosure of those statements if [the requesting party] can obtain the relevant information in another manner," when the requesting party's "need for the financial statements is balanced against the potential harm [the producing party] could suffer if it were required to disclose them." *Mitchell-Proffitt Co. v. Eagle Crest, Inc.*, 2005 WL 8159669, at *2 (M.D. Fla. Feb. 9, 2005). Itamar has also agreed to produce documents "relating to damages that it has suffered as result of Ectosense's unlawful conduct." (Ex. 1 at 13). Between the three years of financial information Itamar has agreed to produce, and the documents it has agreed to produce relating to its damages, Ectosense "can obtain the relevant information in another manner," and there is no need for additional years' of financial data.

**RFP 69:** This request seeks "Any and all documents including, but not limited to, engagement letters, retainer agreements, retainer payments, billing records, time records, invoices, payments, and costs related to this lawsuit." (Ex. 1 at 28.) Itamar objected to RFP 69 as seeking documents protected by both the attorney-client privilege and the work product doctrine, and as conflicting with Federal Rule of Civil Procedure 54(d)(2) and the procedures set forth in the Southern District of Florida Local Rules for motions for attorneys' fees. (*Id.* at 29.) Ectosense asserts these documents are relevant to Itamar's claim for attorneys' fees, and to the pending Motion to Disqualify Gene Kleinhendler. (ECF No. 201 at 5-6.)

Engagement letters and retainer agreements are protected by the attorney-client privilege. *In re Checking Account Overdraft Litig.*, 2010 WL 5136043, at *4 (S.D. Fla. Dec. 16, 2010); *see also In re Takata Airbag Products Liability Litig.*, 2016 WL 5844309, at *3-5 (S.D. Fla. May 23, 2016) (denying motion to compel engagement letters as irrelevant and containing privileged

information). Billing records and time records are likewise privileged – "under Florida law, such information generally constitutes both attorney-client and attorney work product." *Ben-Yishay v. Mastercraft Development, LLC*, 2010 WL 11504358, at *3 (S.D. Fla. July 2, 2010). Because Ectosense seeks documents relating to the pending action, these documents do not need to be provided on a privilege log under Local Rule 26.1. Other than the subset of documents related to Mr. Kleinhendler (discussed below), Ectosense provides no justification for overriding the privilege contained in these documents.

Ectosense also provides no authority to support its claim that it is entitled to attorneys' fees information at this stage in the litigation, instead of through the procedural process set forth by Federal Rule of Civil Procedure 54(d)(2) and Local Rule 7.3, which requires a party seeking attorneys' fees to submit invoices that support its request for fees along with its motion for fees. In general, prevailing parties in Lanham Act cases in this circuit – after obtaining judgment on the merits – file motions to have the case determined to be exceptional and to award their attorneys' fees, complete with the supporting documents. *See, e.g., CarMax Auto Superstores, Inc. v. StarMax Finance, Inc.*, 192 F. Supp. 3d 1279 (M.D. Fla. 2016); *Pergo (Europe) A.B. v. Stanley Black & Decker, Inc.*, 2018 WL 3949746 (N.D. Ga. May 7, 2018).

Ectosense's arguments as to documents related to Mr. Kleinhendler are even more nonsensical. Ectosense advances the argument that a party can defeat attorney-client privilege and work product by filing a motion to disqualify an attorney (meritorious or not), forcing that attorney into an impossible choice – say nothing to defend against specious, false claims of unethical or criminal behavior, risking harm to their professional reputation (or worse), or submit a declaration and (according to Ectosense) waive all privilege and protections related to their representation of their client. Ectosense cites no authority that supports this dilemma, or the huge advantage such

13

gamesmanship would provide to less-scrupulous litigants comfortable filing frivolous motions for disqualification. Mr. Kleinhendler's limited statements in his declaration – regarding the purpose of his engagement, and the timeline of his actions – do not obviate Itamar's privileges and protections over these documents.

Factual testimony by an attorney does not automatically waive the attorney-client privilege and work product protections as to that attorney. *See Kaplan v. Kaplan*, 2012 WL 995202, at *2 (M.D. Fla. Mar. 23, 2012). Further, "the subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege." *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994) (affirming order denying motion to compel documents created by attorneys and protected by the work product doctrine). Itamar has not "inject[ed] into this litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct." (ECF No. 201 at 6) (citing *Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001) (party who alleged "his attorneys provided ineffective assistance of counsel. . .put at issue – and thereby waived – any privilege.")). Mr. Kleinhendler's declaration statements were required because of issues Ectosense inserted into the litigation, not Itamar. Additionally, Ectosense fails to satisfy the two-part test:

> In deciding whether the crime-fraud exception applies to a communication between a lawyer and his client, courts apply a two part test. First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity . . ."

*In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987). There is no waiver or exception here that permits discovery into these privileged documents.

### III. ECF No. 202 (Third Request for Production) Is Largely Moot, and the Remainder Must Be Denied.

As with the Motion regarding the First Request for Production, Ectosense's Motion

regarding the Third Request for Production bizarrely asserts that Itamar "did not comply with the Court's Order requiring production of materials within the scope Itamar deems reasonable," (ECF No. 202), ignoring the key fact that the Motion was filed before Itamar's agreed-upon substantial completion date. Itamar has since substantially completed its document production, including the documents responsive to the Third Request for Production within a reasonable scope; and to the extent the parties recently agreed in their conferrals to a different scope beyond what Itamar has produced, it will supplement its production. As Ectosense notes, many of these issues have already been resolved. Itamar has amended its responses to confirm any lingering doubts Ectosense has.

### a. As Agreed, Itamar Is Producing, Documents Sought by the Motion

**RFP 14**: Based on Ectosense's clarification during the meet and confer that it sought only "formal rule[s] [or] guideline[s] dictating how personnel should interact with third-parties," specific to Ectosense, Itamar agreed to produce any such documents to the extent they exist. This issue is resolved. (**Ex. 3** (Amended Responses).)

**RFPs 16, 19, and 21**: Itamar has agreed to produce sufficient documents responsive to these requests as to studies and analyses performed in the United States. Ectosense has not limited the time period of these requests, so Itamar is producing the documents reasonably available in its corporate records and in the files of its agreed-upon custodians. (**Ex. 3**.)

**RFPs 29, 30, 33, 34, 35, 38, 39, 40, 41, 44, 46, 53, and 56**: Based on Ectosense's clarifications on the scope of these requests, Itamar agreed to produce responsive documents. **(Ex. 3.)**

### b. Itamar's Remaining Objections Are Supported By Law and Should Be Upheld

**RFPs 1 and 2**: These requests seek not only documents referring to certain authors and certain publications, but also any documents "including but not limited to" those particular authors and publications. Itamar's key concerns are (1) that these requests go beyond the extensive lists

15

provided in the requests, leaving Itamar to guess what other documents the requests are seeking, and (2) that these requests are not limited by subject matter to documents related in some way to the claims, defenses or counterclaims in this action. Itamar agreed to produce documents referring to the specified authors and publications in connection with any issue related to the claims, defenses, or counterclaims in this action. (**Ex. 3**.) Ectosense provides no justification for more.

**RFP 47-49**: Itamar's contracts with former and current clients are commercially sensitive documents and contain confidential information of both Itamar and its clients. The contracts themselves are not relevant to either Ectosense's claims about representations or Itamar's allegations about its products' accuracy. Itamar is already producing documents it relies on for its damages – all customer contracts are not required to establish which customers have been lost to Ectosense. Given the serious possible harm of producing such competitively sensitive information, the Court should deny this portion of the Motion. *Mitchell-Proffitt Co.*, 2005 WL 8159669, at *2.

**RFPs 50 and 51**: Ectosense fails to show why SEC documents would be relevant. More importantly, any documents filed with the SEC are publicly available – and if Itamar has any responsive, non-public documents protected by a privilege, Itamar will log those documents. Itamar is not presently aware of any responsive non-public and non-privileged documents.

**RFP 56**: Itamar has agreed to produce three years' worth of financial information that includes marketing and advertising expenses. Ectosense has not explained why it needs five years' worth.

**WHEREFORE**, for the foregoing reasons, Plaintiff Itamar respectfully requests the Court deny Ectosense's Motions to Compel, award Plaintiff its fees and costs for having to respond to Motions to Compel ECF No. 201 and 202 to the extent a large number of requests were already agreed to and Ectosense filed a motion anyway, together with such other and further relief as the Court deems just and proper.

Dated: October 15, 2021

Respectfully submitted,

*/s/ Laura Ganoza*
**FOLEY & LARDNER LLP**
Laura Ganoza, Esq.
Florida Bar No.  0118532
lganoza@foley.com
atownsend@foley.com
Ana Romes, Esq.
Florida Bar No.  101179
aromes@foley.com
avargas@foley.com
Hawwi W.  Edao
Florida Bar No.  1026550
hedao@foley.com
hmoreno@foley.com
One Biscayne Tower, Suite 1900
2 South Biscayne Boulevard
Miami, Florida 33131
Tel.: (305) 482-8400

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on the 15th day of October 2021, a true and correct copy of the foregoing was electronically served on all counsel of record as listed in the Service List below.

*/s/ Laura Ganoza*
Laura Ganoza

**SERVICE LIST**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 20-cv-60719- DIMITROULEAS/SNOW

| | |
|---|---|
| **TRIPP SCOTT, P.A.**<br>Paul O. Lopez, Esq.<br>eservice@trippscott.com<br>pol@trippscott.com<br>sxc@trippscott.com<br><br>Seth J. Donahoe, Esq.<br>eservice@trippscott.com<br>sjd@trippscott.com<br>sgc@trippscott.com<br><br>B. George Walker, Esq.<br>eservice@trippscott.com<br>bgw@trippscott.com<br>sxc@trippscott.com<br><br>*Counsel Ectosense NV*<br><br><br>**GREENBERG TRAURIG, LLP**<br>Paul B. Ranis, Esq.<br>ranisp@gtlaw.com<br>scottlaw@gtlaw.com<br>FLService@gtlaw.com<br><br>*Co-Counsel Ectosense NV* | **FOLEY & LARDNER LLP**<br>Laura Ganoza, Esq.<br>lganoza@foley.com<br>atownsend@foley.com<br>Ana Romes, Esq.<br>aromes@foley.com<br>avargas@foley.com<br>Hawwi Edao, Esq.<br>hedao@foley.com<br>hmoreno@foley.com<br>Jessica N. Walker, Esq.<br>*(admitted pro hac vice)*<br>jwalker@foley.com<br><br>*Counsel for Plaintiff Itamar Medical Ltd.*<br><br>**GK ADVISORY**<br>Anna Adamsky, Esq.<br>*(pro hac vice filed)*<br>anna@gk-ad.com<br>Gene Kleinhendler, Esq.<br>*(pro hac vice filed)*<br>gene@gk-ad.com<br><br>*Co-Counsel for Plaintiff Itamar Medical Ltd.*<br><br>**K&L GATES LLP**<br>Jonathan Bart Morton<br>jonathan.morton@klgates.com<br>Darlene F. Ghavimi, Esq.<br>darlene@ghavimi@klgates.com<br>(*admitted pro hac vice*)<br>Stewart Mesher<br>stewart.mesher@klgates.com<br>(*admitted pro hac vice*)<br><br>*Counsel for Defendant VirtuOx, Inc.* |

4850-9617-1775.4