UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

ITAMAR MEDICAL LTD.,            Case No. 20-60719-CIV-DIMITROULEAS/SNOW

        Plaintiff,

v.

ECTOSENSE NV, and
VIRTUOX, INC.

        Defendants     /

## ECTOSENSE'S REPLY TO ITAMAR'S CONSOLIDATED RESPONSE [D.E. 208] TO ECTOSENSE NV'S MOTIONS TO COMPEL [D.E. 200, 201, 202]

Ectosense, pursuant to the Court's October 12, 2021 Paperless Order [D.E. 207], hereby files this consolidated Reply.[1]

---

1.     "Plaintiff shall file a consolidated Response to the discovery Motions at ECF Nos. 200, 201, and 202 not to exceed 15 pages by October 15, 2021; and Defendant shall file a consolidated Reply not to exceed 9 pages by October 27, 2021." [D.E. 207], which was extended to October 29, 2021 by DE 211.

**I.    Itamar is using red herring objections and wrongfully refusing to produce *any* documents or data responsive Ectosense's Second Request For Production.**

Itamar never responded to the conferral letter regarding the Second Request for Production ("Clinical Data RFPs"), and Itamar *refuses to produce any data or responsive documents at all*. Further, many of Itamar's arguments, and certainly the affidavit testimony, are being raised for the first time in Itamar's Response. Thus, Ectosense is now responding to yet a new wave of arguments from Itamar that are internally inconsistent and facially not credible.

**a) Ectosense's instructions are appropriate and Itamar should produce according to the format that was previously negotiated by the parties, particularly considering that Itamar has not actually identified any specific issues with the protocol.**

Ectosense spent several weeks negotiating a clinical data protocol with Itamar's former counsel to facilitate the exchange of clinical data. The conferrals were actually memorialized by this Court's order as the parties worked through an ESI protocol first, and then a clinical data protocol second. DE 81 (ordering the parties to file a joint timeline for discovery), 82 (filing a discovery timeline for creating the clinical data protocol). The objective of both protocols was the same: create balanced rules governing the mode, manner, and format of production of evidence. In the midst of finalizing the clinical data protocol, Ectosense filed its counterclaim targeting Itamar's rampant false advertisement of the diagnostic performance of its devices. Itamar withdrew from the clinical data protocol days later stating that Ectosense had not yet served requests for production seeking clinical data and thus no protocol was needed. Ectosense then adapted the protocol to its instructions to the Clinical Data RFPs, and served requests seeking the very types of clinical data that was the topic of the negotiated protocol. *See* **Declaration of Bart Van Pee** attached as **Exhibit A.** Itamar was fine with the protocol when it believed it would be the party receiving data under it, but claims incredible burden now that it realizes it will have to produce data pursuant to it.

1

The protocol is structured in an industry standard format for exchanging medical research data. *See* **Ex. A.** It specifically to ensures that with respect to raw clinical data, both sides would be producing only what is natively exportable through ordinary commercial use of each parties' respective products. **Ex. A**. Itamar does not challenge these arguments from Ectosense, but states that because the protocol requires de-identification of data (i.e. stripping PII), it is too burdensome. Ironically, Itamar also argues that "If any clinical data is to be produced, this Court should permit Itamar to produce the data in the format that Itamar maintains the data." ECF 208 at 3. It seems lost on Itamar that its processing-burden argument conflicts with its privacy arguments. Nonetheless, Itamar would have this Court believe that with three decades in business, and teams of data scientists on staff, it has no process in place for stripping PII from clinical data, or that it does not automatically store data in de-identified format. The argument is not credible on its face.

**(b) Itamar's argument that published studies should suffice misses the point.**

Itamar first contends that actual raw clinical data, and Itamar's internal discussions about evidence regarding its diagnostic performance, is not relevant to this case. Clinical data is precisely how medical device manufacturers assess diagnostic accuracy, and Itamar's internal discussions about diagnostic accuracy go directly to Itamar's intent and knowledge. The requests seek data and internal discussions that are both highly relevant and material to the counterclaims. Itamar's fallback position is that published studies should suffice. Itamar cites an irrelevant non-compete case, and another case in which a court was determining whether the deposition of a non-party witness was required, or whether the publicly available publications from said witness would be sufficient. ECF 208 at 3. Both cases involved marginally relevant information related to collateral issues. Yet, from these cases Itamar argues "the publicly accessible research articles are more than sufficient for Ectosense to evaluate its counterclaim, and Ectosense should not be permitted to

undermine peer-reviewed medical research." [2] ECF 208 at 4. Nonsense. First, Ectosense is not even seeking publicly available articles, nor are they the method by which Itamar's diagnostic accuracy should be determined. What, for example, about clinical data that Itamar kept from publication exactly because the results were unfavorable? What of the clients that reported that they validated the device and found poor performance? Both are highly relevant and material. It is benchmark testing—and particularly the testing in which Itamar did not publish results—that will demonstrate Itamar knowingly perpetrates rampant falsehoods about its diagnostic accuracy. More importantly, reviewing the data from Itamar's own diagnostic testing and discussions about the same goes to Itamar's knowledge that it is falsely advertising.

Ectosense merely seeks diagnostic performance benchmark testing data for Itamar's devices, internal discussion about the results of such tests, and discussions regarding publications and reports regarding diagnostic performance. Poetically against Itamar's claim that peer reviewed studies should suffice, recent published clinical validation studies report Itamar's diagnostic accuracy <u>below 60%.</u> In the marketplace, Itamar attempts refute the findings by claiming the study is an outlier and stands in contrast to Itamar's own decades of validation testing, and data on file.

Itamar's contention that Ectosense seeks "every data point" is inaccurate. The requests are tailored to clinical data in which diagnostic accuracy was evaluated (with various categories pertinent to Ectosense's counterclaim identified), and internal discussions about diagnostic accuracy. Further, the claim that the requests are temporally overbroad is a problem of Itamar's own creation. For its present day marketing claims, even of devices that just came out in the last two—three years, Itamar cites in its marketing materials clinical data that is over twenty years old, and "data on file." *See* **Ex A**. Ectosense repeatedly requested stipulation that twenty year old data

---

[2] Ectosense's ability to measure and analyze PAT has also been peer reviewed, published, and cleared by the FDA, but Itamar believes that it can undermine not only peer reviewed publications, but also the FDA itself.

3

is not relevant to assessing diagnostic accuracy under current guidelines for current products. Itamar declined. Thus, Itamar does not want to produce the data, but nevertheless wants to rely upon it in marketing, and presumably in this case to state that the marketing is accurate.

Itamar dedicated three pages arguing that Ectosense is on a fishing expedition and that much of the data sought Itamar does not even have a legal right or access to. This argument again is inconsistent with the burden argument. There is no burden from data Itamar does not have. Yet, conspicuously absent is any specific mention or estimate of how much data is actually responsive to Ectosense's requests. Itamar uses generalities claiming the window of time is too broad and claiming Ectosense is not entitled to "all data points", but then later states "Itamar has extremely limited data for such investigations." ECF 208 at 6. Itamar cannot get its story straight in the argument. Is there too much data? Hardly any data at all? Moreover, as explained in the initial motion to compel, and expanded upon in **Ex A** hereto, Itamar is under stringent regulatory requirements to preserve and have accessible the very data and documents in question.

### (C) The Clinical Data Protocol, as well as this Court's Order Governing Confidential Materials, resolves any of the remaining concerns Itamar raises.

The clinical data protocol was tailored to avoid any output of the device-under-study (i.e., WatchPAT) that would not otherwise be made available by the manufacturer to everyday commercial users of the device. That stands in stark contrast with Ms. Litman's testimony to the contrary, and the purported concerns about proprietary data was never previously raised in the actual objections or during conferrals. The technical output format in which the automated analysis and signals are requested is the 'EDF' format, which Wikipedia correctly describes as "a standard file format designed for exchange and storage of medical time series". It is the industry's default open format in which any commercial user of WatchPAT can download from Itamar's own portal.

With respect to privacy, again the Clinical Data Protocol also *explicitly* requires clinical data to be stripped of any information that could otherwise provide a reasonable basis to believe that the information can be used to identify an individual. Thus, the notion of institutional review boards ("IRB") or other privacy concerns being implicated is not credible—particularly if such data is compelled for disclosure by this Court and designated confidential under the Court's confidentiality order. However, even if IRB consent was somehow triggered, requesting the IRB's review of this matter takes at most a few hours for the handful of Itamar-sponsored studies Ectosense identified as potentially generating responsive clinical data.

Ectosense has run clinical studies in the US and Europe (a jurisdiction subject to stricter privacy regulation, GDPR), and was willing and able to proceed in an exchange of data and documents under the Clinical Data Protocol without such privacy objections. That a publicly-traded medical device company implies that it does not have the processes, record retention, or capabilities to demonstrate how it conducts internal evaluations of its clinical performance claims against collected scientific data, is shocking, and not credible. If true, it would point to a culture that speaks directly to Ectosense's allegations of misconduct. Itamar's inability and refusal to produce the requested documents emphasizes that Itamar cannot substantiate its diagnostic accuracy claims. While this civil dispute is between two commercial parties, it does ultimately involve the health of hundreds of thousands of individuals being misdiagnosed.

II.   **The Court Should Overrule the Remaining Objections to Ectosense's Motion to Compel Regarding its First Request for Production.**

RFPs 11 and 15: Ectosense is Entitled to Documents Reflecting Usage of "PAT" Before and After Itamar's Products Existed. Itamar's discussion of resolving temporal and geographic scope objections is accurate, except where it touches on whether it produced a self-collection in good fait. DE 208 at 8-9. With respect to Itamar's agreement to produce documents sufficient to

5

identify scientific publications in which Itamar used the term "PAT®", DE 208 at 9, this does not satisfy the requests at issue, RFPs 11 and 15. Ectosense asked for documents showing how Itamar used the terms before (to which RFP 11 largely pertains) and after its products existed (to which RFP 15 largely pertains). Usage before its products existed cannot refer to its own products, undermining Itamar's assertion that "peripheral arterial tone" can only refer to Itamar's products.

<u>RFPs 32 and 33: Ectosense is Entitled to All of Itamar's Marketing and Advertising, Not Selective Examples that Do Not Accurately Reflect All Usage</u>: Ectosense asked for documents reflecting the different ways Itamar used the term "PAT" in its advertising materials. Itamar has tried to limit discovery on "PAT" to only its products. If Itamar advertisements use the term "PAT" in a generic way, it undermines Itamar's position that "PAT" can only refer to Itamar products. Itamar appears to have capitulated, but Ectosense requests the Court enter an order requiring what Itamar says it will accomplish, because Itamar has promised things in discovery before, but not followed through unless specifically ordered.

<u>RFPs 39 and 40: Ectosense is Entitled to Know Why it is Being Sued</u>. The parties' dispositive motion practice discusses Itamar's failure to identify much advertising, if any, from Ectosense which is allegedly infringing. Itamar will have to disclose this information. It should have to do so now, though, so Ectosense can test whether it gives rise to a claim, not at a later time period when prejudice would inure due to it not being disclosed so that it could be addressed sooner. Itamar says it has agreed to RFPs 39 and 40. Ectosense requests the Court enter an Order requiring Itamar to follow through.

<u>RFP 48: Itamar Must Produce Documents Supporting its Allegations</u>. Itamar objects to a temporal scope dating back to 1990, but fails to disclose the reason Ectosense use that time period. Itamar's own allegations put that time period at issue, where they allege the terms "were used twice

6

in 1990 and sporadically in 1993[.]" [D.E. 121, pg. 8]. Ectosense wants to know what Itamar is referencing. Ectosense is asking the Court to order Itamar to demonstrate it made the allegation in good faith, by producing the documents it is describing.

RFP 29:  Itamar Should Produce Financial Documents Both Before and After Ectosense Came to Market. Itamar believes producing a few years-worth of financial data from after Ectosense arrived in the market is sufficient. It is not. On the issue of damages, Itamar cannot allege a decline in profits if there is no reference point. The Court should order Itamar to produce the same number of years before, as it is disclosing for the time period after Ectosense entered the market. "Plaintiff should be able to effectively compare the named [person's] incomes in the years both predating and subsequent to the years that [a party] admittedly [relied on]." . . . as noted by Plaintiff, such a comparison may contradict or corroborate the testimony of [the other party]." *Mayfair v. QBE*, 2010 WL 11506006, at *4 (S.D. Fla. 2010). Itamar cannot explain how the financial documents it agreed to produce will show a decline in revenues attributable to Ectosense, without comparing them to documents from the period before Ectosense arrived. It is impossible to determine change over time if the starting values are unknown. Itamar should be compelled to produce an equal number of years from before Ectosense came to market.

RFP 69:  Itamar Has No Basis to Object to Producing Billing and Retainer Agreement Documents. As to the attorney's fees, billing, and retainer agreement document requests in RFP 69, "by claiming attorneys' fees and offering billing statements as evidence of the fees, [the party] put its fees at issue and waived any attorney client privilege with respect to the billing statements . . . that privilege has been waived owing to the doctrine of implied waiver." *Banta v. Arch*, 2012 WL 12836516, *2 (S.D. Fla. 2012) (M.J. Snow, overruling assertion of privilege). Itamar has no basis to refuse simply because a judgment has not been entered, and its response continues to

mischaracterize the local rules. The Court should order Itamar to produce non-privileged billing and retainer agreement documents, and a log.

### III. The Court Should Overrule the Remaining Objections to Ectosense's Motion to Compel Regarding its Third Request for Production.

<u>Itamar Did Not Self-Collect and Voluntarily Produce in Good Faith</u>. Itamar claims to not understand why Ectosense demanded documents before its substantial production deadline. Ectosense did so, because the parties agreed to self-collection of responsive, non-privileged documents for a good faith initial production, explicitly before substantial production: "Itamar will produce on a rolling basis but shall complete substantial production 60 days from creation of the review set for any agreed-upon custodians (i.e. after collection of the agreed custodians, application of the searches using the agreed search terms, and completion of processing of the remaining documents for Itamar's review)." *See* DE 123, pg. 7(e). Itamar did not self-collect documents in good faith and produce them before substantial production, it produced approximately 40 pdf documents, and then later another ~100 documents (after additional extensions of the self-collection deadline). By contrast, Ectosense collected and produced the highly relevant documents that were readily identifiable as part of the non-ESI protocol production, and expected the same in return. Itamar however, produced hardly any documents through self-collection, many of which were publicly available and known, and then performed a 260,000+ page document dump through the ESI protocol. The fundamental difference between the protocol and self-collection in that the custodian is expected to deliberately retrieve the documents he or she knows exist and are relevant from such locations where the custodian knows they are. Itamar should be required to certify that its custodians made good faith diligent efforts to do so.

<u>The Resolved Requests:</u> Itamar's characterization of RFPs 14, 16, 19, 21, 29, 30, 33, 34, 35, 38, 39 40, 42, 44, 46, 53, and 56 is believed to be accurate, to the extent Itamar says it now

understands requests it previously considered ambiguous. However, Itamar served its amended responses only an hour before its Response to the Motion to Compel so Ectosense is at a disadvantage as to understanding what Itamar is committing to do.

      RFPs 1 and 2: Authors and Publications Are Relevant and Should Be Produced: Itamar essentially claims requests 1 and 2 are vague and overbroad. RFPs 1 and 2 provide a list of authors by name, and their articles. They are not vague. Ectosense asked about these, because they pertain to scientific principles at issue, and use terms at issue. If Itamar has responsive documents discussing them, they should be produced. This is not duplicative of Ectosense's Second Request for Production, which Itamar has not agreed to produce a single document responsive to anyway. Itamar should be ordered to produce responsive discussions of these authors or their articles.

      RFPs 47-49; RFPs 50 and 51: Itamar Should Produce Responsive Contracts, and Itamar Should Produce Exchanges With Governmental Agencies. This is a simple issue that Itamar over-complicates with a red-herring objection to disclosing proprietary information. RFPs 47-49 seek contracts with former and current clients that make specific representations about the capabilities of Itamar's products. Ectosense challenges the accuracy of Itamar's representations. Itamar's need to comply with a client contract requirement furnishes Itamar a motive to misstate capability, which is made worse because some of these contracts are with government agencies.

      As to RFPs 50 and 51, which seek inquiries, documents, exchanges, etc. with the SEC, the SEC has questioned the accuracy of any of Itamar's diagnostic claims, and Itamar has responded and amended its representations to investors while maintaining the same claims in marketing. This is clearly relevant to Itamar's intentional and knowing false advertisement. Itamar should be ordered to produce these records, and the Confidentiality Order in place will protect its concerns.

## CERTIFICATE OF SERVICE

Counsel for Ectosense *nv* hereby certifies that on the 29th day of October 2021, I electronically filed the foregoing document via cm/ecf and served this document on all counsel of record as listed in the Service List below.

**Counsel for Ectosense *nv*:**

*/s/   Seth J. Donahoe*____

Paul O. Lopez, Esq.
Florida Bar No. 983314
pol@trippscott.com (primary)
eservice@trippscott.com (secondary)
sxc@trippscott.com (secondary)
Seth J. Donahoe, Esq.
Florida Bar No. 1004133
sjd@trippscott.com (primary)
sgc@trippscott.com (secondary)
B. George Walker, Esq.
FL Bar No. 0071049
bgw@trippscott.com (primary)
Tripp Scott, P.A.
110 SE 6th Street, 15th Floor
Fort Lauderdale, FL  33301
Telephone: (954) 525-7500
Telefax: (954) 761-8475

SERVICE LIST
CASE NO: 20-cv-60719-WPD

| **Counsel for Plaintiff:** | **Counsel for Defendant ECTOSENSE:** |
|---|---|
| LAURA GANOZA, ESQ.<br>Florida Bar No. 0118532<br>lganoza@foley.com<br>atownsend@foley.com<br>HAWWI EDAO, ESQ.<br>Florida Bar No. 1026550<br>hedao@foley.com<br>hmoreno@foley.com<br>**FOLEY & LARDNER LLP**<br>One Biscayne Tower, Suite 1900<br>2 South Biscayne Boulevard<br>Miami, Florida 33131<br>(305) 482-8400<br>(305) 482-8600 (fax)<br><br>**Co-Counsel for Plaintiff:**<br><br>JESSICA N. WALKER, ESQ.<br>jwalker@foley.cOM<br>**FOLEY & LARDNER LLP**<br>555 South Flower Street, Suite 3300<br>Los Angeles, CA 90071-2418<br>(213) 972-4675<br><br>GENE KLEINHENDLER, ESQ.<br>gene@gk-ad.com<br>ANNA ADAMSKY, ESQ.<br>anna@gk-ad.com<br>**GK ADVISORY**<br>72 Ahad Haam St.<br>Tel Aviv 6520512, Israel<br>(972) 3-735-6168 | PAUL O. LOPEZ, ESQ.<br>eservice@trippscott.com (primary)<br>pol@trippscott.com (secondary)<br>sxc@trippscott.com (secondary)<br>SETH J. DONAHOE, ESQ.<br>eservice@trippscott.com (primary)<br>sjd@trippscott.com (secondary)<br>sgc@trippscott.com (secondary)<br>B. GEORGE WALKER, ESQ.<br>bgw@trippscott.com<br>sxc@trippscott.com<br>cab@trippscott.com<br>Tripp Scott, P.A.<br>110 SE 6th Street, 15th Floor<br>Fort Lauderdale, FL  33301<br>Telephone:  (954) 525-7500<br>Telefax:  (954) 761-8475<br><br><br>**Co-Counsel for Defendant ECTOSENSE:**<br><br>Stephen Baird, Esq.<br>(*pro hac vice to be filed*)<br>GREENBERG TRAURIG, LLP<br>90 South 7th St., Suite 3500<br>Minneapolis, MN  55402<br>bairds@gtlaw.com<br><br>Paul B. Ranis, Esq.<br>Florida Bar No. 64408<br>GREENBERG TRAURIG, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, Florida 33301<br>ranisp@gtlaw.com<br>scottlaw@gtlaw.com<br>FLService@gtlaw.com<br><br>***Counsel for VirtuOx Inc.***<br><br>Jonathan B. Morton<br>Florida Bar No. 956872 |

|  | Jonathan.Morton@klgates.com<br>**K&L Gates LLP**<br>Southeast Financial Center<br>200 South Biscayne Boulevard, Suite 3900<br>Miami, Florida 33131-2399<br>Telephone: 305-539-3357<br><br>Darlene F. Ghavimi, *Admitted Pro Hac Vice*<br>Texas Bar No. 24072114<br>Darlene.Ghavimi@klgates.com<br>Stewart Mesher, *Admitted Pro Hac Vice*<br>Texas Bar No. 24032738<br>Stewart.Mesher@klgates.com<br>**K&L GATES LLP**<br>2801 Via Fortuna Suite 350<br>Austin, Texas 78746-7568<br>Telephone: (512) 482-6919 |
|---|---|