# Exhibit C

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF FLORIDA
3   FORT LAUDERDALE DIVISION
    -------------------------------------------X
4   ITAMAR MEDICAL LTD.,

5                            Plaintiff,

6           Vs.                 Case No.
                                20-cv-60719-WPD
7
    ECTOSENSE NV,
8
                             Defendant.
9
    -------------------------------------------X
10

11

12

13

14   REMOTE VIDEOTAPED DEPOSITION OF MATS DAHLQVIST

15                      Via Zoom

16                 October 19, 2021

17

18

19

20

21

22   Reported by:

23   Anita M. Trombetta, RMR, CRR

24   JOB NO. 201214

25

1

2

3

4                    October 19, 2021

5                    1:31 p.m.

6

7

8          Remote videotaped deposition of

9    MATS DAHLQVIST, held via Zoom, before

10   Anita M. Trombetta, an RMR, CRR, and a

11   Notary Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2   R E M O T E   A P P E A R A N C E S:

 3        On behalf of the Plaintiff:

 4        FOLEY & LARDNER

 5             2 S Biscayne Blvd

 6             Miami, Florida 33131

 7        BY:   LAURA GANOZA, ESQ.

 8             HAWWI EDAO, ESQ

 9

10   On behalf of the Defendants:

11        TRIPP SCOTT

12             110 SE Sixth Street

13             Ft. Lauderdale, Florida 33301

14        BY:   JOHN MULLIN, ESQ.

15             SETH DONAHOE, ESQ.

16        -and-

17        K&L GATES

18             200 S Biscayne Boulevard

19             Miami, Florida 33131

20        BY:   JONATHAN MORTON, ESQ.

21

22   ALSO PRESENT:  Joel Coriat, Legal Video

23   Specialist

24   Thomas Mackie, Ectosense

25   Gene Kleinhendler,  GK Advisory
```

Page 4

 1

 2         IT IS HEREBY STIPULATED AND AGREED

 3   by and between the attorneys for the

 4   respective parties herein, that filing and

 5   sealing be and the same are hereby waived.

 6         IT IS FURTHER STIPULATED AND AGREED

 7   that all objections, except as to the form

 8   of the question, shall be reserved to the

 9   time of the trial.

10         IT IS FURTHER STIPULATED AND AGREED

11   that the within deposition may be sworn to

12   and signed before any officer authorized

13   to administer an oath, with the same

14   force and effect as if signed and sworn

15   to before the Court.

16

17

18

19

20                   - oOo -

21

22

23

24

25

1                    M. Dahlqvist

2     Ectosense.

3          Q.    Does that mean you are no longer a

4     board member?

5          A.    Yes.

6          Q.    Okay.  So when did you stop being a

7     board member?

8          A.    Right at the time when ResMed

9     acquired Ectosense.

10               (Court reporter clarification.)

11         A.    ResMed, R-E-S-M-E-D.

12         Q.    So that was fairly recently?

13         A.    Yes.

14         Q.    In the last couple of weeks?

15         A.    Yeah, last couple of weeks.  I don't

16    know right now.

17         Q.    So do you have any current

18    relationship with Ectosense since the ResMed

19    acquisition?

20         A.    No.  I mean, what do you mean by

21    current relationship?  In a professional

22    relationship, no, no.  I'm not employed by

23    them.  I'm not paid by them.

24         Q.    Now, when you were a board member of

25    Ectosense, you were an independent board

```
 1                    M. Dahlqvist
 2   member, correct?
 3        A.    Yes, yes.
 4        Q.    And as an independent board member,
 5   you're supposed to exercise independent
 6   judgment, right?
 7        A.    Yeah.  Correct.
 8        Q.    So you are -- you are not part of
 9   Ectosense's executive team, right?
10        A.    No.
11        Q.    And you are not involved in the
12   day-to-day operations of the company either?
13        A.    That is correct.
14        Q.    You are also not responsible for
15   supervising or directing the litigation between
16   Ectosense or Itamar, correct?
17        A.    Yes.
18        Q.    So you didn't consult regularly with
19   Ectosense's outside counsel, Tripp Scott?
20        A.    No.
21        Q.    When did you become a board member
22   for Ectosense?
23        A.    2019.  I need to look at my CV, but
24   2019.
25        Q.    Now, prior to your board membership
```

1                    M. Dahlqvist

2         provided electronically to the reporter.)

3    BY MS. GANOZA:

4         Q.    Now, ultimately you scheduled a call

5    with Mr. Kleinhendler on April 12, 2021, right?

6         A.    Yeah, yes.

7         Q.    Okay.  Great.

8              MS. GANOZA:  Hawwi, you can take the

9         exhibit down, please.

10   BY MS. GANOZA:

11        Q.    Now, before this call, you called

12   Bart Van Pee, correct?

13        A.    Yes, when -- yes.

14        Q.    Were you going to say something

15   else?

16        A.    No, no.  Please, go ahead.

17        Q.    Okay.  Why did you call him?

18        A.    Because then it dawned on me that

19   this may be related to Itamar and the ongoing

20   litigation.

21        Q.    Okay.  When you called him, what did

22   you say?

23        A.    I told him that an Israeli lawyer

24   would contact me.

25        Q.    Okay.  What did he say?

```
1                      M. Dahlqvist
2        Q.    Okay.  Do you think it's because he
3   was contacting you to find out and get
4   information on the general counsel of
5   Saffelberg?
6        A.    Well, if you continue to read my
7   notes, yes, that's what's part of it.
8        Q.    Okay.  Okay.  Good?
9        A.    I mean, put it this way.  That's
10  what he told me.
11       Q.    Okay.  And then can you keep
12  reading.  What's the next sentence there?
13       A.    "Bunch of issues:  Who is the right
14  person to talk to?"
15       Q.    Okay.  So that seems to be a
16  reference that he's looking to be speaking to
17  somebody in connection with a bunch of issues?
18       A.    Yes.
19       Q.    Okay.  What does it say below that?
20       A.    "Specific:  FDA submission, some of
21  the statements were problematic."
22       Q.    Okay.  Do you know -- did he discuss
23  what specific statements he was referring to?
24       A.    He did not -- not in detail.  Just
25  in -- just describing that there were
```

```
 1                    M. Dahlqvist

 2   problematic statements.

 3      Q.    Okay.  Do you know what documents

 4   those statements came from?

 5      A.    Well, he -- he told me the FDA

 6   submission, so I assume that would be it.

 7      Q.    Do you know if he was referring to

 8   the 510(k) summary that is submitted to the

 9   FDA?

10      A.    I believe that's not an FDA

11   submission, right?  That's a summary.

12      Q.    Well, who submits that?  Who

13   prepares the summary, to your knowledge?

14      A.    I'd like to -- you know, I'm an

15   independent director, and I know of the FDA and

16   510(k).  I'm just saying what I heard here.  I

17   don't want to go into detail because it's --

18   becomes a little bit of guesswork from my

19   point, so I probably -- I apologize for that.

20      Q.    So you don't know -- you don't know

21   what is submitted to the FDA?

22      A.    I didn't say that.  I said who

23   writes the summary.

24      Q.    Oh, you don't know who writes the

25   summary?
```

```
 1                    M. Dahlqvist

 2        A.    The -- the FDA submission is a

 3   submission to the FDA, but I guess that is not

 4   the summary, because then it would have been

 5   called summary of the FDA submission or -- an

 6   FDA submission is a submission to the FDA,

 7   whereas a 510(k) summary is a summary of the

 8   510(k), which is two different things, I

 9   thought.  But again --

10        Q.    That's what you thought.

11        A.    Mm-hmm.

12        Q.    Did you ask Mr. Kleinhendler what

13   submission he was talking about?

14        A.    No, I was -- I was just listening

15   and taking notes.

16        Q.    Did he tell you that he'd reviewed

17   documents that were marked attorneys' eyes only

18   in connection to the FDA submissions?

19        A.    Not to my recollection, no.

20        Q.    And you don't have any independent

21   knowledge of the documents that

22   Mr. Kleinhendler was referring to when he was

23   discussing the statements that were

24   problematic, do you?

25        A.    I -- you need to be more specific.
```

```
 1                      M. Dahlqvist

 2   I don't really understand the question.

 3        Q.    The question is --

 4              (Multiple speakers.)

 5        A.    Have I read the FDA submission?  Or

 6   what is your question, please?

 7        Q.    My question is whether you have any

 8   independent knowledge of the document that

 9   Mr. Kleinhendler was referring to when he was

10   discussing the statements that were

11   problematic?

12        A.    Not in detail, no.  But I know of

13   them.

14        Q.    What do you know of them?

15        A.    That -- that Ectosense has submitted

16   documents to the FDA to get clearance to market

17   the product in the U.S.

18        Q.    And are all of those documents --

19   are any of those documents publicly available?

20        A.    I guess the 510(k) summary.

21        Q.    Do you know if Ectosense actually

22   filed the 510(k) summary as part of the

23   litigation in this case?

24        A.    I -- I don't know who -- who

25   submitted the summary, no.
```

```
 1                     M. Dahlqvist

 2        A.    Well, this is -- there's a real

 3   serious concern for people, for the investors,

 4   and I also assumed it would be linked to the

 5   board as well.  So that means that there is a

 6   responsibility.

 7        Q.    Well, that's not a new concept,

 8   right, that a board -- that the board has

 9   responsibility for -- for disclosures made to

10   government authorities by the company, right?

11        A.    At the time when I listened to

12   Mr. Kleinhendler, I was not sure of that.  I

13   was taken a little bit by surprise by the

14   context of the call.  So I just took down the

15   notes.  This is not, again, my -- to my

16   recollection this is not an interpretation.

17   This is sort of quotes from what

18   Mr. Kleinhendler told me.

19        Q.    Okay.  So if we could keep reading.

20   And I apologize.  This is the way it was

21   produced, but hopefully you can still read

22   what's there.

23        A.    Yeah.  "Someone at Saffelberg who

24   would like to discuss with him."

25        Q.    Okay.  So, again, it looks like he's
```

```
 1                      M. Dahlqvist

 2    looking for someone to discuss this with at

 3    Saffelberg?

 4         A.    Mm-hmm.

 5         Q.    Right.  Okay.

 6               Next sentence.

 7         A.    "Not what is going on in Florida

 8    with Pat, P-A-T."

 9         Q.    Okay.  And what's the last part of

10    this first page say?

11         A.    "More serious, dealing with the

12    government, FDA.  Certain lines were crossed."

13         Q.    Okay.

14               MS. GANOZA:  All right.  Let's move

15         to the next page, please, Hawwi.

16    BY MS. GANOZA:

17         Q.    Okay.  What does it say there on the

18    very top?

19         A.    "Want" -- "wants to speak with an

20    attorney, in-house or out-house counselor" --

21    counselor."

22         Q.    So, again, he's asking to speak to a

23    lawyer --

24         A.    Yes.

25         Q.    -- for Saffelberg.
```

```
 1                      M. Dahlqvist

 2   reporting" -- "not reporting" -- "regarding the

 3   lawsuit."  Sorry.

 4        Q.    Okay.  And the last sentence?

 5        A.    "They asked him to look into."  And

 6   that -- that's -- the directors, I understood.

 7   They, of Itamar.

 8        Q.    Okay.  How would you describe the

 9   tone of the call?  Was it cordial?

10        A.    Yes.  I -- it was cordial, but it

11   was a little bit, when it dawned on me what

12   that meant, I -- my -- there was -- I realized

13   there was -- but he was nice.  I mean, it was a

14   nice cordial talk, yeah.

15        Q.    You didn't feel intimidated during

16   that call?

17        A.    I had no particular feelings of

18   intimidation from him.  I realized what this

19   could mean and I realized -- I perceived it as

20   a way of -- of -- I'm Swedish, excuse me.  I'm

21   searching for my words here a little bit.  So

22   I -- I -- I perceived it to be clearly related

23   to the case and it was a different angle of the

24   same thing.

25        Q.    Okay.  And you don't have to
```

1                          M. Dahlqvist

2          A.     That they would go -- that would

3    make the shareholders responsible or perhaps

4    the directors for fraud against criminal

5    conduct against the FDA, towards the FDA.

6          Q.     Did you call a lawyer about that

7    threat?

8          A.     No.  It wasn't a personal threat to

9    me, indirectly, maybe.

10         Q.     Did you take any action as a result

11   of this alleged threat?

12         A.     I -- I called Bart Van Pee.

13         Q.     Okay.  Other than your call to Bart

14   Van Pee, did you do anything else?

15         A.     Yes, I informed Luc Osselaer about

16   the -- about the call, and I explained to what

17   Mr. Kleinhendler wanted.

18         Q.     Why didn't you contact Saffelberg's

19   counsel?

20         A.     I did indirectly by calling Luc

21   Osselaer, who is the director of Saffelberg.

22   You know I'm an independent director.  I'm

23   transferring the information to them.

24         Q.     Now, you mentioned that you were

25   familiar with Gilad Glick, the CEO of Itamar,

```
 1                      M. Dahlqvist
 2            MS. GANOZA:   In paragraph 10, so if
 3        we can move up a little bit to the bottom
 4        of the first page.   Thank you.
 5   BY MS. GANOZA:
 6        Q.    You say -- you understood
 7   Mr. Kleinhendler's statements and intentions as
 8   a warning that Ectosense would be accused of
 9   criminal conduct.
10            What gave you that impression?
11        A.    This was labeled as much more
12   serious than the actual litigation itself by
13   Mr. Kleinhendler.
14        Q.    Now, you understand -- I'm sorry, my
15   own fault.
16        A.    No, go ahead.
17        Q.    Were you done with your answer?
18        A.    I'll be back if it comes up again,
19   so no worries.   It's gone.
20        Q.    Now, you understand that
21   Ectosense -- or do you understand that
22   Ectosense has taken the position in this case
23   that Mr. Kleinhendler was extorting Ectosense
24   and Saffelberg?
25        A.    If I understand the word extorting
```

Page 40

```
 1                    M. Dahlqvist
 2  correctly, yes.  That I've been informed about.
 3       Q.   You've been informed about that?
 4       A.   Yes.
 5       Q.   Yes?
 6       A.   No, go ahead.
 7       Q.   No, please continue.
 8       A.   No, no, I lost track.  Please go
 9  ahead.
10       Q.   So you've been informed that
11  Ectosense is taking the position that
12  Mr. Kleinhendler is extorting Ectosense and
13  Saffelberg?
14       A.   Yes.
15       Q.   During your conversation with
16  Mr. Kleinhendler, did he ever say that he would
17  be contacting law enforcement if you or
18  Ectosense did not take a particular action?
19       A.   No, he did not do that, no.
20       Q.   Did he say that the only way that a
21  director like yourself could avoid criminal
22  prosecution was to take a specific action in
23  the Florida proceeding?
24       A.   No.
25       Q.   Now, you don't contend that in your
```

Page 42

```
 1                    M. Dahlqvist

 2   was.  Sometimes you say things, but you mean

 3   the other -- the other thing.  So perhaps that

 4   was not correct.

 5        Q.   But to your knowledge,

 6   Mr. Kleinhendler did not present any charges to

 7   the authorities against you or any directors or

 8   anyone at Ectosense, right?

 9        A.   You know, after this, after I --

10   after the call I reported -- so I mentioned  to

11   Bart and I mentioned to Luc Osselaer, and after

12   that I did not follow the case, what happened

13   during the discussions with -- with the

14   counselor of Saffelberg and Mr. Kleinhendler.

15        Q.   You've never been contacted by any

16   criminal authorities following that discussion,

17   right?

18        A.   No.

19        Q.   You've never been told by anyone at

20   Ectosense that any of them have been contacted

21   by authorities, have you?

22        A.   I haven't been told that, no.

23        Q.   You haven't been told by anyone at

24   Saffelberg having been contacted by

25   authorities?
```

1                     M. Dahlqvist

2        A.    No.   But, again, I perceived this as

3    a threat, and a threat is necessarily not

4    acting, right?   So.

5        Q.    You said -- you've mentioned it a

6    couple of times, that following this call, you

7    spoke to Mr. Van Pee?

8        A.    Mm-hmm.

9        Q.    Was that the first thing you did

10   after the call was to contact Mr. Van Pee?

11       A.    I believe so.

12       Q.    Why did you do that first?

13       A.    Because I have been having most of

14   the communication with Bart Van Pee regarding

15   most issues in the company -- it is with

16   Mr. Bart Van Pee that I have had most contacts

17   in discussing these things, the things about

18   the company related to Ectosense, including the

19   legal case.   So for me it was natural to do

20   that.

21            MS. GANOZA:   Okay.   Hawwi, you can

22        take the exhibit down, please.

23   BY MS. GANOZA:

24       Q.    And what did you tell him when you

25   called him?

1                        M. Dahlqvist

2          Q.    Okay.  Well, if we keep going down

3     these messages, it looks like you followed up

4     with Bart a few days later and you ask him:

5     "Any news re Kleinhendler"; right?

6          A.    Yes.

7          Q.    And he responded?

8          A.    Yeah.

9          Q.    And you could read, we only have

10    part of the response there -- and could you

11    read what he says there:  "I wonder if it was a

12    bluff or whether he will at least send a

13    follow-up memo."

14         A.    Yes.

15         Q.    Now, he didn't say in this response

16    that Mr. Kleinhendler was extorting Saffelberg,

17    correct?

18              MR. MULLIN:  Object to the form.

19         A.    I -- he did not use the word

20    extortion in the communication.  That is

21    correct.

22         Q.    And this was after Saffelberg had

23    had a call with Mr. Kleinhendler, right?

24         A.    Yes.  It was the 17th, which is five

25    days after.