# Exhibit D

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF FLORIDA

 3   FORT LAUDERDALE DIVISION
     ------------------------------------------X
 4   ITAMAR MEDICAL LTD.,

 5                          Plaintiff,

 6          Vs.                 Case No.

 7   ECTOSENSE NV,              20-cv-60719-WPD

 8                          Defendant.

 9   ------------------------------------------X

10

11

12

13

14    REMOTE VIDEOTAPED DEPOSITION OF ARNOLD BENOOT

15                      Via Zoom

16                 October 18, 2021

17

18

19

20

21

22   Reported by:

23   Anita M. Trombetta, RMR, CRR

24   JOB NO. 201214

25
```

```
 1

 2

 3

 4                    October 18, 2021

 5                    1:30 p.m.

 6

 7

 8         Remote videotaped deposition of

 9    ARNOLD BENOOT, held via Zoom, before

10    Anita M. Trombetta, an RMR, CRR, and a

11    Notary Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2    R E M O T E   A P P E A R A N C E S:

 3         On behalf of the Plaintiff:

 4         FOLEY & LARDNER

 5               2 South Biscayne Boulevard

 6               Miami, Florida 33131

 7         BY:   LAURA GANOZA, ESQ.

 8               HAWWI EDAO, ESQ.

 9

10    On behalf of the Defendants:

11         TRIPP SCOTT

12               110 SE Sixth Street

13               Ft. Lauderdale, Florida 33301

14         BY:   JOHN MULLIN, ESQ.

15               SETH DONAHOE, ESQ.

16         -and-

17         K&L GATES

18               200 South Biscayne Boulevard

19               Miami, Florida 33131

20         BY:   JONATHAN MORTON, ESQ.

21

22    ALSO PRESENT:

23    Rick Richey, Legal Video Specialist

24    Thomas Mackie, Ectosense

25    Gene Kleinhendler,  GK Advisory
```

Page 4

1

2          IT IS HEREBY STIPULATED AND AGREED

3    by and between the attorneys for the

4    respective parties herein, that filing and

5    sealing be and the same are hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED

7    that all objections, except as to the form

8    of the question, shall be reserved to the

9    time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED

11    that the within deposition may be sworn to

12    and signed before any officer authorized

13    to administer an oath, with the same

14    force and effect as if signed and sworn

15    to before the Court.

16

17

18

19

20                    - oOo -

21

22

23

24

25

```
 1                    A. Benoot

 2   Saffelberg.  He has been working there since

 3   three years or something, yeah.  So it was,

 4   yeah -- and also he was not a person that was

 5   really following up on private equity matters.

 6   He was really my backup during my holiday, but

 7   it's quite logical that I would be the person

 8   calling Mr. Kleinhendler.

 9        Q.    Okay.  And then two days later,

10   there is an email from Mr. Van Pee to Luc and

11   Gert?

12        A.    Yeah.

13        Q.    And it seems that he's pretty

14   anxious to have Saffelberg -- to have someone

15   call Mr. Kleinhendler back, right?

16        A.    Yeah.

17        Q.    The way that I've translated -- I've

18   this had this translated, it says:  "Were you

19   able to make an appointment with this gentleman

20   yet"; correct?

21        A.    Yeah.

22        Q.    And --

23        A.    And then he says --

24              (Multiple speakers.)

25        Q.    Yeah?
```

```
 1                    A. Benoot
 2      A.    Then he says:  "If we can do this
 3 today or tomorrow and have a meeting with him,
 4 that would be a huge gain to our litigation.  I
 5 can inform you through phone."
 6      Q.    So he believed -- Mr. Van Pee -- and
 7 who is Mr. Van Pee?
 8      A.    He's -- he's one of the main
 9 shareholder -- at that time, one of the main
10 shareholders.  Not the CEO, but he's really the
11 guy that manages -- he's one of the founders of
12 Ectosense, and he was the guy that was running,
13 yeah, most of the internal procedures.  He was
14 doing all of the accounting and the
15 administration, and yeah, but he was one of the
16 two founders of Ectosense.
17      Q.    Okay.  So he believed that engaging
18 with Mr. Kleinhendler could actually be, as you
19 put it:  "A huge win in the litigation between
20 Ectosense and Itamar"?
21      A.    Yeah.
22            MR. MULLIN:  Objection as to form.
23      Q.    He is not warning anybody in this
24 email about Mr. Kleinhendler threatening
25 Ectosense or its investors, is he?
```

```
 1                    A. Benoot

 2              MR. MULLIN:  Object to the form.

 3         Q.    You can answer, Mr. Benoot.

 4         A.    Yeah.

 5         Q.    Unless -- unless Mr. Mullin

 6    instructs you not to answer for some reason,

 7    he'll just place his objection on the record,

 8    and you could answer.

 9         A.    Sorry.  Could you briefly repeat the

10    question?

11         Q.    Of course.  He's not warning anybody

12    in this email about Mr. Kleinhendler making

13    threats against Ectosense and its investors, is

14    he?

15         A.    No, he's not.

16         Q.    He's not saying that

17    Mr. Kleinhendler is intimidating Ectosense or

18    its investors, is he?

19         A.    No, I was not.  This is simply to

20    inform us -- he wanted to explain what he

21    thought, because we were not at all involved

22    into all of the -- even in the case or what the

23    case was about, so he wanted to brief us on

24    what this might be about.

25         Q.    Okay.  So if we move further up
```

```
 1                    A. Benoot

 2        Q.    Okay.  Let's go ahead -- and you did

 3   mention that you had submitted a declaration in

 4   this case.  So let's go ahead and mark that as

 5   the next exhibit in the case.

 6             MS. GANOZA:  So Hawwi, if you could

 7        pull up Tab 11 -- I'm sorry, Tab L.

 8   BY MS. GANOZA:

 9        Q.    Mr. Benoot, is this the

10   declaration -- and we can go to the last page.

11   We can go through it and make sure this is your

12   signature, but is this the declaration that you

13   submitted in this case, Itamar versus

14   Ectosense?

15        A.    Yes, it is, yeah.

16        Q.    Let's go ahead -- and that's your

17   signature on the last page?

18        A.    Yes.

19        Q.    Okay.  Let's go ahead and mark this

20   as Exhibit No. 3.

21             (Benoot Exhibit 3, Declaration of A.

22        Benoot, remotely introduced and provided

23        electronically to the reporter.)

24   BY MS. GANOZA:

25        Q.    Now, in paragraph 5 of your
```

```
 1                    A. Benoot

 2   declaration, you state, and I quote,

 3   "Mr. Kleinhendler asserted that he had reviewed

 4   Ectosense's communications with and submissions

 5   to the FDA."

 6              Do you see that?

 7      A.    Yeah.

 8      Q.    Do you know what specific

 9   communications and submissions he was

10   discussing?

11      A.    No, I do not, but I must say I

12   called him and I think he was a bit surprised

13   that -- that no meeting was scheduled, or

14   whatever he probably just -- he contacted

15   Mr. Dahlquist and probably assumed that we

16   would schedule a meeting or something.

17              So I can't recall which exact

18   submission he was referring to, but, yeah,

19   he -- he seemed to be very well aware of the

20   content of -- of the whole trial, which I was

21   not.  This is also the reason why I -- yeah,

22   why I asked him to clarify -- after the first

23   letter, to clarify exactly what he thought the

24   issue was, which he then explained in his

25   letter of the 10th of May.
```

1                    A. Benoot

2          (Court reporter clarification.)

3          A.     Which -- when I got the first memo,

4     I asked him, because if you read the first

5     memo, it only says basically that, generally

6     speaking, a private equity player might be

7     responsible for what -- what they assume to be

8     fraudulent submissions to U.S. governmental

9     authorities.  And this was a very -- very

10    general vague description, and then after the

11    first letter I asked him to clarify what

12    exactly was the issue and then he gave me a

13    summary of the specific issues in the letter of

14    the 10th of May.

15         Q.     But I want to go back to the

16    statement that you made --

17         A.     Yeah.

18         Q.     -- that Mr. Kleinhendler had

19    asserted that he had reviewed Ectosense's

20    communications and submissions to the FDA.  So

21    you already testified you didn't know what

22    specific communications and submissions he was

23    discussing, correct?

24         A.     That's right, yeah.

25         Q.     And you don't know what documents

Page 40

```
 1                     A. Benoot

 2    those specific communications came from, do

 3    you?

 4         A.    No, I do not.

 5         Q.    So you don't know if the statements

 6    he was discussing were from the 510(k) summary

 7    that was submitted to the FDA, do you?

 8         A.    I'm not sure.  No, I'm not sure

 9    which documents, no.

10         Q.    Did Mr. Kleinhendler tell you that

11    he reviewed documents that were marked

12    attorneys' eyes only?

13         A.    No, obviously, he did not, no.  But

14    he said he reviewed the documents -- he

15    reviewed certain documentation.  I think he

16    also confirmed this is one of the letters.

17         Q.    So you don't have any independent

18    knowledge of the documents that

19    Mr. Kleinhendler was referring to when he was

20    discussing the statements -- I mean, the

21    communications made to the FDA, do you?

22         A.    No.  At that time I did not, but if

23    I read the first paragraph of the letter of the

24    10th of May, there he clearly mentions that he

25    has seen the FDA submission.
```

```
 1                    A. Benoot

 2   that this is intimidation in a civil way,

 3   obviously.

 4        Q.    Okay.  So after this initial phone

 5   call, you were the one, though, who contacted

 6   Mr. Kleinhendler again, right?

 7        A.    Yes.

 8              MS. GANOZA:  Let's bring up Tab M,

 9        please, Hawwi.

10   BY MS. GANOZA:

11        Q.    Now, identifying this for the

12   record, it's an April 20, 2021, email from

13   Mr. Benoot to Mr. Kleinhendler.

14              Is that correct, Mr. Benoot?

15        A.    Yes.

16        Q.    And this your subsequent contact

17   with Mr. Kleinhendler after that initial phone

18   call?

19        A.    Yes, that was.  So, basically, I --

20   as I mentioned I was on holiday the week prior

21   and then early the next week I sent an email to

22   him because during the call, the whole point

23   was that this was basically not related to the

24   trial.  That's at least what he mentioned and

25   it was a separate grounds, potential separate
```

```
 1                    A. Benoot

 2    grounds of liability for Saffelberg, and he

 3    mentioned during our initial call that he was

 4    going to put -- put this issue on a short memo.

 5    And this is basically my reminder to ask him if

 6    he was still going to produce that short memo

 7    which he promised me during the call.

 8              MS. GANOZA:  Okay.  Let's mark this

 9         as Exhibit No. 4 for the record.

10              (Benoot Exhibit 4, April 20, 2021,

11         Email from Benoot to Kleinhendler, remotely

12         introduced and provided electronically to

13         the reporter.)

14    BY MS. GANOZA:

15         Q.   And so you just explained, so you

16    asked him to send you the short memo of

17    liability of PE investors towards U.S.

18    government agencies?

19         A.   Yes.

20         Q.   And PE refers to private equity?

21         A.   Private equity, yeah.

22         Q.   And that's your area of expertise,

23    right?

24         A.   Yes, but not the specific matter of

25    the liability to -- towards U.S. governmental
```

```
 1                    A. Benoot

 2    agency.

 3         Q.    Okay.  I got it.

 4               And Mr. Kleinhendler does send you

 5    that memo that you requested a couple of days

 6    later, right?

 7         A.    Yes, he did, yeah.

 8         Q.    And that's the April 22nd letter.

 9               MS. GANOZA:  So if we can move to

10         Tab N, please.  So for the record, this is

11         an April 22, 2001 [sic], letter from Gene

12         Kleinhendler to Arnold Benoot, general

13         counsel Saffelberg.

14    BY MS. GANOZA:

15         Q.    Is this correct?  Is this the letter

16    that you received from Mr. Kleinhendler on or

17    around that date?

18         A.    Yes.

19         Q.    Okay.

20               MS. GANOZA:  So let's mark this as

21         the next exhibit.  I think that's number 5.

22               (Benoot Exhibit 5, April 22, 2021,

23         Letter From Kleinhendler to Benoot,

24         remotely introduced and provided

25         electronically to the reporter.)
```

```
 1                      A. Benoot

 2          Q.    Well, that's what you said in your

 3   declaration?

 4          A.    Yes, yeah.

 5          Q.    Right.

 6               So at that point you tell

 7   Mr. Kleinhendler -- at that point you tell

 8   Mr. Kleinhendler, please stop communicating

 9   with me?

10          A.    Well, it was basically

11   Mr. Kleinhendler that kept on insisting that we

12   do something with this.  Otherwise, they would

13   need to take further action.  So I tried to,

14   yeah, somehow respond to -- first of all, and

15   secondly, I did ask him to clarify because the

16   first letter was extremely vague, only touching

17   upon the --

18          Q.    Okay.  Let me just -- my question

19   was -- as of April 29th when you already

20   claimed to have felt intimidated, you didn't

21   tell Mr. Kleinhendler, please stop contacting

22   me?

23          A.    No, I did not.

24          Q.    No.  Okay.  In fact,

25   Mr. Kleinhendler contacted you on April 29th,
```

Page 60

```
1                      A. Benoot
2    which was a week after the 22nd -- April 22nd
3    letter, right?
4         A.    Yes.
5              MS. GANOZA:  And if we could pull up
6         Exhibit O, Tab O, please, Hawwi.  And I
7         will identify this for the record.  This is
8         an April 29, 2021, email from Gene
9         Kleinhendler to you, Arnold Benoot.
10   BY MS. GANOZA:
11        Q.   Is this the follow-up email that you
12   mentioned that Mr. Kleinhendler had contacted
13   you about?
14        A.    Yes, it is.
15             MS. GANOZA:  Let's go ahead and mark
16        this as Exhibit 6.
17             (Benoot Exhibit 6, April 29, 2021,
18        Email from Kleinhendler to Benoot, remotely
19        introduced and provided electronically to
20        the reporter.)
21   BY MS. GANOZA:
22        Q.   So this is the email that he says
23   it's been a week.  Well, it had been a week
24   since the April 22nd letter.  He asked you to
25   let him know if you wanted to discuss, and
```

1                      A. Benoot

2     basically was checking in to see if Saffelberg

3     had carried out its responsibility of

4     conducting an investigation.

5                 Do you see that?

6          A.    Yes.

7          Q.    And you do respond to that email,

8     don't you?

9          A.    Yes, I do, yeah.  I responded.

10               MS. GANOZA:  So if you could go to

11          Tab P, Hawwi, please.

12               And again, this is one of those

13          situations where it's a document in Dutch,

14          but we've obtained a translation, and so

15          exhibit -- Tab P has both the original

16          Dutch language email and the official

17          translation behind it.

18               So I'm going to identify it for the

19          record.  This is an email -- at the top of

20          the chain, it is an email from Arnold

21          Benoot sent on Thursday, April 29, 2021, to

22          Bart Van Pee, and copying Luc Osselaer, and

23          it's identified as Bates No. Ecto MTD 9 and

24          10.

25     BY MS. GANOZA:

```
 1                     A. Benoot

 2      Q.     Do you see this email Mr. Benoot?

 3      A.     Yes, I do.

 4      Q.     Had you seen this before?

 5      A.     Yes.

 6      Q.     Is this an email you sent to -- an

 7 email chain between you and Mr. Van Pee and

 8 Mr. Osselaer?

 9      A.     Yes.

10             MS. GANOZA:  Okay.  So let's go

11        ahead and mark this as the next exhibit.

12             (Benoot Exhibit 7, April 29, 2021,

13        Email from Benoot to Van Pee, copying

14        Osselaer, marked as Bates No. Ecto MTD 9

15        and 10, remotely introduced and provided

16        electronically to the reporter.)

17 BY MS. GANOZA:

18      Q.     Now, in the bottom -- sorry, if we

19 go to MTD 10, so that's the email that we had

20 just seen -- a follow-up email from

21 Mr. Kleinhendler to you, right?

22      A.     Yes.

23      Q.     Can you explain, how did it get to

24 Mr. Osselaer?  Because the very next email

25 seems to be an email from Mr. Osselaer to you
```

```
 1                    A. Benoot

 2    with a copy to Bart Van Pee, but that original

 3    email was not sent to Mr. Osselaer.

 4             How did it get to him?

 5        A.    Likely I forwarded it.  I think, as

 6    I mentioned, as from about the 25th when we

 7    appointed Tripp Scott, we aligned more or less

 8    on how -- how my contacts with

 9    Mr. Kleinhendler -- I think we didn't do

10    anything until Mr. Kleinhendler send me the

11    email on the 29th and then we aligned on how to

12    respond.  So I think that's probably the email

13    chain, what it's about.

14        Q.    Okay.  And it looks like

15    Mr. Osselaer actually wrote the email for you?

16        A.    Yes, that might be, yeah.

17        Q.    Why did he write it and not you?

18        A.    Well, because he -- yeah, he -- what

19    does he say, is it the same one I send out?

20        Q.    Yeah, it's word for word exact.  We

21    can get to that.

22        A.    Yeah.  Well, yeah, why does he do

23    that?  He was the director at Saffelberg who

24    was the appointed director on the case, so he

25    was most familiar with the situation.  So he
```

```
 1                    A. Benoot

 2   vague.  It only talks about theoretical

 3   liability, and he stops with -- the end of the

 4   letter is:  You need to conduct your internal

 5   review and demand that Ectosense ceases false

 6   claims.

 7              Then in these follow-up emails we

 8   wanted to explore what exactly he was referring

 9   to, and this is what he then responded in his

10   letter of May 10, and it's not more or less

11   than trying to get -- to the bottom of his

12   claims.  That's what we did, and yeah.  This is

13   pretty clear from what Luc makes a proposal on

14   a suggested way to answer to get some

15   information on what exactly he's trying to say.

16        Q.    All right.  But you seem to have

17   already made a determination.  Let me ask you

18   another question.

19              Just in general, giving your

20   experience with PE, private equity firms and

21   the industry, is it -- isn't it a private

22   equity company's responsibility to oversee the

23   compliance of its portfolio companies when it

24   comes to dealing with regulatory authorities?

25              MR. MULLIN:  Object to the form.
```

Page 67

```
 1                     A. Benoot

 2    standards and we try to follow up, but we're

 3    obviously only part of boards of our different

 4    companies, if at all, because in some of the

 5    companies where we have a minor stake, we don't

 6    even have a board -- board position, so.  But

 7    that's typically how it works.

 8         Q.    Did you have any involvement in

 9    overseeing Ectosense's compliance --

10         A.    No.

11         Q.    -- with laws -- with regulatory

12    laws?

13         A.    No.

14         Q.    Do you know if anyone else at

15    Saffelberg did?

16         A.    No, I don't know.  I don't know.

17    Certainly, either Luc through the board maybe,

18    but certainly no one else.

19         Q.    Okay.  So getting back to

20    April 29th.  So even though you already felt

21    that Mr. Kleinhendler's communications to

22    Saffelberg were, in your opinion, a direct

23    threat, you didn't cease communications with

24    Mr. Kleinhendler, correct?

25         A.    Yes, correct.
```

Page 68

```
 1                    A. Benoot

 2       Q.    You didn't stop -- tell him to stop

 3  communicating with you, correct?

 4       A.    Yes, correct.

 5       Q.    You didn't tell him that you felt

 6  that his communications were threatening,

 7  correct?

 8       A.    Yes, correct.

 9       Q.    You did none of those things.

10             Instead, you invited

11  Mr. Kleinhendler to continue communicating with

12  you, right?

13       A.    Yes, yeah.

14             MS. GANOZA:  Okay.  So let's go to

15       Tab Q, please.

16  BY MS. GANOZA:

17       Q.    And for the record, this is an email

18  from you, Arnold Benoot, to Gene Kleinhendler

19  on Thursday, April 29th, and it's a response to

20  the April 29th letter -- or email where you

21  claimed he was making a direct threat, right?

22       A.    Yes.

23       Q.    And you remember sending this email?

24       A.    Yes.

25             MS. GANOZA:  Let's go ahead and mark
```

```
 1                    A. Benoot

 2      A.     No, we did not.

 3      Q.     Why not?

 4      A.     Well, because our assessment was

 5   that -- that, yeah, we did not consider it an

 6   actual legal risk.  That was our initial

 7   assessment and that was why we decided to,

 8   yeah, trust this review to Tripp Scott rather

 9   than another -- involving another unrelated or

10   an insurance appointed attorney to do the

11   analysis.

12      Q.     Okay.  So in this April 29th letter,

13   you were asking Mr. Kleinhendler to send you --

14   continue to send you information.  And it seems

15   like Mr. Van Pee once again was anxious to

16   receiving this letter.

17             Were you aware of that?

18             MR. MULLIN:  Object to the form.

19      A.     Yeah, at that time I was aware of

20   the fact that -- because we obviously had

21   spoken then to Tripp Scott, who are well aware

22   of the case, and I was well aware of the fact

23   that -- that it would be interesting to

24   understand which information Mr. Kleinhendler

25   had seen.
```

```
 1                    A. Benoot

 2       Q.    Why didn't you just ask him?  If you

 3  were so interested in confirming if he had

 4  reviewed documents, why didn't you just ask him

 5  to send you the specific document that's

 6  reviewed, or ask him, did you review attorneys'

 7  eyes only documents?  Why didn't you just ask

 8  him?

 9                 MR. MULLIN:  Object to the form.

10       A.    I think he probably would not have

11  answered that question, so, but that was

12  basically the question we had, and I think in

13  the letter in the 10th of May, we did ask to

14  clarify what -- what -- what potential issue,

15  because in the letter of April 22nd, there is

16  nothing really -- no real detail of what

17  exactly the issue is.

18                 And in his letter of May 10, he

19  explains more or less what the issue is.  And

20  he starts with -- by saying in the first

21  paragraph, clearly referring the FDA

22  submission, so that this shows that he was well

23  aware, I assume.

24       Q.    But you know that some -- maybe now

25  you know that some communications with the FDA
```

```
 1                     A. Benoot

 2    are, in fact, public, such as the 510(k)

 3    summary?

 4         A.    Yeah.

 5         Q.    You know that?

 6         A.    Yes, I -- again, I was not aware of

 7    what he had seen and what he had not seen, but

 8    it was clear that he was well aware of certain

 9    details, which I was not.

10         Q.    Right.  Well, you weren't following

11    the litigation at all, right?

12         A.    No.  Well, no, I just heard about

13    generally from Luc where we were on the -- on

14    the litigation, but not in any detail.  I have

15    not seen the -- the documents, basically.

16         Q.    So you didn't know that Ectosense

17    itself filed the 510(k) summary with the court

18    in this litigation, right?

19         A.    No.

20         Q.    And you weren't aware of any other

21    public filings that were made in the case,

22    right?

23         A.    No.  I was aware of the fact that

24    certain filings were done, but I'm not aware of

25    the ones that were confidential and the pieces
```

1                       A. Benoot

2    that were not confidential.

3              MS. GANOZA:   Okay.  So I'm going to

4         ask, Hawwi, if you could please bring up

5         the documents that are in Tab R.  Actually,

6         it's just one document.  You might need to

7         make this a little bigger for people like

8         me.  There we go.  Okay.  Let's start at

9         the top.

10             Now, for the record, this is Bates

11        numbered Ecto MTD 2, and it looks to be a

12        printout of some WhatsApp messages from

13        Mr. Luc Osselaer.

14   BY MS. GANOZA:

15        Q.   Is that what this looks like to you,

16   Mr. Benoot?

17        A.   Yes, yeah, that looks to be the

18   case, yeah.

19        Q.   Okay.  And it looks like he may be

20   communicating with Bart Van Pee?

21        A.   Yeah, it might be.  You cannot see

22   the other party, but.

23        Q.   Okay.  And it looks like the first

24   email is from May -- May 3, 2021, right?

25        A.   Yes.

1                    A. Benoot

2        Q.    And then ultimately --

3             MS. GANOZA:  You can take that down,

4        Hawwi, please.  Thanks.

5   BY MS. GANOZA:

6        Q.    Then, ultimately, Mr. Kleinhendler

7   does send you another letter as requested.

8             This is the May 10, 2021, letter,

9   correct?

10       A.    Yes, it is.

11            MS. GANOZA:  So why don't we pull

12       that up and mark that as the next exhibit.

13       Please pull up Tab S.

14   BY MS. GANOZA:

15       Q.    Mr. Benoot, can you take a look at

16   this letter.  It's dated May 10 from

17   Mr. Kleinhendler addressed to Arnold Benoot,

18   general counsel at Saffelberg.

19            Is this the letter that you received

20   from Mr. Kleinhendler on or about May 10?

21       A.    Yes, it is.

22            MS. GANOZA:  Okay.  Let's go ahead

23       and mark this as the next exhibit which

24       would be Exhibit No. 9.

25            (Benoot Exhibit 10, May 10, 2021,

1                    A. Benoot

2          Letter from Kleinhendler to Benoot,

3          remotely introduced and provided

4          electronically to the reporter.)

5                    THE WITNESS:  The previous one was

6          9, so I assume this was 10.

7                    MS. GANOZA:  Okay.  You're right.

8          Thank you.

9    BY MS. GANOZA:

10         Q.    So going back, this letter sets out

11   exactly what you invited Mr. Kleinhendler to

12   send you, right?

13         A.    Yes.

14         Q.    Your thoughts on Ectosense's alleged

15   misrepresentations, right?

16         A.    Yes, it is.

17         Q.    And he reiterates his recommendation

18   for Saffelberg to undertake an investigation?

19         A.    Yes.

20         Q.    And in this letter, he doesn't -- in

21   this letter, he doesn't threaten consequences

22   if Saffelberg does not take this investigation,

23   does he?

24                    MR. MULLIN:  Object to the form.

25         A.    Well, he says in the -- in the -- in

1                    A. Benoot

2    the second-to-last paragraph he says:  "It is

3    my opinion that Saffelberg itself would be

4    liable to the U.S. enforcement authorities for

5    this ongoing fraud."

6              In the first letter he says he was

7    exactly the one appointed to investigate

8    liability of the shareholders of Ectosense, so

9    we -- so we understood this as an effort -- an

10   attempt to intimidate us.

11        Q.    He doesn't say he's going to contact

12   the U.S. authorities --

13        A.    No, he's not saying that.

14        Q.    -- if you or Ectosense don't do

15   something though, right?

16        A.    That's clear, yeah.

17        Q.    He also doesn't say that the only

18   way Saffelberg can avoid criminal prosecution

19   is to take a specific step or action in the

20   Florida court litigation, right?

21              MR. MULLIN:  Object to the form.

22        A.    No, he does not say that.  That's

23   clear.  But he -- he did say in this email of

24   the 29th, he said that -- he said that they

25   could avoid any further action in this matter

```
 1                    A. Benoot

 2   if we would comply with our legal

 3   responsibility, whatever that would mean.

 4            So reading this together, our -- the

 5   way we understood this, it was an attempt to

 6   intimidate us, but he did not explicitly say

 7   that he was going to file anything to the U.S.

 8   courts.

 9       Q.   Right.  There is no quid pro quo in

10   this letter; you must do X or Y, right?

11       A.   Yeah, that's right.  Well, there was

12   the request -- the request he's repeated a

13   couple of times to do the assessment.

14       Q.   Well, inviting someone to do an

15   investigation, that's not threatening criminal

16   prosecution, right?

17            MR. MULLIN:  Object to the form.

18       A.   Well, I agree that it's not the

19   way -- it's not explicitly mentioned, but when

20   you put everything together, you see what --

21   what the intent is.  At least, we understood

22   the intention of Mr. Kleinhendler's actions.

23            MS. GANOZA:  Hawwi, you can take

24       down the letter, please.

25       Q.   Mr. Benoot, to your knowledge,
```

```
 1                    A. Benoot

 2   Mr. Kleinhendler did not present charges to any

 3   authorities, correct?

 4        A.    We are not aware of any complaints,

 5   no.

 6        Q.    And Saffelberg has never been

 7   contacted by any criminal authorities in the

 8   U.S.?

 9        A.    No, we have not.

10        Q.    Anywhere else, has Saffelberg been

11   contacted by any criminal authorities, anywhere

12   else?

13        A.    In relation to this matter or?

14        Q.    In relation to this matter.

15        A.    No.

16        Q.    And you are not contending that

17   Mr. Kleinhendler knowingly made a false

18   representation to Saffelberg in these letters,

19   are you?

20        A.    No, I -- yeah, no, I don't think so,

21   no.

22        Q.    Okay.  So what did Saffelberg do

23   when it received the May 10th letter?

24        A.    I think we had some additional

25   exchanges by email.  Let me see.
```

 1                   A. Benoot

 2        Email from Benoot to Kleinhendler, remotely

 3        introduced and provided electronically to

 4        the reporter.)

 5  BY MS. GANOZA:

 6        Q.    So as you were saying after

 7  Mr. Kleinhendler said that he thought it was

 8  odd that Ectosense was alleging in Florida that

 9  he was trying to intimidate you, you responded

10  by saying:  "Thank you, all is indeed well."

11        A.    I -- obviously, if you read his

12  email he says, "I hope all is well."  So I

13  start with:  "Thank you, all is well."  And

14  then I respond what we are doing on the rest.

15  And I simply said, look, I will check again

16  with our outside counsel who are working on

17  this, where they are on the analysis.  And I

18  didn't respond to anything of his detailed

19  email.  I responded basically the same way I

20  had responded to the last three emails.

21              (Multiple speakers.)

22        Q.    So -- go ahead, I'm sorry.

23        A.    No, go ahead.

24              MS. GANOZA:  Hawwi, you can take

25        down the exhibit, please.

```
 1                    A. Benoot

 2        Q.    You're aware that Ectosense is

 3   making the allegation in this case that

 4   Mr. Kleinhendler extorted Saffelberg and

 5   Ectosense, right?

 6        A.    Yes.

 7              MR. MULLIN:   Object to the form.

 8        Q.    They're using the term "extorted"?

 9        A.    Mm-hmm.

10        Q.    Right?  Is this a response from

11   someone who is extorted, "all is indeed well"?

12        A.    Well, it's -- it's a polite response

13   to his request.  I think we're -- yeah, we're

14   corresponding in a polite way.  I think all the

15   emails are very polite, but it doesn't change

16   what the content is of the emails and I don't

17   have any personal issue with Mr. Kleinhendler,

18   but, obviously, he is a counsel retained by a

19   certain company to verify certain liabilities,

20   of which he himself says:  Your company, the

21   company you're representing might be one of

22   the -- might be liable to criminal prosecution

23   in the U.S., and I am asked by that party to

24   review that.

25              So if you read between the lines,
```

```
 1                    A. Benoot

 2   you know that I'm here to -- yeah, to cause a

 3   potential issue for you, but that doesn't --

 4   doesn't mean we cannot correspond in a polite

 5   way about these topics.  I think that's -- that

 6   doesn't -- it's not a formal -- formal legal

 7   letter which we're drafting here.

 8        Q.    Extortion.  Extortion is a pretty

 9   serious allegation to make against another

10   lawyer, right?

11        A.    Well, I'm not a U.S. lawyer.  I

12   don't know under U.S. law what -- what you need

13   to have extortion under U.S. law.  It's at

14   least what happens and is an attempt to

15   intimidate us and -- but yeah, I -- I'm not --

16   I cannot judge whether this qualifies as

17   extortion under U.S. law.

18        Q.    But is extortion -- extortion under

19   Belgian law is pretty serious, right?

20        A.    Yes, it is pretty serious, yeah.

21        Q.    And you never once in your

22   communications from April to June, never once

23   told Mr. Kleinhendler to stop communicating

24   with you because Saffelberg did not appreciate

25   being extorted, right?
```

1                    A. Benoot

2        A.    That's right, yeah, I think I've

3   been very open in all the communications we had

4   and, obviously, we -- we -- we made our own

5   analysis.  I think that's privileged, but,

6   yeah, at some stage we said, Luc, we don't

7   think this is serious, whether it's true or

8   not, I -- yeah.  That's another method.

9             And then based on that we kept an

10  open line with Mr. Kleinhendler and that's what

11  has happened.  And that's what it is basically,

12  we kept an open line.

13       Q.    Well, the reason you kept an open

14  line was because Ectosense was hoping that

15  these communications would actually give

16  Ectosense an advantage in the litigation,

17  right?

18            MR. MULLIN:  Object to the form.

19       A.    Well, that was one of the reasons,

20  clearly.  The other reasons being that we --

21  yeah, we wanted to -- obviously, as long as he

22  kept talking, we wanted to get as much

23  information as we could to assess what he was

24  referring to in detail.

25       Q.    Okay.  Mr. Benoot, I want to go over

1                    A. Benoot

2    a couple of the statements that you make in

3    your declaration.

4            MS. GANOZA:  So, Hawwi, if we can

5        bring that up again.  I believe it's marked

6        as Exhibit 3 to the deposition.

7    BY MS. GANOZA:

8        Q.    And if we can go to paragraph 19,

9    you say that:  "While a Mr. Kleinhendler was

10   issuing threats of criminal prosecution against

11   Saffelberg, Itamar was simultaneously asking

12   the Court to lift attorneys' eyes only

13   designation from the very documents that

14   Mr. Kleinhendler claimed he reviewed."

15           Do you see that?

16       A.    Yes.

17       Q.    We've already established earlier

18   that you have no personal knowledge of the

19   documents Mr. Kleinhendler reviewed, right?

20       A.    No, the detailed documents, I have

21   not, but as he confirms in the letter of the

22   10th of May, he says that he has seen the FDA

23   submission, and my understanding was that, at

24   least part of it was attorneys' eyes only, but

25   I do not -- I have no knowledge of the detailed

```
 1                    A. Benoot

 2   document.  That's right.  So I wouldn't know

 3   exactly --

 4        Q.    How does your client -- I'm sorry.

 5        A.    Go ahead.

 6        Q.    It's hard.

 7              When the exhibit is up, I don't see

 8   you right away, so I don't know when you're

 9   speaking.  I apologize.

10        A.    Go ahead.

11        Q.    How do you think -- if you think

12   Mr. Kleinhendler got his hands on attorneys'

13   eyes only documents, how do you think he

14   received them?

15        A.    I don't know.  I honestly don't

16   know, but I understood that he had seen the

17   FDA, the submission, which he confirms in his

18   letter of May 10, but, again, I don't know

19   which documents he has seen and which he has

20   not seen.  So I'm not -- my understanding was

21   that -- yeah.

22              Most of the documents were

23   privileged and he seemed to have seen these,

24   which he mentions to me and which he confirms.

25   I indeed do not know which ones are privileged,
```

```
 1                    A. Benoot

 2        Q.    So are you aware that Itamar's prior

 3   counsel was the law firm of Latham & Watkins?

 4        A.    Yes.

 5              MS. GANOZA:   Hawwi, you can take

 6   down the exhibit now.

 7        Q.    Are you aware that Latham & Watkins

 8   submitted a declaration in this case that --

 9   that rejected any notion that they provided

10   attorneys' eyes only documents to

11   Mr. Kleinhendler?

12        A.    Sorry, that they -- that they tried

13   to do what?

14        Q.    That they provided attorneys' eyes

15   only documents to Mr. Kleinhendler?

16        A.    No, I was not aware of it.

17        Q.    Are you aware that they submitted a

18   declaration in which they said that their

19   withdrawal as counsel had nothing to do with

20   Mr. Kleinhendler?

21        A.    No, I -- I was not.  I don't have --

22   I'm not aware of the specifics of the case.

23   This is -- the way I understood it from our

24   counsel and Mr. -- Mr. Van Pee and the

25   management team.
```

```
 1                    A. Benoot

 2       Q.    So you'd agree with me that

 3  Latham & Watkins would know more about why they

 4  withdrew than you would?

 5            MR. MULLIN:  Object to the form.

 6       A.    I hope they -- yes, I would assume

 7  they do, yeah.

 8       Q.    And they would know more about why

 9  they withdrew than Tripp Scott would?

10       A.    Yeah, I cannot respond to that.

11  Yeah.  I -- I cannot -- I can only speculate on

12  that.

13       Q.    Yeah, because you have no personal

14  knowledge about why Latham & Watkins withdrew?

15       A.    No, I have not.

16       Q.    You've never spoken to anyone at

17  Latham & Watkins about that, have you?

18       A.    No, I have not.

19       Q.    And you don't know of anyone at

20  Saffelberg that has spoken to Latham & Watkins

21  either?

22       A.    Not that I'm aware of, no.

23       Q.    Mr. Kleinhendler never told you in

24  any of your discussions or in any

25  correspondence that Saffelberg had to withhold
```

```
 1                    A. Benoot

 2   funding from Ectosense, right?

 3        A.    No, not that I'm aware of, no.

 4        Q.    Did Saffelberg ever withhold funding

 5   to -- to Ectosense that it was planning to

 6   provide as a result of these communications

 7   from Mr. Kleinhendler?

 8        A.    I don't think so, no, there was no

 9   funding.  There was equity.  So there was no

10   funding round to whatever ongoing.  To my

11   knowledge,  no.

12        Q.    If there if there were funding

13   rounds, would you know that?

14             (Court reporter clarification.)

15        Q.    If there were funding rounds, would

16   that be something that you would know, as the

17   general counsel of Saffelberg?

18        A.    Yes, I would know that.

19             MS. GANOZA:  Okay.  Why don't we

20        take like a five, ten-minute break.  I

21        think I might be about done, but I just

22        want to check over my notes.  Does that

23        work for everybody?

24        A.    Maybe one comment on the funding

25   round.  There was a small funding round in
```