# DEFENDANT'S EXHIBIT 4



## CONFIDENTIAL ATTORNEY COMMUNICATION

Arnold Benoot
General Counsel
Saffelberg
Oplombeekstraat 6
B-1755 Gooik
E-mail: Arnold.benoot@saffelberg.com

May 10, 2021

## Re: Ectosense

Dear Arnold,

Further to my letter to you of April 22 and our email exchange that followed, I am setting out below a description of what I believe to be, a series of fraudulent and intentionally misleading statements and claims made by your portfolio company, Ectosense, in its FDA submission, which created the bases for the ongoing false claims being made for insurance reimbursement.

The essence of the fraud is the claim for insurance reimbursement for the Ectosense device based on an existing reimbursement code for an existing qualified device. The initial critical step is the submission to the FDA for a 510(k) clearance, based on the existence of predicate device (which has been issued the sought-after reimbursement code). The 510(k) clearance process relies on a written submission by the company, and not the FDA. The FDA does not evaluate the merits of the submission, but relies on the integrity of the company making the submission. The essence of the submission is the comparison of the device receiving clearance to the predicate device that has already been cleared. In this case, the predicate device was the Itamar Watch PAT device, which received FDA clearance only after years of clinical studies and millions of dollars of investment. Ectosense sought to circumvent the required studies and investment, but still market the device under the pre-existing reimbursement code. In order to carry out its scheme, Ectosense chose a path of deception instead of professional disclosure.

The goal was simple: to promote the Night Owl as a device based on PAT, and not PAT technology, and as a device falsely qualifying for reimbursement under CPT95800. Ectosense

knew prior to the FDA submission that its device was not a PAT device, as understood in the industry, which has adopted the predicate device PAT technology, but is in fact a simple Photoplethysmogram ("PPG") device. It is further confirmed by Ectosense's existing CE mark application, which makes no mention of PAT. PPG devices are known not to provide the reliability, efficacy and accuracy of the PAT technology incorporated in the predicate device. However, in order to market its product in the U.S., Ectosense requested FDA clearance and reimbursement designation somehow referring to PAT.

The path chosen by Ectosense was to include in the comparative summary of its FDA submission the descriptive term "Peripheral Arterial Tone". The term is non-specific like, for instance, the term "muscle tone". The key challenge to Ectosense was how to include the general term "PAT" in the summary, but still avoid the comparison to the technological characteristic of the predicate device, as required by the FDA rules. The rules require a description of not only what the device measures, but how it measures or, more specifically, the technology that determines the reliability of the signal received from the device. The predicate device technology has both passive sensing and active conditioning elements that enable the device to detect signals critical to the diagnosis. The Ectosense device has no such technology. Ectosense, of course, understands that this technology is critical, since it is described in the professional literature and AASM guidelines. Therefore, faced with this technological barrier, Ectosense decided to make the misleading statement that both devices analyze changes in Peripheral Arterial Tone and ignored the basic key technological elements of the PAT technology of the predicate device, amounting to gross misrepresentation by omission. Instead of full and honest disclosure, Ectosense simply wanted the descriptive term "Peripheral Arterial Tone" or PAT to appear in the application. The false statement that both devices analyze PAT and the lack of disclosure of the material differences in the technological elements, as required by the FDA, were, in my view, a fraud perpetuated by Ectosense upon the FDA.

The integrity of the FDA clearance process is further violated by the representation by Ectosense that its product qualifies for reimbursement from Medicare under CPT code 958000; the CPT code available for the predicate device. The CPT, for background, is a uniform coding system

consisting of descriptive terms that are used to identify medical procedures. The CPT code is relied upon by physicians and other healthcare professionals. The CPT code claimed by Ectosense covers services that employ PAT technology. The requirements of the device under the CPT code are not met by the Ectosense device and clearly absent from the technological feature comparisons listed in FDA application. I cannot over emphasize the seriousness of this aspect of Ectosense's actions.  False claims for Medicare reimbursement based on a fraudulent submission to the FDA are aggressively prosecuted by U.S. criminal and civil authorities.

Another factor which points to the general business ethics of Ectosense is its assertion that its product measures REM (rapid eye movement). REM detection is not mentioned in the Ectosense FDA clearance. But of course, that does not deter Ectosense from making such claims. The reason for that claim is simple. AASM guidelines which recognize PAT technology (i.e., the technology utilized by the predicate device) include the requirement that a device based on PAT technology also provide REM measurement. For Ectosense claims and reality need not be the same.

I want to impress upon you that while the fraud on the FDA occurred in the form of material omissions in its submissions, the claim by Ectosense that its device qualifies for the CPT code is an ongoing act of fraud upon a federally funded insurance program. As a private equity investor, I believe, that you are required, independently of Ectosense management, to diligently



investigate this matter. As I tried to outline in my previous correspondence, it is my opinion that Saffelberg itself would be liable to the U.S. enforcement authorities for this ongoing fraud.

Investing in a medical device company intent on doing business in the U.S. requires a high level of diligence and independent oversight. The absence of that independent oversight and compliance implementation creates significant culpability. I am hopeful that Saffelberg will assume this responsibility. I am happy to provide information to your independent expert, if you believe my assistance would be appropriate. In any event, please let me know when your specialized third party is commissioned.

Best regards,

Gene Kleinhendler, Advocate

ABC | AML | Crisis Management
www.gk-ad.com

Phone: +972-3-735-6168
Email: office@gk-ad.com
72 Ahad Haam St., Tel Aviv, Israel