**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case Number: 20-cv-60719-WPD

ITAMAR MEDICAL LTD.,
      Plaintiff,

v.

ECTOSENSE NV,
      Defendant.

_____/

**ANSWER AND AFFIRMATIVE DEFENSES TO THIRD AMENDED COMPLAINT**
**AND COUNTERCLAIM**

      Defendant, ECTOSENSE NV, by and through its undersigned attorneys, hereby files its

Answer and Affirmative Defenses to Plaintiff's Third Amended Complaint and as grounds for

same states as follows:[1]

**INTRODUCTION**

      1.     Denied.

      2.     Admitted that Itamar's product line includes the WatchPAT® 200, WatchPAT®

200U, WatchPAT® 300, WatchPAT® ONE, and Endo PAT® devices, as well as its CloudPAT®

digital health platform. Ectosense is without knowledge and therefore denies as to any utility of

Itamar's product outside home sleep apnea testing (HSAT).

      3.     Denied.

      4.     Admitted that VirtuOx is a client of Ectosense that has performed sleep testing

services with NightOwl. Denied as to the remaining allegations.

      5.     Denied.

---

[1] Many of Itamar's allegations in the Third Amended Complaint fail to distinguish between Ectosence and VirtuOx, or otherwise pertain only to VirtuOx. Ectosense's admissions and denials below pertain to the portion of such allegations that are directed to Ectosense. Ectosense does not purport to answer any allegations on behalf of VirtuOx. All admissions or denials are made solely as to Ectosense unless otherwise indicated.

6.      Denied.

7.      Denied.

8.      Denied.

### THE PARTIES

9.      Admitted for jurisdictional purposes.

10.     Admitted.

11.     No response is called for by Ectosense.

### JURISDICTION AND VENUE

12.     Subject to Ectosense's challenge to subject matter jurisdiction raised in its Motion to Dismiss the Third Amended Complaint, but recognizing the Court's ruling on the same, admitted that this Court has subject-matter jurisdiction over the causes of action that arise from federal law and that this Court has supplemental jurisdiction over the state-law claims. Denied as to the merits of the claims Itamar has raised.

13.     Admitted that this Court has personal jurisdiction over Ectosense, but denied as to the remaining compound allegations.

14.     Admitted that venue is proper.

### FACTS COMMON TO ALL CLAIMS FOR RELIEF
### Itamar's Trademarks and Products

15.     Ectosense is without actual knowledge of when Itamar was founded, and therefore denied. Admitted that Itamar is publicly traded on the NASDAQ Capital Market. Admitted that Itamar sells products that measure peripheral arterial tone (PAT), but denied as to the implication that Itamar has any legally protected "proprietary PAT® technology." Admitted that Itamar distributes its products worldwide.

16.     Denied.

17.     Denied.

18.     Admitted certain of Itamar's devices currently use a pressure field that envelopes the finger when measuring peripheral arterial tone, but denied as to any and all implications that a fully enveloped finger pressure field is a necessary feature for measuring arterial tone through peripheral tissue (i.e., PAT) and as to all other allegations not specifically admitted.

19.     Without knowledge and therefore denied.

20.     Denied as framed, and Ectosense demands strict proof of ownership of the trademarks referenced.

21.     Paragraph 21 defines terms within the Third Amended Complaint and thus no response is called for.

22.     Without knowledge and therefore denied.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Admitted that Ectosense is a digital health and medical device company focusing on sleep disorders that sells devices for use in the United States, as it is permitted to do by the FDA 510(k) clearance. Denied as to all other allegations.

27.     Without knowledge and therefore denied.

28.     Denied.

29.     Denied.

30.     Denied.

31.     Denied.

**Ectosense's Deceptive and Infringing Activities**

32.     Denied.

33.     Denied.

34.     Denied.

35.     Admitted that studies have found that WatchPAT 300's failure rate is "5 – 8%" and that Ectosense has posted a comparison sheet, but denied that the information is misleading or false.

36.     Admitted that Ectosense prepared the sheet identified in paragraph 36.

37.     Denied.

38.     Admitted that the AASM guidelines recognize PAT measurements as an acceptable method, but denied as to all implications that the AASM was endorsing Itamar's products. Further denied as to all other allegations not specifically admitted.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Admitted that the brochure states that NightOwl is a PAT-based HSAT according to AASM guidelines, but denied as to the remaining allegations.

43.     Denied.

44.     Admitted that AASM guidelines hold HSAT devices based on PAT as technically adequate, although without the ® symbol that Itamar has included despite issuing public apologies for suggesting that the AASM was endorsing Itamar's technology rather than any device based upon PAT. The guidelines speak for themselves and denied as to all other allegations not specifically admitted.

45.    Admitted that the current AASM guidelines recommend that a PAT-based device report rapid eye movement (REM) time. Denied as to the remaining allegations.

46.    Denied.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Without knowledge as to who is being referred to or what statement Itamar is quoting from and therefore denied.

51.    Denied.

## VirtuOx's Deceptive and Infringing Activities

52.    Without knowledge and therefore denied.

53.    Denied.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Denied.

58.    Denied.

59.    Denied.

60.    Denied.

61.    Denied.

62.    Denied.

63.     Without knowledge to the intent of VirtuOx outside the dissemination of scientific research, but admitted that Virtuox shared a scientific paper investigating WatchPAT's accuracy, and summarized the manuscript by stating that "WatchPAT is NOT Accurate."

64.     Admitted that VirtuOx remained a customer of Ectosense despite Itamar's attempts to interfere with the Ectosense's business by suing VirtuOx. Without knowledge of what promotion Itamar is referring to and thus denied.

65.     Denied.

66.     Denied.

## Harm to Itamar Caused by Ectosense's Activities

67.     Admitted that Itamar sent a cease & desist letter to Ectosense and that Ectosense denied any wrongdoing. Denied as to all remaining allegations or implications.

68.     Denied.

69.     Denied.

## FIRST CLAIM FOR RELIEF
### Lanham Act – Federal Trademark Infringement – 15 U.S.C. § 1114

70.     Ectosense incorporates and realleges by reference all of its responses set forth above in paragraphs 1 through 69.

71.     Without knowledge and therefore denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Admitted that this is an exceptional case, but denied that it is Ectosense's or VirtuOx's acts that make it so, or that Itamar is entitled to an award of fees and costs. Rather, it is the lack of merit in Itamar's case that renders it exceptional justifying a fee award to Ectosense.

## SECOND CLAIM FOR RELIEF
### Lanham Act – Unfair Competition and False Designation of Origin – 15 U.S.C. § 1125(a)(1)(A)

87.     Ectosense incorporates and realleges by reference all of its responses set forth above in paragraphs 1 through 69.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Admitted that this is an exceptional case, but denied that it is Ectosense's or VirtuOx's acts that make it so, or that Itamar is entitled to an award of fees and costs. Rather, it is the lack of merit in Itamar's case that renders it exceptional justifying a fee award to Ectosense.

### THIRD CLAIM FOR RELIEF
### Lanham Act – False Advertising – 15 U.S.C. § 1125(a)(1)(B)

99.     Ectosense incorporates and realleges by reference all of its responses set forth above in paragraphs 1 through 69.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

112.    Admitted that this is an exceptional case, but denied that it is Ectosense's or VirtuOx's acts that make it so, or that Itamar is entitled to an award of fees and costs. Rather, it is the lack of merit in Itamar's case that renders it exceptional justifying a fee award to Ectosense.

## FOURTH CLAIM FOR RELIEF
### Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*

113.    Ectosense incorporates and realleges by reference all of its responses set forth above in paragraphs 1 through 69.

114.    Admitted that Itamar purports to bring an action pursuant to § 501.201 *et seq.*, Florida Statutes, but denied that the action is proper, that Ectosense violated FDUTPA, and that Itamar is entitled to any relief.

115.    Admitted as to Ectosense.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Denied.

## FIFTH CLAIM FOR RELIEF
### Florida Common Law Unfair Competition and Trademark Infringement

122.    Ectosense incorporates and realleges by reference all of its responses set forth above in paragraphs 1 through 69.

123.    Denied.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

132.    Denied.

133.    Denied.

Any and all allegations not specifically admitted herein are hereby denied. As to Itamar's prayer for relieve, all factual allegations are denied and Ectosense notes that Itamar is not entitled to the relief requested.

## AFFIRMATIVE DEFENSES

**First Affirmative Defense**: PAT is not a valid trademark for Itamar's goods. Itamar's claimed use of PAT for Itamar's goods does not satisfy three critical requirements in the definition of a trademark under 15 U.S.C. § 1127. Specifically, PAT does not "identify" Itamar's goods, PAT does not "distinguish" Itamar's goods from those manufactured or sold by others, and PAT does not "indicate the source" of the goods sold by Itamar.

**Second Affirmative Defense**: PAT does not "identify" Itamar's goods. Although Itamar is the record owner of U.S. Reg. No. 4,660,354 for the WatchPAT trademark and it may be fair to say that the WatchPAT trademark "identifies" Itamar's goods, standing alone, 'PAT' does not "identify" Itamar's goods. By appending PAT to the end of the word Watch, to create the WatchPAT trademark, the PAT portion merely informs that the goods assess and measure PAT.

**Third Affirmative Defense**: PAT does not "distinguish" Itamar's goods from those manufactured or sold by others. Following the expiration of its patents, Itamar is not the only company allowed to make and sell devices that assess or measure PAT. As a result, others in the medical device industry, including Ectosense, are free to communicate that a device is a "PAT" or "PAT-based" medical device because it assesses and/or measures PAT (peripheral arterial tone/tonometry). *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111 (1938).

**Fourth Affirmative Defense**: PAT does not "indicate the source" of the goods sold by Itamar. Instead, 'PAT' in the context of HSAT, describes the key working principles of the HSAT. Indeed, the primary significance of PAT to the relevant public relates to the product, not the producer. There is a valid competitive need for Ectosense and others in the medical device industry to be able to use the generic terms PAT, PAT-based, PAT-technology, PAT-signal, PAT-sensor, PAT-measurement, PAT device, etc., in connection with PAT-based medical

devices. As just one example, among others, and as further detailed in the Counterclaims below, the American Academy of Sleep Medicine (AASM) has used "PAT" as a generic term (not a trademark) referring to a category of medical devices in the AASM's 2017 clinical practice guidelines, stating that a "technically adequate HSAT device incorporates a minimum of the following sensors: … peripheral arterial tonometry (PAT)."

**Fifth Affirmative Defense**: PAT is generic: Ectosense has previously instituted a cancellation proceeding with the Trademark Trial and Appeal Board, which Itamar petitioned to have stayed pending resolution of this litigation. Ectosense is simultaneously filing a Counterclaim, below, for cancellation of Itamar's improperly granted U.S. Trademark Registration No. 3,870,786 for the generic term PAT (the "Claimed PAT Mark") on the basis that it is generic, as further explained in the Counterclaim. If PAT is found to be generic by this Court or the TTAB, Ectosense cannot be held liable for infringement because the Claimed PAT Mark is not a protectable trademark.

**Sixth Affirmative Defense**: Unclean hands. Itamar has acted in bad faith to use its Claimed PAT Mark to monopolize references to the PAT physiological signal and the type, class, and/or category of devices that measure the PAT signal. Specifically, peripheral arterial tone (PAT) is a physiological signal pertaining to, *inter alia*, changes in vasoconstriction. An HSAT device that performs peripheral arterial tonometry by measuring and analyzing PAT is a PAT-based device. Itamar held patents on its PAT-based devices, but such patents have now expired and Itamar is and has been attempting to use the Claimed PAT Mark to block incoming competitors from entering the market for PAT-based HSATs. Itamar's anticompetitive goal is transparent and evidenced by its public announcements that competitors in the marketplace for PAT devices could cause significant consequences to Itamar. In a disclosure to the Israel Securities

Authorities in its 2016 annual report, Itamar stated: "It should be noted that the patent registered by the Company for the PAT signal […] will expire in July 2017 and there are likely to be significant consequences for the Company, should any entity start to develop PAT based products to compete with the Company's existing products."

Itamar's efforts to manipulate trademark law to block fair competition have included a comprehensive and inconsistent public misinformation campaign that, on information and belief, Itamar launched shortly after sending a cease and desist letter to Ectosense pertaining to PAT. After decades of using PAT in its generic sense relating to the physiology of peripheral arterial tone and type, class, and/or category of devices that measure PAT, once NightOwl was cleared for marketing in the United States by the FDA as a PAT-based device, Itamar launched a misinformation campaign attempting to undo decades of generic use of PAT. Itamar began editing its website appending "®" next to facially generic uses of PAT in its physiological and device classification sense. Itamar has edited, or commissioned private Wikipedia editors, to alter Wikipedia pages to support its new narrative that PAT is a "proprietary technology" rather than a physiological signal and type, class, or category of devices. Itamar's narrative of PAT being a trademark for "proprietary technology" as opposed to a generic description of the physiological signal is inconsistent with Itamar's own publications, applications to the USPTO, and filings with the SEC.

Much to the confusion of the relevant community that recognizes PAT as a generic acronym for peripheral arterial tone, Itamar has sent demand letters to individuals and entities that Ectosense engages with claiming that PAT is a "proprietary technology" to Itamar and a trademark. Itamar's misinformation campaign is harmful to the scientific discourse and study of further development of peripheral arterial tone. Itamar's unclean hands are further demonstrated

by the false advertising by Itamar of its own WatchPAT product as alleged in the Counterclaim below.

**Seventh Affirmative Defense**: Descriptive fair use under 15 U.S.C. § 1115(b). Even in the unlikely event that Itamar retains ownership of U.S. Reg. No. 3,870,786 for the Claimed PAT Mark, the statutory affirmative defense of fair use applies to all of the descriptive PAT references in Ectosense's advertising. Ectosense's advertisement of NightOwl being a "PAT-based HSAT according to AASM guidelines" is permissible fair use under 15 U.S.C. § 1115(b). Ectosense is not using "PAT" as a trademark, and is instead using it to describe the type, class, and/or category of devices to which NightOwl belongs—devices based upon peripheral arterial tone according to AASM guidelines. Itamar's claims of being the progenitor of the term peripheral arterial tone are manifestly false as peripheral arterial tone is a physiological signal whose descriptions can be traced back to as early as 1902. As set forth in more detail in the Counterclaim below, PAT does not indicate source and is instead a generic description of the physiological signal of peripheral arterial tone and of the type, class, and/or category of devices that measure PAT and perform peripheral arterial tonometry. The relevant market recognizes PAT as synonymous with peripheral arterial tone, and PAT-based devices as the type, class, and/or category of devices that measure PAT. Ectosense describing its device as being PAT-based was and is a fair and good faith descriptive advertisement of NightOwl's attributes and of the type, class, and/or category of devices it belongs to.

**Eighth Affirmative Defense**: Descriptive fair use is compatible with consumer confusion. Even in the unlikely event that Itamar is able to show any confusion from Ectosense's PAT-based references, statutory descriptive fair use is a complete defense, even if the PAT registration is incontestable. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

**Ninth Affirmative Defense**: Preclusion: NightOwl has been cleared by the FDA twice, once in March of 2020, and again in December 2021. Even from the first clearance of NightOwl in March 2020, the FDA found that NightOwl is substantially equivalent in its principles of operation to Itamar's WatchPAT. The basis of the FDA's decision to clear NightOwl is reflected in the 510(k) Summary for NightOwl published by the FDA at https://www.accessdata.fda.gov/cdrh_docs/pdf19/K191031.pdf, which explicitly states that NightOwl and WatchPAT both measure PAT. Discovery has shown that Itamar actively opposed Ectosense's efforts to obtain FDA clearance and submitted the same arguments that it makes in this litigation to the FDA (purportedly supporting Itamar's claim that NightOwl is not "PAT-based"). The FDA specifically considered the question of whether NightOwl is PAT-based, and agreed that it is, after weighing Itamar's arguments against Ectosense's. Ectosense literally implemented the language and labeling directions that it was FDA cleared for, and Itamar did not plead anything to the contrary. Thus, the FDA has cleared Ectosense to market NightOwl as a device that measures PAT and Itamar's Lanham Act claims to the contrary are precluded by the FDCA because for this claim to be successful, the jury would have to enter into a scientific finding opposite to that of the FDA.

**Tenth Affirmative Defense**: Preemption: NightOwl was cleared by the FDA in March 2020 with a finding that NightOwl is substantially equivalent to Itamar's WatchPAT. The basis of the FDA's decision to clear NightOwl is reflected in the 510(k) Summary for NightOwl published by the FDA at https://www.accessdata.fda.gov/cdrh_docs/pdf19/K191031.pdf, which explicitly states that NightOwl and WatchPAT both measure PAT. Thus, the FDA has cleared Ectosense to market NightOwl as a device that measures PAT and any state law claims sounding in false advertising or unfair and deceptive trade practices to the contrary are preempted by the FDCA.

**Eleventh Affirmative Defense**: Abandonment. Itamar abandoned the Claimed PAT Mark by failing to use it as a mark with no intent to resume using it as a mark. Rather than using PAT as a trademark, Itamar regularly and routinely used the Claimed PAT Mark as shorthand for the PAT physiological signal and the type, class, and/or category of devices that measure the PAT signal, not as a source identifying trademark. Specifically, peripheral arterial tone (PAT) is a physiological signal pertaining to, *inter alia*, changes in vasoconstriction. An HSAT device that performs peripheral arterial tonometry by measuring and analyzing PAT is a PAT-based device. Itamar consistently used PAT generically, descriptively and other than as a trademark throughout marketing, scientific journals, SEC filings, FDA submissions, and USPTO applications.  Itamar did not use PAT as a trademark for goods and its rampant non-trademark use demonstrates that Itamar did not intend to use PAT as a trademark. As a result, PAT has lost any ability to serve as a single source identifier for Itamar or its products. Thus, Itamar abandoned the Claimed PAT Mark.

**Twelfth Affirmative Defense**: Misue. Itamar has misued its Claimed PAT Mark to monopolize generic and descriptive references to the PAT physiological signal and the type, class, and/or category of devices that measure the PAT signal. Specifically, peripheral arterial tone (PAT) is a physiological signal pertaining to, *inter alia*, changes in vasoconstriction. An HSAT device that performs peripheral arterial tonometry by measuring and analyzing PAT is a PAT-based device. Itamar held patents on its PAT-based devices, but such patents have now expired and Itamar is and has been attempting to use the Claimed PAT Mark to block incoming competitors from entering the market for PAT-based HSATs. Itamar's anticompetitive goal is transparent and evidenced by its public announcements that competitors in the marketplace for PAT devices could cause significant consequences to Itamar. In a disclosure to the Israel Securities

Authorities in its 2016 annual report, Itamar stated: "It should be noted that the patent registered by the Company for the PAT signal […] will expire in July 2017 and there are likely to be significant consequences for the Company, should any entity start to develop PAT based products to compete with the Company's existing products."

Itamar's efforts to manipulate trademark law to block fair competition have included a comprehensive and inconsistent public misinformation campaign that, on information and belief, Itamar launched shortly after sending a cease and desist letter to Ectosense pertaining to PAT. After decades of using PAT in its generic sense relating to the physiology of peripheral arterial tone and type, class, and/or category of devices that measure PAT, once NightOwl was cleared for marketing in the United States by the FDA as a PAT-based device, Itamar launched a misinformation campaign attempting to undo decades of generic use of PAT. Itamar began editing its website appending "®" next to facially generic uses of PAT in its physiological and device classification sense. Itamar has even edited Wikipedia pages to support its new narrative that PAT is a "proprietary technology" rather than a physiological signal and type, class, or category of devices. Itamar's narrative of PAT being a trademark for "proprietary technology" as opposed to a generic description of the physiological signal is inconsistent with Itamar's own publications, applications to the USPTO, and filings with the SEC.

Much to the confusion of the relevant community that recognizes PAT as a generic acronym for peripheral arterial tone, Itamar has sent demand letters to individuals and entities that Ectosense engages with claiming that PAT is a "proprietary technology" to Itamar and a trademark. Itamar's misinformation campaign is harmful to the scientific discourse and study of further development of peripheral arterial tone. Itamar's unclean hands are further demonstrated

by the false advertising by Itamar of its own WatchPAT product as alleged in the Counterclaim below.

## COUNTERCLAIM

## JURISDICTION AND VENUE

1.     This is a civil action for cancellation of a federally registered trademark, unfair competition, and false advertising. The claims set forth herein arise from the Lanham Act, 15 U.S.C. §§ 1120 and 1125.

2.     Ectosense's claim for cancellation of a federally registered trademark set forth herein is a compulsory counterclaim.

3.     Ectosense's claims for unfair competition and false advertising are permissive counterclaims that are nevertheless substantially related to the subject matter of this litigation.

4.     The Court has subject matter jurisdiction over this action under 15 U.S.C. §§ 1119, and 1121, and 28 U.S.C. §§ 1331, 1332, and 1338. Specifically, this counterclaim involves actions for cancellation of a trademark registration, and actions that arise from federal law.

5.     Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

6.     Counter-Plaintiff Ectosense *nv* is a medical device manufacturer formed under the laws of Belgium.

7.     Counter-Defendant Itamar Medical Ltd. ("Itamar") is a limited corporation with a principal place of business in Caesarea, Israel.

8.     Itamar is subject to this Court's personal jurisdiction because Itamar has availed itself of this Court's jurisdiction by filing the underlying action, and because Itamar distributes its products in the State of Florida and has marketed its products in a false, unfair, and deceptive way in the State of Florida.

## FACTUAL ALLEGATIONS

9.      Ectosense applied for 510(k) clearance to market its device, NightOwl, on April 18, 2019 and ultimately received the FDA's 510(k) clearance on March 06, 2020 (K191031). A successor NightOwl device based on PAT again obtained 510(k) clearance on December 16, 2021 (K213463).

10.     NightOwl is a device that measures relative changes in the tone of the arteries in peripheral vascular beds, and analyzes such changes in peripheral arterial tone to detect the presence of sleep apnea.

### (a) *History of Peripheral Arterial Tone and Sleep Medicine*

11.     Peripheral arterial tone is correctly described as "a special physiological signal that mirrors changes in the autonomic nervous system (ANS) caused by respiratory disturbances during sleep."

12.     Itamar itself has publicly stated on its own website that "peripheral arterial tone" is "a special physiological signal that mirrors changes in the autonomic nervous system (ANS) caused by respiratory disturbances during sleep."

13.     More specifically, though, peripheral arterial tone is evaluated by analyzing the pulsatile volume changes at the fingertip that reflect changes in sympathetic tone. Peripheral is a reference to the location of the vascular beds found in peripheral tissue such as the fingertip, and arterial tone is a reference to the state of vasoconstriction of the arteries in the peripheral tissue, which can be associated to sleep disturbances.

14.     Peripheral arterial tonometry, as the suffix "metry" appended to the root word "tone" indicates, is a technique for measuring peripheral arterial tone.

15.     The term 'peripheral arterial tone' is descriptive, used when referring to the arterial tone of the periphery.

16.     'Arterial tone' (also known as 'tonus') is a nonspecific descriptive term, used in the same nonspecific descriptive sense that muscle tone (or 'tonus') is used.

17.     Sleep apnea is a condition marked by repeated cessations of breathing during sleep. An apneic event during sleep is characterized by a complete or partial reduction of breathing, oftentimes resulting in the decrease of oxygen saturation levels in the blood.

18.     A home sleep apnea test (HSAT) is a home-based test that can assist in the diagnosis of sleep apnea, often by detecting and analyzing physiological events corresponding to sleep apnea. The principal index of a home sleep apnea test is the 'Apnea-Hypopnea Index' (AHI), expressed as the number of sleep apnea events divided by sleep time.

19.     The AHI indicates the presence and severity of the patient's condition with a severity classification scheme of mild, moderate, or severe that is dictated by the AHI calculation.

20.     PAT, when analyzed with other physiological information such as increases in heart rate and decreases in oxygen saturation of the blood, can be used to detect sleep apnea events.

21.     When PAT is analyzed alongside the principles described above, the information is applied to estimate the AHI and indicate whether the wearer of the HSAT device suffers from sleep apnea, and, if so, how severe the patient's condition may be.

22.     Descriptions of peripheral arterial tone go back over a century.

23.     An article[2] in 1902 published on cardiac pain in The Lancet states: "That the arterial periphery under the influence of the nervous system varies in calibre, and therefore in permeability, is a fact too well recognized in physiology to be called in question […] That agents under the influence of which such **peripheral arterial tone** is reduced likewise relieve the central pain as been the gratifying experience of many since Sir Lauder Brunton[…]"

24.     The advent of detecting changes in vasoconstriction (i.e. changes in arterial tone) in peripheral tissue can be traced back to 1937 in the work of Hertzman[3] with his introduction of photo-plethysmography ("PPG").

25.     PPG is a bio-monitoring technique that uses optical sensors and light to perform non-invasive measurements of blood-volume changes in vascular tissue.

26.     Among the numerous potential uses for a photo-plethysmograph that Hertzman identified in 1937[2], he specifically observed that the device was able to detect changes in peripheral vascular system during rest, and that the results obtained with his then-new optical-sensor-based device were identical to other plethysmograph devices dominating the field at the time that used pneumatic (pressure) sensors.

27.     In a follow up paper in 1940[4], Hertzman *et al.* expanded upon the ways PPG could assist in detecting variations in peripheral arterial tone. Specifically, Hertzman connected vasoconstriction to breathing by showing that the peripheral arterial system undergoes constriction at the end of a deep breath resulting in the following chart:



[2] Morisson A., FOUR LECTURES ON THE NATURE, CAUSES, AND TREATMENT OF CARDIAC PAIN, *The Lancet*, 1902
[3] Hertzman A., PHOTOELECTRIC PLETHYSMOGRAPHY OF THE FINGERS AND TOES IN MAN, *Proceedings of the Society for Experimental Biology and Medicine,* 1937
[4] Hertzman A. and Dillon J., APPLICATIONS OF PHOTOELECTRIC PLETHYSMOGRAPHY IN PERIPHERAL VASCULAR DISEASE, *American Heart Journal,* 1940

28.     Scientists identified other information that could be gleaned from monitoring changes of peripheral arterial tone. For example, A.C. Burton and R.M. Taylor published a study in 1940[5] on the changes of peripheral vascular[6] tone and the relationship to regulating body temperature.

29.     Remarkably, in 1942[7], Hertzman already identified a relationship between sleep and arterial vasoconstrictions measured through PPG. Hertzman included the following chart to demonstrate the changes in arterial volume of a sleeping patient:



30.     Hertzman's relation of PPG to disturbed sleep is notable because it came several decades before what is widely considered as the first discovery of 'sleep apnea' in 1965 when two separate research groups in Europe related the condition to an obstruction of the upper airway during sleep. It would be more than thirty years after Hertzman's early work before the first organized body of knowledge gave birth to the new 'sleep medicine' discipline, with the pioneering 'American Sleep Disorder Association' emerging only in 1975.

---

[5] Burton A.C. and Taylor R.M., A STUDY OF THE ADJUSTMENT OF PERIPHERAL VASCULAR TONE TO THE REQUIREMENTS OF THE REGULATION OF BODY TEMPERATURE, *American Journal of Physiology,* 1940.

[6] The 1940 paper by A.C. Burton and R.M. Taylor used the term 'peripheral vascular tone', which in context of the research was synonymous with peripheral arterial tone. The vascular system is comprised of five main types of blood vessels: arteries, arterioles, capillaries, venules, and veins.

[7] Hertzman A. and Roth L, THE ABSENCE OF VASOCONSTRICTOR REFLEXES IN THE FOREHEAD CIRCULATION. EFFECTS OF COLD, *American Journal of Physiology,* 1942

31.     The chart Hertzman published reflects a prototypical PAT response during sleep in a snoring patient.

32.     In 1972, Lugaresi *et al.*[8] published a study analyzing the relationship between arousals from sleep and changes in peripheral arterial tone. Lugaresi specifically linked the occurrence of disturbed sleep to an increase in peripheral arterial tone (as measured by PPG), increases in the pulse rate, and the presence of an arousal.

33.     Over the following several decades, the medical and scientific community continued developing different methods of measuring and analyzing the physiological signals that can be instructive in the diagnosis of sleep apnea.

34.     In stark contrast to the decades of research into PAT predating Itamar's existence—research that Itamar's founder has cited in publications about PAT—Itamar claims to have coined peripheral arterial tone "in or around 1997 and introduced this measurement to the medical field." ECF 19 ¶ 1.

35.     Although Itamar previously enjoyed patent protection for its devices that measure peripheral arterial tone, and was the lone manufacturer of HSAT devices that measure PAT for many years, peripheral arterial tone itself is a physiological signal that no one company has dominion over.

36.     In March 2017, the American Academy of Sleep Medicine ("AASM") updated its clinical practice guidelines for diagnostic testing of obstructive sleep apnea and found that HSAT devices based on peripheral arterial tonometry with oximetry and actigraphy are technically adequate.

---

[8] Lugaresi E. et al., Some periodic phenomena arising during drowsiness and sleep in man., *Electroencephalography and Clinical Neurophysiology*, 1972

37.     Increased acceptance of the clinical sleep medicine community of these type of HSAT techniques resulted in a wider coverage by healthcare payors of the 'CPT' code 95800, which allows reimbursement for "Sleep study, unattended, simultaneous recording: heart rate, oxygen saturation, respiratory analysis (eg, by airflow or peripheral arterial tone), and sleep time."

38.     A few days after the AASM recognized PAT-based devices as technically adequate, Itamar issued a press release implying that the AASM had adopted Itamar's WatchPAT technology.

39.     The AASM promptly admonished Itamar and required Itamar to issue a clarification and apology, which Itamar did and the AASM republished on its own website.

40.     With respect to the press release in question, in March 2017 Itamar's CEO Gilad Glick issued a public apology that is irreconcilable with the representations to the Court in this case and current publications to investors. Mr. Glick stated:

> Certain language in the press release mistakenly implies that the new [2017] AASM clinical practice guideline formally endorses Itamar Medical's WatchPAT™ product. In fact, the new AASM guideline was solely referring to the Peripheral Arterial Tonometry (PAT) technology as technically adequate based on evidence, **and not to a specific product or device manufacturer**. Itamar Medical wishes to publicly and sincerely apologize for any potential misunderstanding and inconvenience this caused to the AASM, its members or their patients. (emphasis added)

41.     As recognized in Itamar's public apology, PAT is an acronym referring to medical devices that analyze peripheral arterial tone as a physiological signal that can be instructive in the diagnosis of sleep apnea, and does not and cannot function as an exclusive source indicator pointing to any "specific product or device manufacturer."

**(b) PAT is generic**

42.    PAT is a generic acronym that serves as shorthand for peripheral arterial tone and peripheral arterial tonometry, depending upon the context.

43.    Itamar does not claim exclusive trademark rights in the term "peripheral arterial tone" or "peripheral arterial tonometry."

44.    Itamar is unable to claim any exclusive trademark rights in the term "peripheral arterial tone" or "peripheral arterial tonometry."

45.    Itamar's use of "peripheral arterial tone (PAT)" on its own website indicates that "PAT" is an acronym for and synonymous with "peripheral arterial tone."

46.    PAT is an acronym for and synonymous with "peripheral arterial tone."

47.    PAT is an acronym for and synonymous with "peripheral arterial tonometry."

48.    PAT is a widely accepted physiological signal, not a source indicating term, and in the context of medical devices, relevant consumers primarily understand PAT to generally refer to the type, class, and/or category of medical devices that measure peripheral arterial tone.

49.    Itamar has used PAT in a generic sense throughout its patent and trademark applications and scientific publications, but even independent of Itamar there is also an abundance of scholarly literature discussing PAT from 1902 to the present day, and leading medical associations that currently recognize PAT-based devices as the type, class, and/or category of devices that measure and analyze peripheral arterial tone.

50.    Now that Itamar's patents have expired, Itamar is attempting to use trademark law to in an anticompetitive effort to monopolize the market for HSAT devices that measure and/or analyze PAT.

51.    Itamar's efforts to this end are deliberate because it knows that it has no protectable rights to prevent competition in the market for PAT-based devices.

52.     In a disclosure to the Israel Securities Authorities in its 2016 annual report, Itamar stated: "It should be noted that the patent registered by the Company for the PAT signal […] will expire in July 2017 and there are likely to be significant consequences for the Company, should any entity start to develop PAT based products to compete with the Company's existing products."

53.     Prior to the expiration of its patents, Itamar filed a trademark application with the USPTO to register the Claimed PAT Mark (U.S. Serial No. 77111195).

54.     In Itamar's Response to Office Action dated December 7, 2007 for Itamar's PAT trademark application (U.S. Serial No. 77111195), Itamar admitted to the USPTO that "PAT" was adopted by Itamar for use in connection with Itamar's medical devices "as a shorthand abbreviation for peripheral arterial tone technology."

55.     What Itamar did not disclose, divulge, or reveal to the USPTO during prosecution of Itamar's PAT trademark application is that the applied for goods consisted of medical testing kits consisting primarily of medical devices for measuring peripheral arterial tone. Itamar was less-guarded before the USPTO when it freely used the spelled-out version of the generic PAT term in Itamar's application to register its ITAMAR housemark (U.S. Reg. No. 4,756,014), which application described the Itamar WatchPAT medical devices in part as "medical testing kits consisting primarily of medical devices for measuring *peripheral arterial tone*. . . ." (emphasis added)

56.     Itamar also failed to disclose, divulge, or reveal to the USPTO during prosecution of Itamar's WatchPAT trademark application that the applied for goods consisted of medical testing kits consisting of primarily medical devices for measuring peripheral arterial tone.

57.     Because of the selective information that Itamar disclosed, divulged, and revealed to the USPTO about the goods during prosecution, Itamar is now the record owner of U.S. Registration No. 3,870,786 for the Claimed PAT Mark for use with "medical apparatus, namely, non-invasive, diagnostic units used to assess and measure body functions and states and physiological conditions which affect the vasculature" in International Class 10.

58.     On information and belief, had the USPTO known during prosecution of the Claimed PAT Mark that Itamar's applied-for goods actually assess and measure PAT (peripheral arterial tone), U.S. Registration No. 3,870,786 never would have issued.

59.     Despite Itamar's registration of the Claimed PAT Mark, PAT does not serve a source indicating function and is instead a generic abbreviation for peripheral arterial tone. The following serve as just a few examples of how the sleep medicine community uses PAT.

60.     Attached as Exhibit 1 is a true and correct copy of Itamar's web page located at www.itamar-medical.com/pat-peripheral-arterial-tone-technology, which states in relevant part that Itamar's HSAT device "utilizes Peripheral Arterial Tone (PAT), a special physiological signal that mirrors changes in the autonomic nervous system (ANS) caused by respiratory disturbances during sleep."

61.     Attached as Exhibit 2 is a true and correct copy of an excerpt from Itamar's Investor Presentation dated May 2020, located at https://ir.itamar-medical.com/static-files/60b02961-8eac-480c-8703-8bdb7ee49cb6, which stated on slide 36 that "the leading U.S. medical organization for the treatment of sleep disorders," the American Academy of Sleep Medicine (AASM), recognized PAT technology in its 2017 clinical practice guidelines, stating: "A technically adequate HSAT device incorporates a minimum of the following sensors: … peripheral arterial tonometry (PAT) . . . ."

62.     Exhibits 1-2 show examples of how Itamar's own website and promotional presentations treat the term "PAT" as synonymous with "peripheral arterial tone" and "peripheral arterial tonometry," depending on context, and use PAT generically to refer to a type, class, or category of HSAT device that is PAT-based.

63.     Attached as Exhibit 3 is a true and correct copy of the AASM Clinical Practice Guidelines for Diagnostic Testing for Adult Obstructive Sleep Apnea (2017), located at https://aasm.org/resources/clinicalguidelines/diagnostic-testing-osa.pdf, which also treats PAT as being synonymous with "peripheral arterial tonometry" – as a type, class, or category of device.

64.     The above clinical practice guidelines of Exhibit 3 show that the AASM—which Itamar recognizes as the "leading U.S. medical organization for the treatment of sleep disorders"—has adopted and uses "PAT" as the generic term referring to a type, class, or category of HSAT device that measures peripheral arterial tonometry. This is further confirmed by Itamar's public apology and retraction of its press release that implied the AASM was adopting Itamar's technology rather than PAT as a science independent of Itamar.

65.     Attached as Exhibit 4 is a true and correct copy of a study in 2013 by the peer-reviewed medical journal JAMA Otolaryngology–Head & Neck Surgery located at https://www.ncbi.nlm.nih.gov/pubmed/24158564, which analyzed fourteen studies that conducted sleep apnea tests that measured either PAT, or (PSG), to assess the "correlation between sleep indexes measured by a portable sleep-testing device (peripheral arterial tonometry [PAT]) and those measured by [polysomnography] PSG," and concluded that "respiratory indexes calculated using PAT-based portable devices positively correlated with those calculated from the scoring of PSG."

66.     Additionally, Itamar's now expired US Patent No. 6,916,289 and International Patent Cooperation Treaty Patent App. No. WO 2017/212370 contain generic use of "peripheral arterial tonometry" as a type of scientific measurement. Specifically, Itamar's patent and PCT application disclose methods and apparatus for monitoring "the **peripheral arterial tone**" of a patient's body "manifested by changes in the arterial blood volume in a terminal extremity of a body part, preferably a digit (finger or toe) of the patient."

67.     The above peer-reviewed medical journal study in Exhibit 4 shows that, at least since 2013, the term "PAT" (or "PAT-based") has been used and understood in the field of sleep apnea diagnosis as referring generically to a type, class, or category of HSAT device that diagnoses sleep apnea by measuring PAT.

68.     Simply summarized, PAT is the acronym for peripheral arterial tone/tonometry, and a PAT-based device represents and is understood by the relevant public as a recognized type, class, and/or category of HSAT device, not a brand or exclusive trademark for such a device.

### (c) _Medical diagnostic devices for sleep apnea and Itamar's false advertising_

69.     The most accurate and reliable method of diagnosing sleep apnea involves monitoring a patient's sleep in a laboratory. These tests require that a patient travel to a medical facility and be connected to an array of sensors appended to the head, nose, chest, belly, finger, and foot. This testing method is known as an in-lab Polysomnography ("PSG"), and although the inconvenience of being connected to an array of sensors in a sleep laboratory is often an obstacle for many patients, the PSG remains the most accurate diagnostic tool for sleep disorders.

70.     While HSATs cannot provide the same level of detail or accuracy that PSGs can, they do provide a critical and more convenient alternative for patients and can nevertheless aid in the detection and classification, or exclusion, of obstructive sleep apnea.

71.     Importantly, although HSATs are used to detect sleep apnea, they are not a substitute for the more elaborate gold-standard PSG because the latter takes into account a variety of other, more complex, sleeping disorders.

72.     For this reason, validation studies of HSAT actually involve simultaneous PSG and HSAT monitoring to assess the HSAT's accuracy when compared to the PSG to determine overall diagnostic accuracy of the HSAT equipment. Accuracy relates to the precision with which the HSAT device correctly identified the presence (or absence) of sleep apnea and the relative severity classification (i.e. mild, moderate, severe) when benchmarked against a PSG.

73.     As set forth below, Itamar deceives the public with false advertising about (i) WatchPAT's utility and diagnostic accuracy; and (ii) the availability of other HSAT devices.

i.      ***Itamar falsely advertises WatchPAT as having the "accuracy of PSG" and as being 97% accurate.***

74.      Itamar commercially advertises that WatchPAT has "the simplicity of a pulse oximeter" and the "accuracy of PSG."

75.     For example, Itamar's promotional materials distributed through marketing webinars to the market represents that WatchPAT accuracy is equivalent to that of a PSG:



76.     Itamar makes the same claims of having "the simplicity of pulse oximetry and the accuracy of PSG" in its marketing materials on its website that are currently accessible at https://www.itamar-medical.com/articles/testing-your-patients-sleep-apnea-at-home/.

77.     WatchPAT does not have the accuracy of a PSG and this claim is literally false.

78.     The advertisement is also misleading because it signals that the utility of WatchPAT as an HSAT is comparable to the wider utility of a PSG. This is misleading because a PSG system monitors a wider variety of physiological processes and can detect more complex sleep disorders than WatchPAT can.

79.     An important distinction between WatchPAT and PSG testing is that PSG directly measures sleep time through an EEG sensor while WatchPAT uses the actigraphy technique to estimate sleep time.

80.     An EEG detects brain activity to directly monitor sleep time, whereas actigraphy is primarily based on detecting movement of the limbs to indirectly estimate sleep time.

81.     Actigraphy is a technique commonly found in most modern HSAT equipment.

82.   Itamar refers to its actigraphy-based sleep time estimate as 'True Sleep Time'.

83.   Itamar markets True Sleep Time as a unique feature among HSAT equipment despite the fact that it is actigraphy-based.

84.   Itamar necessarily implies with its usage of "true", that WatchPAT's estimate of sleep time is equivalent to the actual sleep time derived from a device that incorporates an EEG sensor, such as the PSG.

85.   However, peer-reviewed clinical papers establish that the correlation between the 'True Sleep Time' from WatchPAT and the gold-standard PSG's direct measure of total sleep time is merely 68%.

86.   Itamar's marketing of a capability to measure 'true' sleep time is literally false, and misleads buyers into thinking that the correlation between WatchPAT's output and the gold-standard measurement is near-perfect.

87.   In a further attempt to mislead buyers into believing that Itamar's estimate of sleep is equivalent in performance to the real registration of sleep as performed by a PSG, Itamar claims that its actigraphy-based "True Sleep Time" "avoids a 20% misdiagnosis".

88.   Here is one example of Itamar marketing on its website that falsely states that Itamar's devices calculate AHI using the purported "True Sleep Time":



89.     Itamar's deployment of the term true sleep time when it in fact uses actigraphy is misleading, and Itamar's related claim of preventing 20% misdiagnosis is literally false.

90.     Itamar is deliberate in its false and misleading advertising.

91.     Itamar's willful intent is evidenced by the fact that it does not make the same types of misrepresentations about PSG-like accuracy when engaging with federal agencies such as the FDA and SEC, but routinely makes them in commercial advertisements.

92.     In one striking example, the Securities of Exchange Commission (SEC) Division of Corporation Finance wrote to Itamar on September 14, 2018 and on October 26, 2018, noting that the division could not find support in relation to claims of "PSG-like Accuracy" in an investor prospectus filed with the SEC. Apparently more fearful for the Sarbanes-Oxley Act than of the Lanham Act, Itamar removed the false and misleading language to comply with the SEC request, only to maintain it throughout its commercial advertising.

93.     Consistent with Itamar's broader marketing strategy to hold WatchPAT out as superior to other HSAT equipment on the market, Itamar advertises its WatchPAT as having 84 – 97% accuracy.

94.     Attached as Exhibit 5 is an advertisement Itamar published online and circulated through sponsored email blasts from industry magazines in December 2020 wherein Itamar makes the claim of WatchPAT being 84 – 97% accurate.

95.     The largest clinical validation study of WatchPAT ever conducted[9], was published in October 2020 and found that WatchPAT's diagnostic accuracy was a mere 53%.

96.     Itamar's advertisement of WatchPAT as achieving up to 97% accuracy is literally false.

97.     Itamar is deliberate in its false and misleading advertising of WatchPAT's diagnostic accuracy claims of "84%-97% accuracy" and purported PSG-like accuracy.

ii.     ***Itamar misleads the market by advertising WatchPAT as the only fully-disposable HSAT.***

98.     Itamar markets its fully-disposable WatchPAT as the "only" disposable HSAT.

99.     In just one example, during the industry's annual conference at 'SLEEP 2020' in August 2020, Itamar distributed marketing materials through its digital booth that described the WatchPAT as "the first and only disposable HSAT".

100.     This is meaningful because demand for disposable HSAT grew due to the threat of COVID-19. Indeed, throughout its presentations to investors in 2020, Itamar's claims that WachPAT ONE "is the only commercially available disposable HSAT device" and that the company experienced a "surge in demand" for the disposable device as a result of the COVID-19 pandemic restricting sleep physician's ability to use re-usable HSAT equipment.

---

[9] Ioachimescu O. et al., Performance of peripheral arterial tonometry-based testing for the diagnosis of obstructive sleep apnea in a large sleep clinic cohort., *Journal of Clinical Sleep Medicine*, 2020.

101.    NightOwl is a fully-disposable HSAT device.

102.    Itamar's claim to offer the only fully-disposable HSAT is literally false, and designed to mislead the market such that Itamar would be perceived as the only provider of disposable HSAT equipment at a time that sleep physicians needed disposable HSAT equipment more than ever.

103.    Itamar is deliberate in its false and misleading advertising.

104.    Itamar commenced this litigation shortly after the FDA issued 510(k) clearance in March 2020 for Ectosense to market NightOwl in the U.S., and directly alleged that NightOwl was cleared by the FDA and that Ectosense was marketing NightOwl in the U.S.

105.    Moreover, Itamar alleged to this Court as early as June 2020 that "Ectosense has also recently begun distributing marketing materials promoting the NightOwl product to "physicians in all 50 states" and claimed that its "multi-use Disposable Home Sleep Apnea Testing HSAT" device is "now shipping." ECF 19 ¶ 36.

106.    Itamar's marketing of WatchPAT as the only disposable HSAT is literally false.

**COUNT I — Declaratory Judgment**
**(no infringement or false designation of origin)**
**(28 U.S.C. §§ 2201 et seq.)**

107.    Ectosense repeats and re-alleges paragraphs 1 through 106 as though fully set forth herein.

108.    A substantial, immediate, and real controversy exists between Ectosense and Itamar based, in part, on Itamar's allegations in this case that Ectosense has infringed upon Itamar's trademark rights by describing NightOwl as "PAT-based according to AASM Guidelines."

109.    Ectosense's accurate description of NightOwl as "PAT-based according to AASM Guidelines" did not constitute trademark infringement or false designation of origin.

110.    Ectosense was describing the category of devices that NightOwl belongs—devices that measure peripheral arterial tone.

111.    Ectosense is entitled to judgment declaring that its marketing, offering for sale, and sale of the NightOwl as a PAT-based device does not infringe, and has not infringed, Itamar's Claimed PAT Mark.

112.    Ectosense is entitled to judgment declaring that its marketing, offering for sale, and sale of the NightOwl as a PAT-based device does not constitute a false designation of origin.

**COUNT II — Declaratory Judgment of Invalidity and Cancelation of Registration**
**(PAT is generic)**
**(15 U.S.C. §§ 1052, 1064, 1119; 28 U.S.C. § 2201)**

113.    Ectosense repeats and re-alleges paragraphs 1 through 106 as though fully set forth herein.

114.    Itamar's Claimed PAT Mark shown in Itamar's U.S. Trademark Registration No. 3,870,786 (the "Registration") is generic for the type, class, and/or category of devices that

1898596v2 998877.0001

measure peripheral arterial tone (i.e. PAT-based medical devices), including the medical devices identified in the Registration, "medical apparatus, namely, non-invasive, diagnostic units used to assess and measure body functions and states and physiological conditions which affect the vasculature" (the "Registered Goods").

115.    PAT is not distinctive and does not uniquely identify Itamar as the source of a good.

116.    Because the relevant market understands PAT refers to peripheral arterial tone and the type, class, and/or category of devices that measure peripheral arterial tone, Ectosense and others have a legitimate need and right to freely use PAT without Itamar's permission in order to identify the physiological signal and class of devices that PAT represents.

117.    PAT primarily refers to the medical devices that perform calculations of peripheral arterial tone, including the Registered Goods, and, thus, any terminology other than PAT would be unwieldy, clinically imprecise, awkward, and not the primary or most easily understood term that relevant consumers would use instinctively and naturally to identify the type, class, and/or category of medical devices that measure PAT.

118.    Third parties regularly use PAT in the sleep medicine community in a generic sense as shorthand for peripheral arterial tone and the type, class, and/or category of HSATs that measure peripheral arterial tone. This includes, without limitation, third-party payor reimbursement codes, academic publications studying peripheral arterial tone and tonometry, and the AASM guidelines.

119.    Itamar itself regularly and consistently used, and still uses, PAT in a generic sense throughout its own website, in applications to the USPTO, in filings with the SEC, and in applications to the FDA, in connection with the Registered Goods.

120.    Ectosense has been and is being damaged by Itamar's claim of exclusive trademark rights in an invalid, unprotectable, and unenforceable designation that the relevant consumers primarily understand to be generic for the Registered Goods.

121.    Ectosense is entitled to an order and declaratory judgment pursuant to 28 U.S.C. §§ 2201-02 and 15 U.S.C. §§ 1052, 1064, 1119, including that (a) the Claimed PAT Mark is invalid, unprotectable, and unenforceable mark on the ground of genericness, and (b) that the Director of the USPTO shall direct the cancelation of Itamar's Registration on the ground of genericness according to this Court's power over trademark registrations pursuant to 15 U.S.C. § 1119.

**COUNT III — Federal Unfair Competition**
**(false advertising)**
**15 U.S.C. § 1125(a)(1)(B)**

122.    Ectosense repeats and re-alleges paragraphs 1 through 106 as though fully set forth herein.

123.    Itamar regularly distributes false, deceptive, and misleading commercial advertisements relating to the utility and accuracy of its devices.

124.    Specifically, Itamar misrepresents WatchPAT as having "the accuracy of a PSG", measuring "True Sleep Time", and that WatchPAT achieves up to a "97%" accuracy.

125.    Itamar's advertisements are misleading.

126.    Itamar's false and misleading advertisements are objectively and demonstrably literally false.

127.    Itamar's false and misleading advertisements are material as they attempt to portray Itamar devices as superior to other HSAT devices by misrepresenting crucial attributes of Itamar's devices and the availability of other disposable HSATs.

128.    Itamar's false and misleading advertisements do deceive and are likely to deceive a substantial portion of the relevant purchasing market.

129.    Itamar's false and misleading advertisements are likely to influence purchasing decisions among the relevant purchasing market.

130.    Itamar's false and misleading advertisements have deceived and unless restrained will continue to deceive the relevant purchasing public, including medical professionals, governmental and commercial payors, consumers, and retailers.

131.     Unless Itamar's false and misleading advertisements are restrained, Itamar will continue to injure Ectosense and the public, including medical professionals, governmental and commercial payors, consumers, and retailers, causing damages to Ectosense in an amount to be determined at trial.

132.    Ectosense has no adequate remedy at law to fully compensate it for the damages caused by Itamar's false and misleading advertisements.

133.    Ectosense is entitled to an injunction preventing Itamar from continuing its false and misleading advertisements.

134.    Further, Ectosense is entitled to a disgorgement of Itamar's profits pursuant to 15 U.S.C. §1117(a).

135.    Itamar has publicly announced that "U.S. WatchPAT revenue for the full year ended December 31, 2020 is expected to range from $31.6 million to $31.9 million, reflecting growth of 41% to 42% (and growth of 48% to 49%, excluding a one-time $1 million sale in 2019 to Kaiser Permanente) compared to $22.4 million in 2019."

136.    Ectosense is entitled to an order (i) requiring Itamar to account for any and all profits derived from its false and misleading advertising, to be multiplied in accordance with the

applicable provisions of law; and (ii) awarding all damages sustained by Ectosense that were caused by Itamar's conduct.

137.    Ectosense is entitled to an award of attorneys' fees and costs.

138.    Itamar's acts of false advertising are willful, intentional, and egregious, and make this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

## **Prayer**

WHEREFORE, Ectosense *nv*, by and through the undersigned counsel, hereby respectfully demands judgment against Itamar Medical Ltd:

a.  Declaring that Ectosense's marketing of NightOwl as a PAT-based device does not constitute trademark infringement or false designation of origin.

b.  Declaring that the Claimed PAT Mark is invalid, unprotectable, and unenforceable mark on the ground of genericness;

c.  Ordering the Director of the USPTO to direct the cancelation of Itamar's U.S. Registration No. 3,870,786 for the Claimed PAT Mark on the ground of genericness;

d.  Finding that, by the acts complained of above, Itamar has materially misrepresented the WatchPAT device technical abilities, clinical performances, and competitive landscape;

e.  Finding that, by the acts complained of above, Itamar's material misrepresentations in its advertising of the WatchPAT device were willful, designed to mislead, systematic, and coordinated by senior management;

f.  Awarding Ectosense damages caused by Itamar for its false advertising;

g.  Awarding Ectosense a disgorgement of Itamar's profits;

h.  Enjoining Itamar from:

      a.   advertising that WatchPAT has the equivalent accuracy of PSG;

      b.   advertising WatchPAT's sleep estimate as the 'true' sleep time;

      c.   advertising that Itamar is the only provider of fully-disposable HSAT equipment; and

      d.   advertising false and unsupported accuracy rates for the WatchPAT devices;

i.   Requiring Itamar Medical to disclose in all its marketing materials for a period of 5 years that its accuracy cannot be relied upon for a diagnosis of sleep apnea and that a follow-up test may be warranted;

j.   Awarding Ectosense *nv* its reasonable attorneys' fees in connection with this action; and

k.   Awarding any such further relief this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ectosense *nv* demands a trial by jury.

1898596v2 998877.0001

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 14th day of January, 2022, I electronically filed the

foregoing document with the Clerk of Court using CM/ECF.

/s/ *Seth J. Donahoe*
**PAUL O. LOPEZ**
Florida Bar #983314
pol@trippscott.com
**SETH J. DONAHOE**
Florida Bar #1004133
sjd@trippscott.com
**TRIPP SCOTT, P.A.**
110 S.E. 6th Street, 15th Floor
Ft. Lauderdale, FL 33301
(954) 525-7500 telephone
(954) 761-8475 facsimile **SERVICE**

1898596v2 998877.0001

**SERVICE LIST**
**CASE NO: 20-cv-60719-WPD**

| **Counsel for Plaintiff:** | **Counsel for Defendant ECTOSENSE:** |
|---|---|
| LAURA GANOZA, ESQ. | PAUL O. LOPEZ, ESQ. |
| Florida Bar No. 0118532 | eservice@trippscott.com (primary) |
| lganoza@foley.com | pol@trippscott.com (secondary) |
| atownsend@foley.com | sxc@trippscott.com (secondary) |
| HAWWI EDAO, ESQ. | SETH J. DONAHOE, ESQ. |
| Florida Bar No. 1026550 | eservice@trippscott.com (primary) |
| hedao@foley.com | sjd@trippscott.com (secondary) |
| hmoreno@foley.com | sgc@trippscott.com (secondary) |
| **FOLEY & LARDNER LLP** | B. GEORGE WALKER, ESQ. |
| One Biscayne Tower, Suite 1900 | bgw@trippscott.com |
| 2 South Biscayne Boulevard | sxc@trippscott.com |
| Miami, Florida 33131 | cab@trippscott.com |
| (305) 482-8400 | Tripp Scott, P.A. |
| (305) 482-8600 (fax) | 110 SE 6th Street, 15th Floor |
| | Fort Lauderdale, FL  33301 |
| | Telephone:  (954) 525-7500 |
| **Co-Counsel for Plaintiff:** | Telefax:  (954) 761-8475 |
| | |
| JESSICA N. WALKER, ESQ. | |
| jwalker@foley.cOM | |
| **FOLEY & LARDNER LLP** | **Co-Counsel for Defendant ECTOSENSE:** |
| 555 South Flower Street, Suite 3300 | |
| Los Angeles, CA 90071-2418 | Stephen Baird, Esq. |
| (213) 972-4675 | (*pro hac vice to be filed*) |
| | GREENBERG TRAURIG, LLP |
| GENE KLEINHENDLER, ESQ. | 90 South 7th St., Suite 3500 |
| gene@gk-ad.com | Minneapolis, MN  55402 |
| ANNA ADAMSKY, ESQ. | bairds@gtlaw.com |
| anna@gk-ad.com | |
| **GK ADVISORY** | Paul B. Ranis, Esq. |
| 72 Ahad Haam St. | Florida Bar No. 64408 |
| Tel Aviv 6520512, Israel | GREENBERG TRAURIG, P.A. |
| (972) 3-735-6168 | 401 E. Las Olas Boulevard, Suite 2000 |
| | Fort Lauderdale, Florida 33301 |
| | ranisp@gtlaw.com |
| | scottlaw@gtlaw.com |
| | FLService@gtlaw.com |
| | |
| | ***Counsel for VirtuOx Inc.*** |
| | |
| | Jonathan B. Morton |
| | Florida Bar No. 956872 |

1898596v2 998877.0001

|  | Jonathan.Morton@klgates.com<br>**K&L Gates LLP**<br>Southeast Financial Center<br>200 South Biscayne Boulevard, Suite 3900<br>Miami, Florida 33131-2399<br>Telephone: 305-539-3357<br><br>Darlene F. Ghavimi, *Admitted Pro Hac Vice*<br>Texas Bar No. 24072114<br>Darlene.Ghavimi@klgates.com<br>Stewart Mesher, *Admitted Pro Hac Vice*<br>Texas Bar No. 24032738<br>Stewart.Mesher@klgates.com<br>**K&L GATES LLP**<br>2801 Via Fortuna Suite 350<br>Austin, Texas 78746-7568<br>Telephone: (512) 482-6919 |
| --- | --- |

1898596v2 998877.0001